## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## ST. CROIX DIVISION

| | |
|---|---|
| ERIC MARTIN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiff, <br> vs. <br><br> ALTISOURCE RESIDENTIAL CORPORATION, WILLIAM C. ERBEY,  ASHISH PANDEY, KENNETH D. NAJOUR,  ROBIN N. LOWE, AND RACHEL M. RIDLEY, <br><br> Defendants. | CASE No.: <br><br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br><br> **JURY TRIAL DEMANDED** |

### COMPLAINT FOR VIOLATIONS OF
### THE FEDERAL SECURITIES LAWS

Plaintiff Eric Martin, individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Altisource Residential Corporation ("RESI" or the "Company"), as well as media reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased RESI securities between February 7, 2013  and January 23,

1

2015, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78a *et seq*. (the "Exchange Act") and Rule 10b-5 against the Company and certain of its officers and directors.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

3.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the Company is headquartered in and conducts business in this district.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff Eric Martin, as set forth in the attached certification, purchased RESI securities at artificially inflated prices during the Class Period and has been damaged upon the revelation of the alleged corrective disclosures. *See* Ex. 1, Eric W. Martin Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Law.

6.       Defendant RESI is a Maryland Corporation with its principal executive offices located at 402 Strand Street, Frederiksted, United States Virgin Islands. RESI was originally incorporated as a wholly-owned subsidiary of Altisource Portfolio Solutions S.A. ("Altisource"),

but separated from Altisource on December 21, 2012 and became an independent publicly traded company. RESI common stock is traded on the NYSE under the ticker symbol "RESI."

7.    Defendant William C. Erbey ("Erbey") served as the Chairman of the Board of Directors at RESI from the beginning of the Class Period until his resignation became effective on January 16, 2015. During the Class Period, he also served as Chairman of the Board of the Directors for AAMC, HLSS, and Ocwen.

8.    Defendant Ashish Pandey ("Pandey") is the Company's Chief Executive Officer ("CEO"). During the Class Period, Defendant Pandey also served as CEO of Altisource Asset Management Corporation ("AAMC").

9.    Defendant Kenneth D. Najour ("Najour") was the Company's Chief Financial Officer ("CFO") from the beginning of the Class Period until October 8, 2014 when he was redesignated as Chief Accounting Officer of RESI. He was also the CFO for AAMC.

10.    Defendant Rachel M. Ridley ("Ridley") was the Company's CFO prior to Defendant Najour.

11.    Defendant Robin N. Lowe ("Lowe") is RESI's current CFO assuming the position on October 8, 2014.

12.    Defendants RESI, Erbey, Pandey, Najour, Lowe, and Ridley are collectively referred to herein as "Defendants."

13.    The Defendants Erbey, Pandey, Najour, Lowe, and Ridley are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

3

14.     RESI has a unique arrangement with the companies AAMC and Ocwen Financial Corporation ("Ocwen"). Each of these companies depends upon each other for survival. RESI derives its revenue from Ocwen and AAMC derives its revenue from RESI therefore AAMC indirectly derives its revenue from Ocwen. RESI's success is based on Ocwen's business and operations. AAMC's success is based on RESI's business and operations.

15.     Additionally, Home Loan Servicing Solutions, Ltd. ("HLSS") is another company intertwined with RESI, Ocwen, and AAMC. HLSS acquires mortgage servicing assets from Ocwen as a residential mortgage loan servicer. HLSS's mortgage servicing assets are servicing advances, mortgage servicing rights, rights to mortgage servicing rights, and other related assets.

16.     RESI, AAMC, and HLSS rely upon and derive revenue from the operations and workings of Ocwen.

17.     A diagram of the structure between AAMC, RESI, and Ocwen is demonstrated in the following graphic found in RESI's Form 10-K for the year ending December 31, 2013 (the "RESI 2013 Form 10-K"):



18.     RESI is a real estate investment trust ("REIT") that acquires and manages single-family rental properties throughout the United States.

19.     RESI's business is purchasing loan portfolios from Ocwen. RESI and Ocwen entered into a 15-year servicing agreement (the "Servicing Agreement") in which Ocwen transfers non-performing loans to RESI and RESI pays a servicing fee and expense reimbursement to Ocwen.

20.     As stated in the RESI 2013 Form 10-K, through its relationship with Ocwen, RESI employs various loan resolution methodologies with respect to our residential mortgage loans, including loan modification, collateral resolution and collateral disposition.

21.     Ocwen is a financial services holding company that engages in servicing and originating forward and reverse mortgage loans. Ocwen's servicing segment provides residential and commercial mortgage loan servicing, special servicing, and asset management services to owners of mortgage loans and foreclosed real estate. Ocwen's servicing segment's residential servicing portfolio includes conventional, government insured, and non-agency loans, such as subprime loans. Ocwen's lending segment is involved in originating and purchasing conventional and government insured residential forward, and reverse mortgage loans primarily through its correspondent lending arrangements, as well as offers direct lending services.

22.     AAMC is the asset manager for RESI. For a management fee and expense reimbursement, AAMC advises RESI on making and managing real estate investments and provides corporate governance services.

23.     Stated in the RESI 2013 Form 10-K, substantially all of RESI's investment activities are conducted by AAMC pursuant to the 15-year asset management agreement that RESI and AAMC entered on December 21, 2012 (the "Asset Management Agreement").

5

24.     RESI, AAMC, and Ocwen each had the same Director and Chairman of the Board, Defendant Erbey, until his forced resignation effective on January 16, 2015. His resignation was announced on December 22, 2014.

25.     Not only was Defendant Erbey Chairman of RESI, AAMC, and Ocwen, he was also the control person and largest individual shareholder of the three companies.

26.     In addition to having the same Chairman during the Class Period, RESI and AAMC had the same CEO, Defendant Pandey, as well as CFO, Defendant Najour, until he changed his position to RESI's Chief Accounting Officer.

27.     The New York Department of Financial Services ("NY DFS") began investigating Ocwen in 2011 for violations of New York State laws and regulations.

28.     Ocwen and NY DFS entered into an Agreement on Mortgage Servicing Practices on September 1, 2011. When Ocwen violated this 2011 Agreement, Ocwen entered into a Consent Order with NY DFS on December 5, 2012. That Consent Order required Ocwen to retain an independent compliance monitor for two years to conduct a comprehensive review of Ocwen's servicing operations.

29.     To resolve the wrongdoings and illegal conduct the NY DFS found at Ocwen, Ocwen entered into a Consent Order and settlement with the NY DFS on December 22, 2014 to resolve *In the Matter of Ocwen Financial Corporation, Ocwen Loan Servicing, LLC*.

30.     The Consent Order stated that the NY DFS had investigated Ocwen's deficiencies in its mortgage servicing practices including, but not limited to, missing documents, inappropriate affidavits, wrongful foreclosure, and initiating foreclosures without proper documentation and notice.

31.     As a condition of a settlement with the NY DFS and Ocwen, Defendant Erbey was required to resign as Chairman for RESI, AAMC, HLSS, and Ocwen and other companies in which he held that position.

32.     Ocwen and its management, including Defendant Erbey, were aware of NY DFS's investigation since 2011. Considering the overlap in management and RESI's dependence on Ocwen, it is impossible that Defendants were unaware of NY DFS's investigation of Ocwen and the severity of the illegal actions it which it was engaged.

33.     The release of the Consent Order in December 2014 harmed RESI's shareholders.

34.     Furthermore, Defendants must have been aware that the California Department of Business Oversight ("DBO"), had been in the process of determining whether to revoke Ocwen's mortgage servicing license since October 2014.

35.     On January 23, 2015, the DBO entered into a settlement with Ocwen to end the process of suspending Ocwen's mortgage license. The terms of the settlement were that the DBO would cease its effort to suspend Ocwen's mortgage license in exchange for $2.5 million from Ocwen. Additionally, Ocwen would be prohibited from engaging new California customers until the DBO determines it is in compliance with state laws like the California Residential Mortgage Lending Act and the 2012 Homeowner Bill of Rights. The DBO maintains the right to pursue enforcement against Ocwen if after an audit of the loan files reveals violation so the California laws.

36.     On January 23, 2015 BlueMountain Capital Management, LLC ("BlueMountain"), a hedge fund, sent HLSS and Ocwen a notice of default on certain Series 2012-T2 and Series 2013-T3 Notes issued in connection with HLSS Servicer Advance Receivables Trust ("HSART Trust"). Due to Ocwen's violation of laws and regulations, HLSS was in breach of provisions of

the Indenture and Master Subservicing Agreement ("Agreement") dated February 10, 2012. It was therefore also in breach of provisions in the Sixth Amended and Restated Indenture dated January 17, 2014.

37.     Events affecting HLSS and Ocwen are so intertwined with RESI that they have a detrimental impact upon RESI's shareholders.

## Defendants Make Materially False Statements Regarding RESI's relationship with Ocwen

38.     On February 7, 2013 the Company filed its Form 10-K with the SEC for the year ending December 31, 2012 (the "RESI 2012 Form 10-K"). The RESI 2012 Form 10-K was materially false and misleading because RESI failed to adequately disclose its reliance on Ocwen and risks relating to its relationship with Ocwen including, but not limited to, that Ocwen was not properly servicing and selling loans, that Ocwen was under investigation by regulators for violating state and federal laws regarding servicing of loans, and Ocwen's system lack of internal controls.

39.     The RESI 2012 Form 10-K was signed by Defendants Pandey, Ridley, and Erbey. Attached to the RESI 2012 Form 10-K were Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Defendants Pandey and Ridley attesting to the accuracy of the RESI 2012 Form 10-K.

40.     On February 20, 2014 the Company filed the RESI 2013 Form 10-K with the SEC for the year ending December 31, 2013. Again, the RESI 2013 Form 10-K was materially false and misleading because RESI failed to adequately disclose its reliance on Ocwen and risks relating to its relationship with Ocwen including, but not limited to, that Ocwen was not properly servicing and selling loans, that Ocwen was under investigation by regulators for violating state and federal laws regarding servicing of loans, and Ocwen's system lack of internal controls.

8

41.     The RESI 2013 Form 10-K was signed by Defendants Erbey, Pandey and Najour. Attached to the RESI 2013 Form 10-K were SOX certifications signed by Defendants Pandey and Najour attesting to the accuracy of the RESI 2013 Form 10-K.

42.     Defendants knew that Ocwen was violating laws and regulations relating to foreclosure governance, implementation of modification programs, record keeping, required notifications, and charging unallowable fees but never disclosed this to investors.

43.     Ocwen's lack of adherence to regulations severally damaged its business which, because of the relationship between the companies, adversely affected RESI shareholders.

44.     Based on the corporate structure, relationships, and overlapping membership of Boards of Directors of RESI, AAMC, and Ocwen, Defendants were aware that Ocwen was engaged in illegal conduct. Although Defendants knew of Ocwen's illegal conduct and that RESI derived substantial, if not all, of its revenue from Ocwen, Defendants did not adequately inform investors of Ocwen's internal control weaknesses.

**<u>Additional Allegations Supportive of Scienter</u>**

45.     Pursuant to the Asset Management Agreement, RESI agreed to compensate AAMC for managing RESI's portfolio of loans and residential assets on the last day of each fiscal quarter (the "Incentive Fee").

46.     The Asset Management Agreement benefits AAMC to the detriment of RESI shareholders. The Asset Management Agreement encourages the Individual Defendants to engage in improper related party transactions in the form of the Incentive Fee and RESI's severe overpayment for the services rendered by AAMC.

9

47.     Under Section 4(a) of the Asset Management Agreement, RESI shall pay AAMC an Incentive Fee of between 2% to 50% of "the amount of cash dividends paid by [RESI] to its shareholders." The Incentive Fee is structured so that the more assets RESI acquires and the better the returns on such assets, the greater the fee for AAMC.

48.     However, AAMC's Incentive Fee is not calculated from the dividends paid to RESI's shareholders each quarter as Section 4(a) seems to suggest. Rather, an obfuscated methodology is used. Under Section 4(b) of the Asset Management Agreement, it states "for the purposes of [calculating AAMC's Incentive Fee], [RESI] shall be deemed to have made quarterly distributions to its shareholders of all of its Available Cash."

49.     Under Section 4(c) of the Asset Management Agreement, Available Cash is defined as follows:

(c)     For purposes of this Section 4, the following terms shall have the following meanings:
(i)     "Available Cash" shall mean, with respect to any fiscal quarter:
    A.     the sum of:
        (1)     all cash receipts of Residential during such quarter from all sources (including, without limitation, distributions of cash received from the Partnership and cash
        (2)     any reduction in reserves with respect to such quarter from the level at the end of the prior quarter;
    B.     less the sum of:
        (1)     all cash disbursements of Residential during such quarter, including, without limitation, disbursements for operating expenses, taxes, if any, debt service (including, without limitation, the payment of principal, premium and interest), capital expenditures and contributions, if any, to the Partnership; and
        (2)     any reserves established with respect to such quarter, and any increase in reserves established with respect to prior quarters, in such amounts as the Board of Directors determines in its reasonable discretion to be necessary or appropriate (x) to provide for the

proper conduct of the business of Residential and its subsidiaries (including, without limitation, reserves for future capital expenditures or the purchase or other acquisition of Real Estate Assets) or (y) because the distribution of such amounts would be prohibited by applicable law or by any loan agreement, security agreement, mortgage, debt instrument or other agreement or obligation to which Residential or any of its subsidiaries is a party or by which any of them is bound or by which any of their assets are subject.

Notwithstanding the foregoing, "Available Cash" with respect to any fiscal quarter shall include any cash receipts (to the extent such cash receipts are attributable to transactions and operations during such quarter) received by Residential after the end of such quarter.

50.    According to the RESI 2013 Form 10-K filed with the SEC on February 20, 2014,

the Incentive Fee is described as follows:

**Incentive Management Fee**
Under the asset management agreement, we pay AAMC quarterly incentive management fees as follows:

i.     2% of all cash available for distribution by us to our stockholders and to AAMC as incentive management fees, which we refer to as "available cash," until the aggregate amount per share of available cash for the quarter (based on the average number of shares of our common stock outstanding during the quarter), which we refer to as the "quarterly per share distribution amount," exceeds $0.161, then

ii.    15% of all additional available cash for the quarter until the quarterly per share distribution amount exceeds $0.193, then

iii.   25% of all additional available cash for the quarter until the quarterly per share distribution amount exceeds $0.257, and thereafter

iv.    50% of all additional available cash for the quarter; in each case set forth in clauses (i) through (iv), as such amounts may be appropriately adjusted from time to time to take into account the effect of any stock split, reverse stock split or stock dividend.

*We will distribute any quarterly distribution to our stockholders after the application of the incentive management fee payable to AAMC.*

In the event of the payment of any dividend of cash from capital transactions by us, each of the thresholds described above shall be reduced by an amount equal to the applicable threshold multiplied by a fraction (i) the numerator of which shall be the amount of distributions of available cash that are deemed to be cash from capital transactions that a hypothetical holder of one share of common stock acquired on the separation date has received with respect to such share of common stock, during the period since the separation date through the date of such payment, and (ii) denominator of which shall be $12.74 (as such amount may be appropriately adjusted from time to time to take into account the effect of any stock split, reverse stock split or stock dividend); provided that in no event shall such fraction be greater than 1.

Notwithstanding the foregoing, in the case of cash dividends from capital transactions, no incentive management fee will be paid to AAMC in respect of such dividends unless and until a hypothetical holder of one share of common stock acquired on the separation date has received with respect to such share of common stock, during the period since the separation date through the date of payment, cash dividends from capital transactions in an aggregate amount equal to $12.74 (as such amount may be appropriately adjusted from time to time to take into account the effect of any stock split, reverse stock split or stock dividend).

The asset management agreement defines "capital transactions" to include various financing transactions and sales and other dispositions of assets, but not sales and other dispositions in the ordinary course of business. A sale or disposition is treated for this purpose as being in the ordinary course of business unless it involves, in a single transaction or series of related transactions, assets that have an aggregate value in excess of 50% of the aggregate value of all assets held by us and our subsidiaries on a consolidated basis immediately prior to the consummation of such transaction or, in the case of a series of related transactions, the first such transaction.

(Emphasis added.)

51.     RESI does not have its own executives or management team to protect the interests of RESI's shareholders or properly monitor the Incentive Fees paid to AAMC. Indeed, RESI's executive officers are provided by AAMC. According to the RESI's Proxy Statement for 2013 filed with the SEC on April 19, 2013 ("RESI 2013 Proxy"):

**Executive Compensation**

***We have no employees. Our executive officers, including our Chief Executive Officer, do not receive compensation directly from us for services rendered to us.*** Our day-to-day management functions are performed by AAMC pursuant to the asset management agreement between AAMC and us, as described more fully in "Certain Relationships and Related Party Transactions." ***Pursuant to the asset management agreement, AAMC provides us with a management team, including a Chief Executive Officer, and is responsible for the compensation of the Chief Executive Officer and AAMC's other executive officers who provide services to us.*** As a result, we do not have, and our Compensation Committee has not considered, a compensation policy or program for our executive officers. Accordingly, we have not included a Compensation Discussion and Analysis, a Compensation Committee Report or an Executive Compensation section in this proxy statement.

(Emphasis added.)

52.     Rather, members of AAMC's management serve in a dual capacity as asset managers and executives of RESI. As AAMC states in its Form 10-K for the fiscal year ended December 31, 2013 ("AAMC 2013 10-K") filed with the SEC on February 20, 2014 states "[o]ur executive officers are also officers of [RESI]."

53.     The compensation to Defendants Pandey and Najour are reimbursed by RESI pursuant to the Asset Management Agreement. According the AAMC 2013 10-K:

**Expense Reimbursement**

***Pursuant to the asset management agreement, we are reimbursed by [RESI] on a monthly basis for the (i) direct and indirect expenses we incur or payments we make on [RESI]'s behalf, including, but not limited to, the allocable compensation and routine overhead expenses of all our employees and staff for activities they conduct for Residential*** and (ii) all other reasonable operating and overhead expenses we incur related to the asset management services we provide to RESI]. We are not reimbursed by [RESI] for any compensation paid to William C. Erbey for his role as our Chairman.

(Emphasis added.)

54.     On October 22, 2013, RESI filed a Form 10-Q for the quarterly period ended

September 30, 2013 ("RESI 2013 Q3 10-Q") with the SEC, which stated that it paid AAMC an Incentive Fee of $51,000 for the quarter.

55.     According to the RESI 2013 10-K, RESI paid AAMC an Incentive Fee of $4.88 million for the year ended December 31, 2013 or $4.83 million for the last quarter of 2013.

56.     Although the RESI 2012 Form 10-K and RESI 2013 Form 10-K state that RESI is a related party to AAMC and Ocwen, the public filings are materially false and misleading because they fail to disclose fully the entire details of the relationship including, but not limited to, above market compensation paid to AAMC from RESI and the impropriety of the relationships. Such dependence is improper.

### THE TRUTH MATERIALIZES CAUSING PLAINTIFF'S LOSSES

57.     On February 26, 2014 the NY DFS sent a letter to Ocwen concerning the conflict of interest of Defendant Erbey's empire of RESI, AAMC, Ocwen and HLSS. The letter states in relevant part:

> The Department's ongoing review of Ocwen's mortgage servicing practices has *uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated. Indeed, the facts our review has uncovered to date cast serious doubts on recent public statements made by the company that Ocwen has a "strictly arms-length business relationship" with those companies*. We are also concerned that this tangled web of conflicts could create incentives that harm borrowers and push homeowners unduly into foreclosure. As such, we are demanding additional information on these issues as part of our review.
>
> Pursuant to the December 4, 2012 Consent Order between Ocwen and the Department, we have engaged an independent on-site compliance monitor at Ocwen to conduct a comprehensive review of Ocwen's servicing operations. *It is in the course of the monitorship that we uncovered these potential conflicts between and among Ocwen, Altisource Portfolio Solutions, S.A. ("Altisource Portfolio"), Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd. (together, the "affiliated companies"), all of which are chaired by William C. Erbey, who is also the*

*largest shareholder of each and the Executive Chairman of Ocwen*.

(Emphasis added).

58.     On the publication, release and reporting of this letter, the price of RESI securities fell by $1.95, or over 7%, closing at $24.49 on February 25, 2014.

59.     On March 19, 2014, an analyst report published by Glaucus Research Group discussed concerns surrounding the relationship between RESI and AAMC (the "Glaucus Report"). The Glaucus Report detailed how the obfuscation of calculating the Incentive Fees was exemplified by the gross underestimation by Wall Street analysts for the fourth quarter of 2013. The Glaucus Report states in relevant part:

> Prior to AAMC's February 2014 earnings announcement and annual report, investors and Wall St. analysts modeled AAMC's Incentive Fee as a percentage of cash dividends to RESI's shareholders (a figure driven by REIT taxable income). It therefore came as a great surprise to experts and laymen alike when AAMC announced that its Q4 2013 Incentive Fee was 454% higher than consensus estimates. In the following chart, we compare the ex-ante estimates for RESI's dividends and asset management fee to the reported figures.

**Q4 2013 Street Estimates vs. Actual**

| RESI Dividends Paid | 4Q 2013 |
|---|---|
| Credit Suisse | $ 0.25 |
| Deutsche Bank | $ 0.25 |
| Piper Jaffray | $ 0.24 |
| **ACTUAL RESI Dividends Paid** | $ 0.33 |
| *% Difference* | 34% |

| AAMC Incentive Fee (in $USDmm) | 4Q 2013 |
|---|---|
| Credit Suisse | $ 1.0 |
| Deutsche Bank | $ 0.7 |
| Piper Jaffray | $ 0.9 |
| **ACTUAL AAMC Incentive Fee Paid** | $ 4.8 |
| *% Difference* | 454% |

Source: Analyst reports from January 2014.

Actual RESI dividends paid of $0.33 includes special dividend of $0.08 per share.

This chart only serves to illustrate that while analysts accurately predicted RESI's dividends, there was absolutely no understanding of how RESI's performance influenced AAMC's Incentive Fee. This ambiguity permits AAMC significant leeway to determine its own compensation.

60. The obfuscated methodology in calculating the Incentive Fees and RESI's lack of its own executives, since RESI itself does not have employees, gives AAMC wide discretion in dictating the amount of its revenue.

61. Furthermore, as stated in the Glaucus Report, members of AAMC's management have strong financial incentives to increase AAMC's Incentive Fees at the expense of RESI's shareholders, given that AAMC's management owns much more equity in AAMC than RESI. The Glaucus Report states:

> **AAMC CEO Ashish Pandey owns 45 times more equity in AAMC than RESI**: as of February 24, 2014, he currently owns over $40mm in restricted stock and options in AAMC and a paltry $875,000 in shares of RESI.



Note: Ownership includes restricted stock and options.

62.     The combination of the dual role of AAMC/RESI executives, Defendant Erbey's control of AAMC and RESI, the obfuscated methodology in calculating the Incentive Fees, the substantial influence of AAMC in determining the Incentive Fees, and the financial incentives of AAMC executives to generate the highest Incentive Fee as possible presents a clear conflict of interest.

63.     According to AAMC'S 2013 Proxy Statement filed with the SEC on April 19, 2014 ("AAMC 2013 Proxy"), Defendants Pandey and Najour  received the following cash compensation from AAMC for 2013:

| | | Cash Incentive Compensation Opportunity | | | |
|---|---|---|---|---|---|
| Officer | Base Salary | Threshold Performance Level | Target Performance Level | Outstanding Performance Level | Total Cash Compensation Opportunity at Target Performance Level [1] |
| Ashish Pandey, Chief Executive Officer | $325,000 | $162,500 | $325,000 | $487,500 | $650,000 |
| Salah Saabneh, Executive Vice President, Corporate Development [2] | $350,000 | $175,000 | $350,000 | $525,000 | $700,000 |
| Kenneth D. Najour, Chief Financial Officer [3] | $206,150 | $103,075 | $206,150 | $309,225 | $412,300 |
| Stephen H. Gray General Counsel and Secretary | $248,000 | $76,000 | $152,000 | $228,000 | $400,000 |

(1)   At the threshold performance level, Mr. Pandey's total cash compensation would be $487,500, Mr. Saabneh's would be $525,000, Mr. Najour's would be $309,225 and Mr. Gray's would be $324,000. At the outstanding performance level, Mr. Pandey's total cash compensation would be $812,500, Mr. Saabneh's would be $875,000, Mr. Najour's would be $515,375 and Mr. Gray's would be $476,000.
(2)   Mr. Saabneh joined the Company effective February 19, 2013 and was appointed as an executive officer as of March 4, 2013.
(3)   Mr. Najour joined the Company as the Chief Financial Officer effective March 5, 2013.

64.   The Glaucus Report asserts that "AAMC's Incentive Fee is **at least four to seven times higher than the compensation received by similarly situated asset managers**" and such compensation is "significantly **higher than the market compensation paid to similarly situated asset managers**."

65.   Additionally, the Glaucus Report illustrated the massive overpayment by RESI to AAMC as an asset manager by comparing of AAMC's Incentive Fee to that of other internal and external asset managers of REITs. With regards to internal asset managers, its states:

*2) Internally Managed Mortgage REITs*

Another methodology to compare AAMC's Incentive Fee to the asset management fees paid by other REITs is to measure the fees as a percentage of dividends paid to shareholders. The chart below sets forth AAMC's Incentive Fees and RESI's dividends from Q4 2013 as well as the consensus Wall St. estimates for such fees and dividends in both 2014 and 2015.

| AAMC Incentive Fee (as % of RESI Dividends) | | | ($ in mms) |
|---|---|---|---|
| | Q4 2013 | 2014E | 2015E |
| Piper Jaffray 1/22/2014 | | $99.7 | $130.3 |
| Deutsche Bank 1/17/2014 | | 65.6 | 82.0 |
| Credit Suisse 1/27/2014 | | 75.6 | 120.4 |
| **RESI Dividends Paid** | $15.1 ‡ | $80.3 † | $110.9 † |
| Piper Jaffray 1/22/2014 | | 52.6 | 71.9 |
| Deutsche Bank 1/17/2014 | | 31.5 | 52.9 |
| Credit Suisse 1/27/2014 | | 11.5 | 24.4 |
| **AAMC Incentive Fee** | $4.8 | $31.9 † | $49.7 † |
| **% of RESI Dividends** | 32% | 40% | 45% |

† Consensus average

‡ Q4 2013 dividends paid of $15.1 mm includes the special dividend of $4.5 million ($0.08 per share) announced in Q4 2013.

**Based on Wall St. consensus estimates, AAMC's Incentive Fee will reach a whopping 45% of the dividends paid to RESI's shareholders in 2015.**

In the following table, we calculated the total compensation and benefits, measured as a percentage of dividends, paid by four mortgage REITs (MFA Financial (NYSE: MFA), Capstead Mortgage Corp (NYSE: CMO), CYS Investments (NYSE: CYS) and Annaly Capital Management (NYSE: NLY)) to internal asset managers of their respective loan portfolios.

The four mortgage REITs listed below have brought management of their loan portfolios in-house for an average **of 6% of their dividends. By our estimate, RESI will be obligated to pay AAMC seven times that amount (45% in 2015) or more going forward.**

| Internally Managed REITs $ in mms | Year | Total Comp & Benefits | Dividends Paid | Comp as % of Dividends |
|---|---|---|---|---|
| MFA Financial (NYSE: MFA) | 2013 | $20.3 | $608.6 | 3.3% |
| Capstead Mortgage (NYSE: CMO) | 2013 | 9.3 | 132.2 | 7.1% |
| CYS Investments (NYSE: CYS) | 2013 | 12.6 | 235.8 | 5.3% |
| Annaly Capital Management (NYSE: NLY) | 2012† | 190.7 | 2,149.9 | 8.9% |
| | | | Average | 6.2% |
| AAMC | 2015E | $49.7 | $110.9 | 44.8% |
| | | As multiple of Internally Managed REITs | | 7.3x |

Sources: Company filings.
† NLY was converted to external management in 2013.

We believe that the four REITs identified above are suitable comps because their management teams perform a similar function to AAMC: developing and implementing an investment strategy, identifying which loans to acquire and determining how much to pay for new loans. Despite only having seven employees, RESI pays seven times as much as the four mortgage REITs to manage a portfolio of loans.



Both charts above show that RESI is paying more for less when compared to other internally managed REITs. AAMC has seven employees, no material assets and a limited operating history. AAMC does not service RESI's loans (outsourced to Ocwen). AAMC does not service the properties it obtains through default (outsourced to ASPS).

66.    With regards to external asset managers, the Glaucus Report states:

20

*3) Externally Managed REITs*

Widening the comp set to include management fees paid to external asset managers of single-family REITs further underscores that RESI overpays AAMC to manage its portfolio.

In the following table, we have outlined the actual compensation paid to the asset managers of twelve externally managed mortgage REITS. Despite the fact that AAMC has by far the fewest employees, it is paid an average of 4x more.

**AAMC Comps - Externally Managed REITS**

| | Year | Mgmt Fee Arrangement (% of BV) | Mgmt Fee (mms) | Dividends Paid (mms) | Mgmt Fee (as % of Dividends) | Employees (or access to) |
|---|---|---|---|---|---|---|
| **Two Harbors Investment Corp (NYSE: TWO)** | | | | | | |
| PRCM Advisors LLC (Asset Mgr) | 2013 | 1.50% | 41.7 | 591.5 | 7.1% | 423 [1] |
| **Annaly Capital Management (NYSE: NLY)** | | | | | | |
| Annaly Management Co (Asset Mgr) | 2013 | 1.05% | 167.4 | 1,640.7 | 10.2% | 147 |
| **PennyMac Mortgage Investment Trust (NYSE: PMT)** | | | | | | |
| PNMAC Capital Management (Asset Mgr) | 2013 | 1.50% | 32.4 | 147.6 | 22.0% | 1,370 |
| **Colony Financial (NYSE: CLNY)** | | | | | | |
| Colony Financial Manager, LLC (Asset Mgr) | 2013 | 1.50% | 26.3 | 111.3 | 23.6% | NA |
| **AG Mortgage Investment Trust (NYSE: MITT)** | | | | | | |
| AG REIT Management, LLC (Asset Mgr) | 2013 | 1.50% | 10.7 | 93.7 | 11.4% | 18 |
| **ARMOUR Residential REIT (NYSE: ARR)** | | | | | | |
| ARRM (Asset Mgr) | 2013 | 1.13% | 28.1 | 292.6 | 9.6% | 19 |
| **Hatteras Financial Corp (NYSE: HTS)** | | | | | | |
| Atlantic Capital Advisors LLC (Asset Mgr) | 2013 | 0.73% | 18.2 | 283.3 | 6.4% | 16 |
| **American Capital Mortgage Investment (MGTE)** | | | | | | |
| American Capital MGTE Mgmt (Asset Mgr) | 2013 | 1.50% | 18.7 | 167.3 | 11.2% | NA |
| **Anworth Asset Mgmt Corp (NYSE: ANH)** | | | | | | |
| Anworth Management LLC (Asset Mgr) | 2013 | 1.20% | 12.0 | 87.0 | 13.7% | 12 |
| **Apollo Residential Mortgage (NYSE: AMTG)** | | | | | | |
| ARM Manager LLC (Asset Mgr) | 2013 | 1.50% | 11.6 | 98.5 | 11.8% | 710 [2] |
| **Invesco Mortgage Capital (NYSE: IVR)** | | | | | | |
| Invesco Advisors (Asset Mgr) | 2013 | 1.50% | 42.6 | 332.8 | 12.8% | 60 [3] |
| **Chimera Investment Corp (NYSE: CIM)** | | | | | | |
| FIDAC (Asset Mgr) | 2012 | 1.50% | 44.8 | 410.7 | 10.9% | 35 |
| **Median** | | **1.50%** | | | **11.3%** | |
| **Altisource Residential (NYSE: RESI)** | | | | | | |
| **AAMC (Asset Mgr)** | **2015E** | | **49.7** | **110.9** | **44.8%** | **7** |
| | | | | | **4.0x** | |

Sources: Company filings.

[1] via relationship with Pine River Capital Management
[2] via relationship with Apollo Capital Management
[3] via relationship with WL Ross & Co. LLC and Invesco

Assuming an even moderately efficient market for external asset managers, RESI's independent directors could obtain a perfectly competent external asset manager for $18 million in compensation per year (1.5% of book value of $1.2 billion), which would allow RESI to boost its consensus 2015 annual dividend by around $32 million ($0.14 per quarter per share).

In addition, AAMC is performing fewer services for RESI than other external asset managers are performing for their respective REITs. AAMC has seven employees, while other asset managers have over 300. Despite the fact that it has far fewer resources, AAMC is paid on average 4x more.



In our opinion, the two charts above show just how little RESI's shareholders are getting for their money. AAMC's paltry infrastructure, assets and human resources stand in stark comparison to the handsomeness of its Incentive Fee.

67.    Defendants, in causing RESI to pay the excessive Incentive Fees to AAMC and accepting the cash compensation as AAMC executives in connection with the Asset Management Agreement, engaged in related party transactions that damaged RESI's shareholders.

68.    If RESI was unrelated to AAMC, RESI would have more favorable terms with its REIT management. RESI shareholders were damaged by the relationship between RESI and

AAMC.

69.     Despite the unreasonable compensation paid to AAMC, there is no indication that Defendants have not sought to terminate or renegotiate the onerous terms of the Asset Management Agreement as provided for.

70.     Section 10(a) of the Asset Management Agreement provides that it is automatically renewed annually on December 21st unless terminated by either party, which states:

(a)     This Agreement shall be in effect until December 21, 2027 (the "Initial Term") and shall be automatically renewed for a one-year term each anniversary date thereafter (a "Renewal Term") unless terminated by either party in accordance with this Section 10.

71.     Section 10(b) of the Asset Management Agreement permits RESI to terminate the contract based on unreasonable compensation or renegotiate its terms, stating in relevant part:

(b)     Subject to Section 11 below, neither Residential nor the Partnership may terminate this Agreement unless (i) in the case of a termination by the Partnership, the General Partner determines that there has been unsatisfactory performance by the Asset Manager that is materially detrimental to the Partnership or *(ii) in the case of a termination by Residential, at least two-thirds of the Independent Directors (as defined herein) agree that* (x) there has been unsatisfactory performance by the Asset Manager that is materially detrimental to Residential or *(y) the compensation payable to the Asset Manager hereunder is unreasonable; provided that Residential shall not have the right to terminate this Agreement under clause (ii)(y) above if the Asset Manager agrees to continue to provide the services under this Agreement at a reduced fee that at least two-thirds of the Independent Directors determines to be reasonable pursuant to the procedure set forth below*… For purposes of this Agreement, "Independent Directors" shall mean the members of the Board of Directors who are not officers or employees of the Asset Manager or any person or entity directly or indirectly controlling or this Section 10 during the first twenty-four (24) months of the Initial Term.

(Emphasis added.)

72.     According to Section 10(b) of the Asset Management Agreement, the Independent Director Defendants constitute Independent Directors.

23

73.     Pursuant to Section 10(d) of the Asset Management Agreement, in order to terminate the contract on the grounds that AAMC's compensation is unreasonable, the Independent Directors must deliver notice no later than June 14 of any given calendar year, which states:

> (d)    No later than 180 days prior to the anniversary date of this Agreement of any year during the Initial Term or Renewal Term, the Asset Manager may deliver written notice to Residential informing it of the Asset Manager's intention to decline to renew this Agreement, whereupon this Agreement shall not be renewed and extended and this Agreement shall terminate effective on the anniversary date of this Agreement next following the delivery of such notice. Residential is not required to pay to the Asset Manager the Termination Fee if the Asset Manager terminates this Agreement pursuant to this Section 10(c).

74.     Under Section 10(c) of the Asset Management Agreement, the Termination Fee equates to three times  the sum of the average annual Incentive Fees paid over the previous 24 months, which states:

> (c)    In recognition of the level of the upfront effort required by the Asset Manager to structure and acquire the assets of Residential and the Partnership and the commitment of resources by the Asset Manager, in the event that this Agreement is terminated in accordance with the provisions of Section 10(a) of this Agreement, Residential shall pay to the Asset Manager, on the date on which such termination is effective, a termination fee (the "Termination Fee") equal to three (3) times the sum of the average annual Incentive Fee during the 24-month period immediately preceding the date of such termination, calculated as of the end of the most recently completed fiscal quarter prior to the date of termination. The obligation of Residential to pay the Termination Fee shall survive the termination of this Agreement.

75.     Given how the Termination Fee is calculated, it will only increase with time. Indeed, the Glaucus Report states in relevant parts:

>  Notably, Asset Management Agreement provides for a Termination Fee (measured as three times the sum of the average of the annual Incentive Fees paid over the previous 24 months) in the event that RESI's independent directors terminate the contract. *We estimate that if RESI terminates the contract in December 2014, the Termination Fee under the contract will be ~$55 million. By*

***December 2015, we estimate that the Termination Fee will rise to a whopping ~$120 million.***

***RESI's independent directors must act quickly: with each passing quarter, AAMC's Terminate Fee will only get larger.*** Investors should also note that RESI is not obligated to pay a Termination Fee under the Asset Management Agreement if it renegotiates (rather than terminates) AAMC's Incentive Fees. Any investor adverse to paying a Termination Fee or finding a different asset manager (external or internal) would look favorably on simply reducing AAMC's current compensation.

(Emphasis added.)

76.     To date, based on information and belief, Defendants have not sought to renegotiate or terminate the Asset Management Agreement in light of the excessive Incentive Fees made to AAMC, thereby damaging RESI shareholders.

77.     On December 22, 2014 Ocwen issued a press release entitled "Ocwen Financial Agrees to Settlement With New York Dept. of Financial Services." The press release details how the NY DFS's investigation of Ocwen was settled by a Consent Order. The press release states in relevant part:

ATLANTA, Dec. 22, 2014 (GLOBE NEWSWIRE) -- **Ocwen Financial Corporation** (OCWEN) ("Ocwen") today announced that it has reached a comprehensive settlement with the New York Department of Financial Services ("DFS") related to the agency's recent investigation.

"We are pleased to have reached a comprehensive settlement with the DFS and will act promptly to comply with the terms," said CEO Ronald Faris. "We believe this agreement is in the best interests of our shareholders, employees, borrowers and mortgage investors. We will continue to cooperate with the DFS in the implementation of the terms of this settlement which we believe will allow Ocwen to continue to focus on what we do best -- helping homeowners."

**Under the terms of the settlement, Ocwen will pay a civil monetary penalty of $100 million to the DFS by December 31, 2014, which will be used by the State of New York for housing, foreclosure relief and community redevelopment**

**programs. The Company will also pay $50 million as restitution to current and former New York borrowers who had foreclosure actions filed against them by Ocwen between January 2009 and December 19, 2014.** As previously communicated in the third quarter of 2014, Ocwen recorded a charge of $100 million to increase its legal reserves in anticipation of a potential settlement with the DFS. Ocwen will record an additional $50 million charge in its fourth quarter 2014 financial statements to reflect the final settlement amount.

After nearly 30 years of distinguished service, and **as part of the settlement, founder William C. Erbey will step down from his position as Executive Chairman of Ocwen, effective January 16, 2015.** Barry Wish, a current director of Ocwen, will assume the role of Non-Executive Chairman on that date.

"I am grateful to the many associates who have worked alongside me and proud of what we have accomplished," Mr. Erbey said. "I am confident about Ocwen's future under the experienced leadership of the executive team. I have worked with Ron for more than 20 years, and he is uniquely qualified to lead Ocwen going forward."

Ocwen has also agreed to non-monetary provisions relating to New York borrower assistance measures, a monitor-led oversight of Ocwen's operations, interactions with related parties and certain corporate governance measures. MSR acquisitions will be subject to Ocwen meeting specified benchmarks as well as DFS approval.

A summary of the settlement terms is below.

**Settlement Summary of Monetary Provisions**

- Ocwen will pay a civil monetary penalty of $100 million to the DFS by December 31, 2014, which will be used by the State of New York for housing, foreclosure relief and community redevelopment programs.
- Ocwen will also pay $50 million as restitution to current and former New York borrowers in the form of $10,000 to each borrower whose home was foreclosed upon by Ocwen between January 2009 and December 19, 2014, with the balance distributed equally among borrowers who had foreclosure actions filed, but not completed, by Ocwen between January 2009 and December 19, 2014.

**Settlement Summary of Non-Monetary Provisions**

26

*Borrower Assistance*

Beginning 60 days after December 19, 2014, and for two years, Ocwen will:

- Provide upon request by a New York borrower a complete loan file at no cost to the borrower;
- Provide every New York borrower who is denied a loan modification, short sale or deed-in-lieu of foreclosure with a detailed explanation of how this determination was reached;
- Provide one free credit report per year, at Ocwen's expense, to any New York borrower on request if Ocwen made a negative report to any credit agency from January 1, 2010, and Ocwen will make staff available for borrowers to inquire about their credit reporting, dedicating resources necessary to investigate such inquiries and correct any errors.

*Operations Monitor*

- The DFS will appoint an independent Operations Monitor to review and assess the adequacy and effectiveness of Ocwen's operations. The Operations Monitor's term will extend for two years from its engagement, and the DFS may extend the engagement another 12 months at its sole discretion.
- The Operations Monitor will recommend and oversee implementation of corrections and establish progress benchmarks when it identifies weaknesses.
- The Operations Monitor will report periodically on its findings and progress. The currently existing monitor will remain in place for at least three months and then for a short transitional period to facilitate an effective transition to the Operations Monitor.

*Related Companies*

- The Operations Monitor will review and approve Ocwen's benchmark pricing and performance studies semi-annually with respect to all fees or expenses charged to New York borrowers by any related party.
- Ocwen will not share any common officers or employees with any related party and will not share risk, internal audit or vendor oversight functions with any related party.
- Any Ocwen employee, officer or director owning more than $200,000 equity ownership in any related party will be recused from negotiating or voting to approve a transaction with the related party in which the employee, officer or

director has such equity ownership, or any transaction that indirectly benefits such related party, if the transaction involves $120,000 or more in revenue or expense.

*Corporate Governance*

•     Ocwen will add two independent directors who will be appointed after consultation with the Monitor and who will not own equity in any related party.

•     As of January 16, 2015, Bill Erbey will step down as an officer and director of Ocwen, as well as from the boards of Ocwen's related companies.

•     The Operations Monitor will review Ocwen's current committees of the Board of Directors and will consult with the Board relating to the committees. This will include determining which decisions should be committed to independent directors' oversight, such as approval of transactions with related parties, transactions to acquire mortgage servicing rights, sub-servicing rights or otherwise to increase the number of serviced loans and new relationships with third-party vendors.

•     The Board will work closely with the Operations Monitor to identify operations issues and ensure that they are addressed. The Board will consult with the Operations Monitor to determine whether any member of senior management should be terminated or whether additional officers should be retained to achieve the goals of complying with this Consent Order.

*MSR Purchases*

•     Ocwen may acquire MSRs upon (a) meeting benchmarks specified by the Operations Monitor relating to Ocwen's onboarding process for newly acquired MSRs and its ability to adequately service newly acquired MSRs and its existing loan portfolio, and (b) the DFS's approval, not to be unreasonably withheld.

•     These benchmarks will address the compliance plan, a plan to resolve record-keeping and borrower communication issues, the reasonableness of fees and expenses in the servicing operations, development of risk controls for the onboarding process and development of a written onboarding plan assessing potential risks and deficiencies in the onboarding process.

(emphasis added)

78.     On December 22, 2014, RESI filed a Form 8-K with the SEC with a press release as

an exhibit stating that Defendant Erbey was stepping down as Director and Chairman of the Board

28

of RESI effective January 16, 2015. The 8-K states that Defendant Erbey was abdicating his position "in connection with the Consent Order entered into by Ocwen Financial Corporation with the New York Department of Financial Services."

79.     On the news of Ocwen's settlement and signed Consent Order with the NY DFS and Defendant Erbey's departure from RESI, the Company's securities fell by $1.37 per share, or about 7%, closing at $18.65 December 22, 2014.

80.     On January 13, 2015, it was revealed that California regulators are seeking to suspend Ocwen's mortgage license. *Investor's Business Daily* published an article, "Ocwen Financial's Calif. Woes Sink Shares" detailing the California regulators' position. The article states in relevant part:

> **Trading of Ocwen Financial Group (NYSE:<u>OCWEN</u>) shares was temporarily halted after news that California may suspend the mortgage-payment collector's license, a move that would deprive the company of its largest market.**
>
> **The state alleges that Ocwen has refused over the past two years to provide sufficient information to verify whether it was obeying laws intended to prevent foreclosure-related abuse**, the Los Angeles Times reported late Monday.
>
> **Shares plunged 30% on the stock market today, hitting lows not seen since 2009.**
>
> Stocks of other mortgage servicers followed. Altisource Asset Management (AMEX:AAMC), a spin-off of Ocwen, caved more than 28%. Home Loan Servicing Solutions (NASDAQ:HLSS), another spin-off, hemorrhaged as much as 24%. Nationstar Mortgage Holdings (NYSE:NSM) fell 6%, and Walter Investment Management (NYSE:<u>WAC</u>) lost 2%.
>
> The sector overall has tumbled as banks have sought to unload bad mortgage-related assets, and the housing and financial markets have settled somewhat since the recession.
>
> If California and Ocwen, which is among the biggest U.S. mortgage servicers, can't settle, the company could lose its license in the state before the end of the year, which means that it could no longer collect payments and handle foreclosures.

State and federal investigators are also examining whether Ocwen delayed short sales of some homes so it could keep collecting fees, Bloomberg said last month, citing sources.

The company has settled similar cases. William Erbey, its chairman and founder, was forced to resign last month from Ocwen and from top posts at related companies over conflict-of-interest issues and other abuses related to troubled mortgages.

Banks and their foreclosure processors in general faced a raft of criticism after reports of robo-signing and other misconduct surfaced.

(emphasis added)

81.    On the same day, *Forbes* published an article " California Regulator In Process of Suspending Ocwen Financial's Mortgage License" states relevant part:

California regulators are seeking to suspend the mortgage license of Ocwen Financial, after the servicing giant did not adequately respond to repeated information requests into its compliance with the state's Homeowner Bill of Rights. Suspension proceedings began in October, Tom Dresslar, a spokesperson for the California Department of Business Oversight told *Forbes* on Tuesday.

"Since the early part of last year, we have been asking Ocwen to provide the information we need to determine their compliance with the Homeowners Bill of Rights. They have repeatedly failed to comply with those requests," Dresslar said. "At this point, we are seeking a suspension of their license. This matter is before an administrative law judge."

***

Were Ocwen to lose its California license it would impact 378,132 loans that the company services in the state, according to Bose George, an analyst with Keefe, Bruyette & Woods. Those loans currently carry a unpaid principal balance of $95 billion or roughly 23% of Ocwen's total UPB due.

Ocwen shares fell over 36% on Tuesday. Shares in the company have fallen over 80% in the past 12-months. Publicly traded Ocwen affiliates Altisource Portfolio Solutions and Altisource Asset Management fell 38% and 33%. Home Loan

Servicing Solutions fell nearly 20%, **while Altisource Residential Corp. fell over 6%.**

***

**However, shares in the company have been battered over the past 12-months as regulators across the country accuse Ocwen of a string of legal violations. In December, New York Department of Financial Services head Benjamin Lawsky alleged that Ocwen routinely incorrectly foreclosed on homes, and had significant conflicts of interest among its related entities.**

**Ocwen settled those allegations, agreeing to pay $150 million in hard dollar assistance to New York homeowners, $50 million in direct restitution and $100 million for housing, foreclosure relief and redevelopment programs. Ocwen also agreed that founder and former billionaire Erbey would step down as executive chairman of the company and its four publicly traded affiliates.**

For Erbey, known as a penny-pincher and a tireless worker, the pact was a dramatic reversal in fortune after he built a mortgage empire out of the aftermath of the housing bust. Erbey fell out of the billionaire ranks in December, according to to Forbes's Real Time Wealth Rankings for billionaires. He was worth as much as $2.5 billion in March when we published our annual listing of the world's wealthiest.

(emphasis added)

82.    On the news that California regulators were proceeding to suspend Ocwen's mortgage license, RESI's securities fell by $1.08 from the previous day, or about 6%, closing at $16.76 on January 13, 2015.

83.    On January 23, 2015, BlueMountain sent a notice of default to HLSS and Ocwen on certain notes HLSS serviced. Due to recent regulatory sanctions against Ocwen, which also had an impact on HLSS, it constituted a breach and a default under the terms of the lending agreement. HLSS defaulted on notes worth about $1 billion. The notice of default states in relevant part:

We write on behalf of our client BlueMountain Capital Management, LLC, as investment manager to BlueMountain Montenvers Master Fund SCA SICAV-SIF, BlueMountain Guadalupe Peak Fund L.P., and Blue Mountain Credit Alternatives Master Fund L.P. ("BlueMountain"), which own certain Series 2012-T2 and Series 2013-T3 Notes issued in connection with the HLSS Servicer Advance Receivables Trust (the "HSART Trust"). We write in reference to the Sixth Amended and Restated Indenture, dated as of January 17, 2014, including all Schedules and Exhibits thereto (the "Indenture"), by and among the HSART Trust, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, Calculation Agent, Paying Agent and Securities Intermediary, HLSS Holdings, LLC ("HLSS"), as Administrator and as Servicer (on and after the MSR Transfer Date), Ocwen Loan Servicing, LLC ("Ocwen"), as a Subservicer and as Servicer (prior to the MSR Transfer Date), Barclays Bank PLC, as Administrative Agent, Wells Fargo Securities, LLC, as Administrative Agent, and Credit Suisse AG, New York Branch, as Administrative Agent, and all agreements referenced therein, including without limitation all the Designated Servicing Agreements and Transaction Documents. Unless otherwise specified, capitalized terms used but not defined in this letter have the meanings ascribed to them in the Indenture and the Master Subservicing Agreement, dated as of February 10, 2012, by and between HLSS, as Servicer and Ocwen, as Subservicer.

As particularized herein, **we write to provide notice that Events of Defaults exist under the Indenture pursuant to (i) Section 8.1(d), resulting from Ocwen's material breach of its covenants to, among other things, comply with applicable laws and requisite servicing obligations; (ii) Section 8.1(m)(i), resulting from Ocwen's breach of a warranty in the Senior Secured Term Loan Facility Agreement and a subsequent amendment thereto that it is not in violation of any law that could reasonably be expected to cause, among other things, a material adverse effect on Ocwen's business and financial condition; and (iii) Section 8.1(g), resulting from the failure of the Collateral Test, which measures whether the Notes are adequately collateralized.**

**The facts establishing these Events of Default are irrefutable.** For example, Ocwen recently "stipulate[d]" and "agree[d]" in a consent order with the New York Department of Financial Services to violations of law and to engaging in imprudent servicing practices. In addition, the California Department of Business Oversight has commenced proceedings to suspend Ocwen's servicer license in California, a significant source of loans in the RMBS trusts that generate the advances that collateralize the payments to Noteholders. These (and other) agencies' findings and enforcement actions demonstrate Ocwen's systemic, long-standing and continuing servicing failures and disregard of applicable and analogous laws. Evidencing the significance of these affirmations of Ocwen's servicing misconduct, the rating agencies expressly referenced the state regulatory authorities' actions as a basis for their decisions to downgrade Ocwen's servicer rating and the corporate ratings of related entities, Ocwen Financial Corporation

32

and Home Loan Servicing Solutions, Ltd.  Likewise, the share price of the two related companies fell precipitously following the announcement of the California suspension proceeding, *i.e.*, by approximately 36% and 20%, respectively.

**The recent disclosures thus demonstrate Ocwen's material breaches of its covenants and warranties not to engage in such illicit and imprudent practices; and those breaches in turn materially increase the risk of loss on the Notes that are collateralized by receivables affected by Ocwen's standing as a servicer.**  Indeed, the offering memorandum governing the issuance of the Notes explicitly recited the very servicing misconduct that Ocwen engaged in as a factor that would increase the risk of loss on the Notes.  That material increase in the risk of loss gives rise to the specified Events of Default, and a corresponding right to an increased return for the Noteholders.

Specifically, **under the bargained-for terms of the Indenture, the Note Interest Rate is increased by 3.00% upon the occurrence of any Event of Default to compensate the Noteholders for the associated increased risk of loss.**  Deutsche Bank National Trust Company, in its capacity as Calculation Agent, must provide "written notice specifying the nature and status of any . . . Event of Default, Facility Early Amortization Event or other event or occurrence which could have an Adverse Effect."  (Indenture § 3.3(b).)  Such notice must be provided to the Noteholders, the Indenture Trustee, the Issuer and each Note Rating Agency promptly after receiving knowledge of such event, but no later than three Business Days thereafter

***

(emphasis added)

84.    Later in the day of January 23, 2015, *Forbes* published an article "Ocwen Financial Keeps California Mortgage License, Sued by Bondholders" that discussed a settlement between Ocwen and the DBO and the notice of default it received from BlueMountain. The article states in relevant part:

The California Department of Business Oversight (DBO) is dropping an effort to suspend Ocwen Financial's mortgage license in the state, after reaching a settlement with the embattled mortgage servicing giant.

The DBO said on Friday evening it has reached a $2.5 million settlement with Ocwen Loan Servicing, and will drop an effort to suspend the company's mortgage

license, which it filed in a California court in October. That threat came after the DBO said Ocwen was unresponsive to information requests the regulator made after receiving complaints about the servicer over the course of multiple years.

"The Department is committed to supporting a fair and secure financial services marketplace for all California consumers," DBO Commissioner Jan Lynn Owen, said in a statement. "This settlement allows us to move forward and ensure that Ocwen is meeting its obligations under the law."

**As part of the settlement, Ocwen will be prohibited from taking new California customers until the DBO determines it is in compliance with state laws such as the California Residential Mortgage Lending Act and the 2012 Homeowner Bill of Rights. Under the consent order, Ocwen will allow a third-party monitor to review its compliance with the DBO's information requests and state laws.**

**The monitor will also audit Ocwen's loan servicing procedures, processes and staffing levels. The DBO retains the ability to pursue enforcement against Ocwen if the examination of loan files uncovers violations of the California laws.**

Friday's settlement is likely to be taken positively. Had Ocwen lost its mortgage license in California, the sanction would impact 378,132 loans that the company services in the state. Those loans currently carry a unpaid principal balance of $95 billion or roughly 23% of Ocwen's total UPB due, according to analyst estimates.

While the pact with the DBO can help remove some major uncertainties for Ocwen, significant issues continue to emerge for the company.

Earlier in the day, BlueMountain Capital disclosed it was shorting the stock of Ocwen Financial and one of its publicly traded affiliates Home Loan Servicing Solutions. **The hedge fund also delivered a notice of default against a receivables trust that is a key funding source for Ocwen, battering shares of both Ocwen and HLSS**.

**BlueMountain believes that regulatory sanctions against Ocwen have put some of the RMBS trusts it services in position of default. As a result, the hedge fund has bought what it believes are defaulted notes, and shorted both the stock of Ocwen and HLSS. On Friday, the hedge fund delivered a notice of default on the notes it owns, Series 2012-T2 and Series 2013-T3 Notes issued in connection with the HLSS Servicer Advance Receivables Trust[.]**

BlueMountain also said it directed the trustees of some RMBS investors "to investigate and/or take action with respect to Ocwen Loan Servicing." Those efforts appear to have succeeded.

Law firm Gibbs & Bruns said late on Friday that 25% of voting rights in 119 Residential Mortgage Backed Securities Trusts that count Ocwen Financial as a master servicer issued a notice of non-performance to their trustees BNY Mellon, Citibank, Deutsche Bank , HSBC, US Bank, and Wells Fargo  Those trusts contain an original mortgage balance of $82 billion, Gibbs & Bruns said.

**"Based on a lengthy investigation and analysis by independent, highly qualified experts, the Holders' Notice alleges Ocwen has failed to perform, in material respects, its contractual obligations as Servicer and/or Master Servicer under the applicable [pooling and servicing agreements]," Gibbs & Bruns said[.]**

The firm cited Ocwen's use of trust funds to pay for borrower relief, conflicts of interest that enriched affiliates like Altisource and HLSS, and the company's poor record keeping. It said those issues have caused trusts serviced by Ocwen to perform "materially worse" than those of other servicers.

"The Holders further allege that these claimed defaults and deficiencies in Ocwen's performance have materially affected the rights of the Holders and constitute an ongoing Event of Default under the applicable PSAs," Gibbs & Bruns concluded.

(emphasis added)

85.     On the news of HLSS defaulting on the notes with BlueMountain, RESI securities fell by $0.35, closing at $18.04 on January 23, 2015.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

86.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired RESI securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

87.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, RESI securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by RESI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

88.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

89.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

90.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of RESI;

- whether the Individual Defendants caused RESI to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of RESI securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

91.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

92.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

• Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

• the omissions and misrepresentations were material;

• RESI securities are traded in efficient markets;

• the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

• the Company traded on the NYSE, and was covered by multiple analysts;

• the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

• Plaintiff and members of the Class purchased and/or sold RESI securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

93. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## NO SAFE HARBOR

94. RESI's "Safe Harbor" warnings accompanying its reportedly forward looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

95. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of RESI who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying

38

or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE:<br>FRAUD ON THE MARKET

96.     Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)      The omissions and misrepresentations were material;

(c)      The Company's securities traded in an efficient market;

(d)      The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)      Plaintiff and other members of the Class purchased RESI securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

97.     At all relevant times, the market for RESI securities was efficient for the following reasons, among others:

(a)      As a regulated issuer, RESI filed periodic public reports with the SEC; and

(b)      RESI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the

major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
### *AFFILIATED UTE*

98.     Neither plaintiffs nor the Class (defined herein) need prove reliance – either individually or as a class – because under the circumstances of this case, which involve omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## LOSS CAUSATION/ECONOMIC LOSS

99.     The market for RESI securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, RESI securities traded at artificially inflated prices during the Class Period Plaintiff and other members of the Class purchased or otherwise acquired RESI securities relying upon the integrity of the market price of RESI securities and market information relating to RESI, and have been damaged thereby.

100.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of RESI securities and operated as a fraud or deceit on Class Period purchasers of RESI securities by misrepresenting the value of the Company's business and prospects. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price

of RESI securities fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of RESI securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

101.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about RESI's business and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of RESI and its business and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing RESI securities at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of RESI securities was removed and the price of RESI securities declined dramatically, causing losses to Plaintiff and the other members of the Class.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

102.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

103.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule l0b-5 promulgated thereunder by the SEC.

104.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of RESI securities; and (iii) cause Plaintiff and other members of the Class to purchase RESI securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

105.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for RESI securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about RESI's finances and business prospects.

106.    By virtue of their positions at RESI, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

107.    Information showing that Defendants acted knowingly or with reckless disregard or the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of RESI, the Individual Defendants had knowledge of the details of RESI's internal affairs.

108.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of RESI. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to RESI's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of RESI securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning RESI's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased RESI securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

109.    During the Class Period, RESI securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading

statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of RESI securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of RESI securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of RESI securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

110.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

111.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the  Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Individual Defendants

112.    Plaintiff repeats and realleges each and every allegation contained in  the foregoing paragraphs as if fully set forth herein.

113.    During the Class Period, the Individual Defendants participated in the operation and management of RESI, and conducted and participated, directly and indirectly, in the conduct

of RESI's business affairs. Because of their senior positions, they knew the adverse non-public information about RESI's misstatement of income and expenses and false financial statements.

114.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to RESI's financial condition and results of operations, and to correct promptly any public statements issued by RESI which had become materially false or misleading.

115.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which RESI disseminated in the marketplace during the Class Period concerning RESI's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause RESI to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of RESI within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of RESI securities.

116.   Each of the Individual Defendants, therefore, acted as a controlling person of RESI. By reason of their senior management positions and/or being directors of RESI, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, RESI to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of RESI and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

117.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by RESI.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 27, 2015                             Respectfully submitted,

                                                  K. A. RAMES, P.C.

                                                  /s/_____
                                                  Kevin A. Rames, Esq.
                                                  VI Bar No. 193 and

                                                  /s/_____
                                                  Semaj Johnson, Esq.
                                                  VI Bar No. 1151
                                                  2111 Company Street, Suite 3
                                                  Christiansted, VI 00820
                                                  (340) 773-7284 / Fax (340) 773-7282
                                                  Kevin.rames@rameslaw.com
                                                  Semaj.johnson@rameslaw.com

-And-

Laurence M. Rosen
Phillip Kim
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 34th Floor
New York, NY 10016
Tel: 212-686-1060
Fax: 212-202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com

*Counsel for Plaintiffs*