IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| ERIC MARTIN, individually and on behalf of all others similarly situated, | Case No: 1:15-cv-00024-WAL-GWC |
| Plaintiff, | |
| v. | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| ALTISOURCE RESIDENTIAL CORPORATION, WILLIAM C. ERBEY, ASHISH PANDEY, KENNETH D. NAJOUR, ROBIN N. LOWE, and RACHEL M. RIDLEY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## TABLE OF CONTENTS

NATURE OF THE CLAIM ................................................................................................1

JURISDICTION AND VENUE ........................................................................................7

PARTIES ..........................................................................................................................7

SUBSTANTIVE ALLEGATIONS ...................................................................................9

    Background and the ASPS Spinoff ..........................................................................9

    The Beginning of the Investigations ......................................................................11

    The Company and AAMC Are Spun Off, Yet Remain Intertwined.......................16

    Erbey's Control of the Erbey Companies and Diminishing Stake in Residential ............21

    Investigation Findings and Investor Criticism ......................................................22

    The 2014 NY DFS Consent Order and Erbey's Forced Resignations ..................28

    Other Recent Developments ...................................................................................31

DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS ........36

    December 24, 2012 – Registration Statement .......................................................36

    February 7, 2013 – Annual Report ........................................................................41

    April 19, 2013 – Proxy Statement .........................................................................50

    April 25, 2013 - Prospectus ...................................................................................52

    May 9, 2013 – Quarterly Report ...........................................................................61

    May 11, 2013 – Conference Call ...........................................................................68

    July 23, 2013 – Quarterly Report ..........................................................................70

    July 23, 2013 – Conference Call ...........................................................................74

    September 25, 2013 - Prospectus ...........................................................................75

    October 22, 2013 – Quarterly Report ....................................................................84

    October 22, 2013 – Conference Call......................................................................88

    January 15, 2014 – Prospectus...............................................................................89

    February 20, 2014 – Annual Report ......................................................................98

    February 20, 2014 – Conference Call ..................................................................106

    April 16, 2014 – Proxy Statement .......................................................................107

    April 29, 2014 – Quarterly Report ......................................................................111

    April 29, 2014 – Conference Call ........................................................................116

    July 22, 2014 – Quarterly Report........................................................................117

i

July 22, 2014 – Conference Call.................................................................122

November 4, 2014 – Conference Call............................................................123

November 5, 2014 – Quarterly Report .........................................................124

INVESTORS RECEIVED PARTIAL CORRECTIVE DISCLOSURES ...................................130

December 19, 2013 – CFPB Consent Judgment................................................130

February 6, 2014 – NY DFS Suspension.......................................................130

February 26, 2014 – NY DFS Letter ............................................................131

August 4, 2014 – NY DFS Letter ................................................................131

October 21, 2014 – NY DFS Letter .............................................................131

November 12, 2014 – Discontinuance of Force-Placed Insurance.................................132

December 22, 2014 – NY DFS Consent Order.................................................132

DEFENDANTS ACTED WITH SCIENTER ...........................................................133

Defendants Benefited Financially from the Fraud............................................133

Defendants Used Public Money to Fund the Erbey Companies...................................134

Defendants Knew that the Erbey Companies Were Detrimental to Residential ...........135

Defendants Disregarded Residential's Internal Controls..............................................139

PRESUMPTION OF RELIANCE:......................................................................139

FRAUD-ON-THE-MARKET DOCTRINE .................................................................139

THE PSLRA SAFE HARBOR DOES NOT APPLY...................................................141

LOSS CAUSATION......................................................................................142

CLASS ACTION ALLEGATIONS .......................................................................143

COUNT ONE............................................................................................144

COUNT TWO............................................................................................147

PRAYER FOR RELIEF ................................................................................147

JURY DEMAND ........................................................................................148

Lead Plaintiff Lei Shi ("Plaintiff"), by his undersigned attorneys, alleges in this Amended Class Action Complaint (the "Complaint") the following upon personal knowledge with respect to his own acts, and upon facts obtained through an investigation by his attorneys and review of documents and materials including but not limited to: (a) relevant filings made by Altisource Residential Corporation ("Residential" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) public documents, conference calls, and press releases; (c) research analysts' reports concerning the Company; and (d) interviews of confidential witnesses ("CWs") with personal knowledge of relevant facts.  Plaintiff believes that further substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.  Certain facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE CLAIM

1.      This is a securities class action on behalf of all persons or entities, other than defendants, who invested in defendant Residential between December 24, 2012 and December 22, 2014, inclusive (the "Class Period"), against Residential and its senior officers for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), codified at 15 U.S.C. § 78a, *et seq.*, and SEC Rule 10b-5 promulgated thereunder.

2.      The claims stated herein arise from material misrepresentations and omissions made concerning the nature and extent of the Company's relationship with the former Chairman of the Board of Directors (the "Board"), William C. Erbey ("Erbey"), and other companies controlled by or connected to Erbey, *viz:* Ocwen Financial Corporation ("Ocwen"), Altisource Asset Management Corporation ("AAMC"), and Altisource Portfolio Solutions, S.A. ("ASPS") (together with Residential, the "Erbey Companies").  For each of these companies, Erbey served as either the Chairman or Chief Executive Officer as well as the largest individual shareholder.

1

3.      As a whole, the Erbey Companies own, service, and sell billions of dollars of residential mortgages and single-family properties.  Residential owns and manages single-family rental properties through the acquisition of sub-performing and non-performing residential mortgage loans.  The Company services and/or modifies the loans initially.  If and when the mortgages fail, Residential acquires the underlying properties through foreclosure and converts them into a single-family rental properties.

4.      Defendant Erbey, as Chairman of Residential's Board, used the other Erbey Companies to service Residential's operations.  In exchange, the Erbey Companies (and Erbey) profited immensely.  For example, Residential has no employees, which means that it needed outside management in order to operate.  To remedy this issue, Defendant Erbey manufactured a series of agreements between Residential and AAMC whereby Residential pays AAMC exorbitant fees in exchange for managerial services.  Similarly, while Residential owns billions of dollars of residential mortgages, the Company has no one to service the loans.  Defendant Erbey, accordingly, created a loan servicing agreement between Residential and Ocwen for the purpose of having Ocwen service Residential's loans.  Additionally, with respect to Residential's single-family rental properties, Residential paid ASPS to manage the units (*e.g.*, renovations, maintenance, leasing, etc.).  Residential provided the following illustration of its operations in its filings with the SEC:



5.      Defendants materially misled investors by creating the false appearance that these related-party transactions had been vetted and approved in accordance with Residential's internal related-party transaction policies.  Moreover, Defendants did not disclose to investors that the related-party transactions with the Erbey Companies were detrimental to Residential's operations and, in turn, Residential's stock price.

6.      Throughout the Class Period, Defendants promoted Ocwen as an outstanding loan servicer and represented to investors that the Company would benefit as a result of having Ocwen service its loans.  Defendants' representations included statements such as:

> "Ocwen's servicing approach is focused on the psychological principles of influencing borrower behavior and uses non-linear optimization models for deciding the best resolution for a loan. . . .  Importantly, by using Ocwen's servicing platform to modify as many loans as possible, we believe that more families may remain in their homes because of our efforts."

and

> "Our service, Ocwen has been ranked best in class in modifying loans by many third party servicing performance reports."

and

> "We believe that our access to Ocwen's servicing expertise and multifaceted resolution methodologies helps us maximize the value of our loan portfolios and

provides us with a competitive advantage over other companies with a similar focus."

7.     In reality, Ocwen was an extreme liability to Residential and its operations as a whole.  Contrary to Defendants' public statements, Ocwen had been under investigation since the start of the Class Period.  Organizations such as the New York Department of Financial Services ("NY DFS"), Federal Trade Commission ("FTC"), Consumer Financial Protection Bureau ("CFPB"), and the Multistate Mortgage Committee had been examining Ocwen's operations under intense scrutiny—for example, pursuant to the terms of a December 2012 Consent Order, the NY DFS had installed an on-site monitor to supervise Ocwen's loan servicing conduct.  While Defendants portrayed Ocwen as being a superior loan servicer whose practices would allow "more families [to] remain in their homes," Ocwen was responsible for back-dating thousands of loan modification letters that resulted in numerous improper foreclosures.

8.     Similar to Residential's relationship with Ocwen, its agreements with AAMC were also extremely harmful to the Company.  Through AAMC, Defendant Erbey improperly transferred millions of dollars from Residential to AAMC in the form of "incentive fees" and "expenses."  Between 2012 and 2014, AAMC received over $84 million from Residential.  This is compared to Residential's total dividends to shareholders during the same time period of $132 million.  According to public analyst reports, AAMC's "incentive fees" were over six times higher than amounts paid by similarly situated companies for external management services.

9.     By withholding this information from investors, Defendants were able to artificially inflate Residential's stock price and attract close to $1 billion in public equity through three separate stock offerings.  From there, Defendants transferred the money from Residential

through the Erbey Companies and benefited personally by millions of dollars.  Defendant Erbey

alone received over $26 million in director and officer compensation as a result of the fraud:



10.     Defendant Erbey was also able to reap over $19 million in realized and unrealized

profits from exercising valuable stock options.   Meanwhile, Defendants Ashish Pandey

("Pandey"), Kenneth D. Najour ("Najour"), Robin N. Lowe ("Lowe"), and Rachel M. Ridley

("Ridley") enjoyed lucrative salaries and perks including reimbursement of expenses related to

their relocation to the Virgin Islands, supplemental living expenses, car allowances, education

allowances, travel allowances, housing expenses, and medical benefits.

11.     Not until the NY DFS forcibly removed Defendant Erbey from each of the Erbey

Companies did investors finally discover the extent of his wrongdoing and the wrongdoing of the

other Defendants.  According to the NY DFS's Consent Order issued on December 22, 2014,

Defendant Erbey operated with little to no supervision across each of his companies, approving

related-party transactions at will and profiting immensely as a result thereof.   In addition to

Erbey's forced resignation, Ocwen was required to pay $150 million to compensate wronged borrowers as well as completely restructure its board of directors and revamp its internal corporate governance.

12.     Defendant Erbey's misconduct has spurred *four* other separate class action securities fraud lawsuits against each of his companies—in addition to this action against Residential, there are suits against AAMC, ASPS, Ocwen, and a fifth related company named Home Loan Servicing Solutions, Ltd. ("HLSS")—as well as a number of shareholder derivative lawsuits, including one against the directors of Residential.   The lawsuits against Ocwen and ASPS are styled respectively as *In re Ocwen Financial Corporation Securities Litigation*, 9:14cv81057-WPD (S.D. Fl. August 12, 2014) and *In re Altisource Portfolio Solutions, S.A. Securities Litigation*, 9:14cv81156-WPD (S.D. Fl. Nov. 8, 2014).   The shareholder derivative lawsuit that is in the process of settling is venued in Maryland State Court and is styled *Police Retirement System of St. Louis v. Erbey et al.*, Case No. 24-C15000223 (Cir. Ct. Md., City of Baltimore Jan. 16, 2015).   The other lawsuits against the Erbey Companies are in the briefing process.

13.     From a Class Period high of $33.69 per share on January 13, 2014, Residential's stock price has declined by approximately 300% to nearly $10 per share, where it remains today at its current trading price.   Defendant Erbey is responsible for the decline in Residential's stock price, as he created the Erbey Companies, employed the Individual Defendants through AAMC, profited significantly at the expense of Residential's investors, and was responsible for approving and orchestrating the related-party transactions at issue in violation of the Company's related-party transaction policies.   Investors have suffered losses of millions of dollars as a result of Defendants' acts and omissions in concealing the risk of Erbey's fraudulent conduct.

14.     Plaintiff brings this lawsuit on behalf of himself and all similarly situated investors to recover damages.

## JURISDICTION AND VENUE

15.     The federal law claim asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Exchange Act § 27.

17.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and Exchange Act § 27 because Residential is headquartered in this District.  Furthermore, at all times relevant to this action, many of the acts and transactions alleged herein occurred in substantial part in this District.

## PARTIES

19.     Plaintiff Lei Shi purchased Residential common stock at artificially inflated prices during the Class Period and has been damaged thereby.  Plaintiff's transactions in Residential common stock were filed with the Court earlier in this action as an exhibit to a declaration in support of his motion for appointment as lead plaintiff.  Plaintiff incorporates by reference his certification, and the information contained therein, into this Complaint as if it were set forth fully below

20.     Defendant Residential is a real estate investment trust incorporated in Maryland. The Company was incorporated in Maryland on July 19, 2012, as a wholly owned subsidiary of ASPS. Residential's principal executive offices are, care of AAMC, located at 402 Strand Street, Frederiksted, United States Virgin Islands.

21.     Defendant Erbey served as Chairman of the Board since July 2012 until his forced departure on January 16, 2015. Erbey was also the Executive Chairman of the Board of Directors of Ocwen from September 1996 until his forced departure from Ocwen on January 16, 2015, CEO of Ocwen from January 1998 until October 2010, and President of Ocwen from January 1988 to May 1998. Erbey was chairman of HLSS from December 2010 until January 16, 2015, ASPS from July 2009 until January 16, 2015, and AAMC from March 2012 until January 16, 2015. Erbey was a Managing General Partner of Oxford Financial Group, a private investment partnership that was the predecessor of Ocwen, from 1983 until 1995.

22.     Defendant Pandey was CEO of Residential from December 2012 until June 30, 2015. Pandey also served as CEO of AAMC.

23.     Defendant Najour has been chief accounting officer of Residential since October 8, 2014. Previously, Najour served as chief financial officer ("CFO") of the Company and AAMC.

24.     Defendant Lowe has been CFO of Residential since October 2014. Lowe is also CFO of AAMC.

25.     Defendant Ridley was CFO of Residential and AAMC until March 4, 2013.

26.     Erbey, Pandey, Najour, Lowe, and Ridley are referred to collectively herein as the "Individual Defendants" and, together with Residential, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### *Background and the ASPS Spinoff*

27.     Erbey founded Ocwen in 1988. Ocwen focused its business on the acquisition of Mortgage Servicing Rights ("MSRs")—particularly those relating to subprime mortgages—pursuant to which Ocwen would service mortgages for third parties in exchange for a fee.

28.     In 2009, Ocwen undertook acquisitions of a number of mortgage servicers, including Litton Loan Servicing LP ("Litton") and Homeward Residential Holdings, Inc. (formerly American Home Mortgage Servicing Inc.) ("Homeward"), thereby expanding its presence in the market at a time when many institutions, including large banks, worked to reduce their portfolios. Ocwen grew roughly an order of magnitude through these and other acquisitions, from a portfolio of approximately 350,000 loans in late 2009 to more than 2,850,000 loans by the end of 2013.

29.     Also in 2009, Ocwen spun off ASPS via a stock distribution whereby Ocwen shareholders received one share of ASPS stock for every three shares of Ocwen common stock they held on August 4, 2009. ASPS also experienced geometric growth, from a market capitalization of approximately $100 million at the time of the spin-off to $3.5 billion by late 2013. The stock price of ASPS concomitantly rose from approximately $ 21 per share near the end of 2009 to over $170 per share towards the end of 2013. Prior to the spin off, ASPS had operated as Ocwen Solutions, a wholly owned subsidiary of Ocwen created in 2008.

30.     ASPS has remained a necessary part of Ocwen's business. It provides mortgage-servicing services for Ocwen, particularly for those mortgages in Ocwen's portfolio in connection with which mortgagors become delinquent or default or foreclosure becomes necessary. Pursuant to several agreements between Ocwen and ASPS, the latter is the exclusive provider to Ocwen of various services relating to delinquent mortgages, defaulted mortgages,

and foreclosure on properties covered by mortgages underlying MSRs owned by Ocwen. These services include, but are not limited to, appraisals, foreclosure sales through Hubzu.com, and provision of force-placed insurance on properties subject to at-risk mortgages. As detailed in the Form 10-Q quarterly report which Ocwen filed with the SEC on August 18, 2014 ("Ocwen August 18, 2014 10-Q"):

> [Ocwen's] business is currently dependent on many of the services and products provided by [ASPS] under various long-term contracts, including the Services Agreements, Technology Products Services Agreements, Intellectual Property Agreements and the Data Center and Disaster Recovery Services Agreements. Under the Services Agreements, [ASPS] provides various business process outsourcing services. Under the Technology Products Services Agreements and the Data Center and Disaster Recovery Services Agreements, [ASPS] provides technology products and support services. In addition, [Ocwen] ha[s] entered into (i) Support Services Agreements pursuant to which [Ocwen] and [ASPS] provide administrative and corporate services to each other and (ii) a Data Access and Services Agreement pursuant to which [Ocwen] make[s] available to [ASPS] certain data from [Ocwen's] servicing portfolio in exchange for a per asset fee.
>
> * * *
>
> Services provided by [ASPS] under the Services Agreement with Ocwen are generally charged to the borrower and/or loan investor. Accordingly, such services, while derived from [Ocwen's] loan servicing portfolio, are not reported as expenses by Ocwen. These services include residential property valuation, residential property preservation and inspection services, title services and real estate sales. [Ocwen] believe[s] the rates charged for these services are market rates as they are materially consistent with one or more of the following: the rates Ocwen pays to or observes from other service providers and the fees [Ocwen] believe[s ASPS] charges to other customers for comparable services.

31.    The ASPS spin off was the first step in the construction of the interrelated web of the Erbey Companies, which were designed, among other things, to extract money from Residential and line the pockets of Erbey and other insiders at the expense of Residential's shareholders.

32.    As part of the spinoff, ASPS received REALServicing software that Ocwen had developed over the previous two decades. Ostensibly, REALServicing would allow ASPS to automate loan servicing from setup of the loans through the asset management stage, should

foreclosure prove necessary, and streamline both communication with mortgagors and data aggregation that would help Ocwen take measures to assist mortgagors at risk of delinquency, default, or foreclosure. ASPS leased REALServicing back to Ocwen, and realized revenue based on each Ocwen loan serviced on the REALServicing platform.

33.     Ocwen also promoted the social value of its Shared Appreciation Modification ("SAM") program, which it rolled out in 2010 in response to the real estate market crash. The SAM program would ostensibly afford mortgagors the opportunity to reduce their principal balance in exchange for conveying to mortgagees and/or investors in mortgage-backed securities a 25% stake in any appreciation of the property covered by the mortgage, which would be realized at the time of sale or refinance. As Erbey would later tell *Forbes* magazine, REALServicing and the SAM program were "socially responsible" mortgage innovations implemented because, while Erbey was "in the business of making money," he "tr[ied] to do it in a way that [he could] go home and say that people benefited from what [he] did today."

### The Beginning of the Investigations

34.     While Erbey, Ocwen, and ASPS were supposedly working to assist distressed homeowners, numerous state and federal entities began investigating Erbey, Ocwen, and Ocwen-affiliated entities for wrongdoing in connection with their mortgage-servicing practices.

35.     In Ocwen's Form 10-K Annual Report filed with the SEC on February 28, 2011, Ocwen disclosed that it was being investigated by the federal government:

> ***Governmental and legal proceedings and related costs could adversely affect our financial results.*** An adverse result in a governmental investigation or private lawsuits, including purported class action lawsuits, could affect our financial condition and results of operations. We and certain of our affiliates have been named as defendants in a number of purported class action lawsuits challenging our residential loan servicing practices. **We have also received a Civil Investigative Demand from the Federal Trade Commission (FTC), requesting documents and information concerning various loan servicing**

**activities**. A number of our competitors and others in the industry have paid significant sums to resolve investigations initiated by the FTC and/or settle lawsuits brought against them that raised claims similar to those raised in the lawsuits brought against us and our affiliates. **We have also been made aware that a coalition of state Attorneys General (AG Coalition) is conducting an industry-wide investigation into certain acts and practices concerning the mortgage foreclosure process**. We have received no notification of alleged wrongdoing from either the FTC or the AG Coalition. Furthermore, we believe that we have meritorious legal and factual defenses to the lawsuits. However, we can provide no assurances with regard to ultimate outcomes with respect to these matters. Litigation and government proceedings may require that we pay significant legal fees, settlement costs, damages, penalties or other charges, or undertake remedial actions pursuant to administrative orders or court-issued injunctions, any of which could adversely affect our financial results. For more information about our legal proceedings, see "Legal Proceedings."

(emphasis added.)

36.     In response to the FTC investigative demand made on Ocwen in November 2010, Ocwen did not freeze foreclosures pending the outcome of the investigation, as other firms had done. In March 2011, Paul Koches, then employed at Ocwen as executive vice president, called the demand a "generic review of operations" issued in connection with recent headlines about robo-signing, noting that Ocwen had "not been advised of any wrongdoing, and we're fully cooperating with the commission."

37.     Also in 2010, the New York State Banking Department, which was later combined with the New York State Insurance Department to create the NY DFS, began participating in a multistate examination of Ocwen, as well as Litton and Homeward, which were acquired by Ocwen on September 1, 2011 and December 27, 2012, respectively.

38.     The FTC referred its investigation of Ocwen to the CFPB in July 2011. The CFPB was created by the Dodd-Frank Wall Street Reform and Consumer Protection Act enacted in 2010 ("Dodd-Frank Act") and tasked with, among other things, protecting consumers from predatory behavior by mortgage-servicing operations. Upon the bureau's creation, CFPB

Director Richard Cordray identified wrongdoing relating to the mortgage industry as a priority that is high on the bureau's enforcement agenda.

39.     In the midst of these investigations, the New York State Banking Department, Ocwen, Goldman Sachs Bank USA, and Litton entered into an Agreement on Mortgage Servicing Practices on September 1, 2011 (as amended on December 15, 2011 by the NY DFS and Ocwen, the "Servicing Practices Agreement"). As later described by the NY DFS, this agreement required Ocwen to:

- establish and maintain sufficient capacity to properly board and manage its significant portfolio of distressed loans;

- engage in sound document execution and retention practices to ensure that mortgage files were accurate, complete, and reliable; and

- implement a system of robust internal controls and oversight with respect to mortgage servicing practices performed by its staff and third-party vendors.

40.     The December 15, 2011 amendment was implemented, *inter alia*, to prevent Ocwen from charging borrowers penalties, fees, costs, and interest as a result of delays in court appearances caused by the closer of one of Ocwen's New York foreclosure counsel, following widespread allegations of improper foreclosures by that firm.

41.     In early 2012, examinations by the Multistate Mortgage Committee, comprised of state financial regulators, identified potential violations by Ocwen of various states' statutes outlawing unfair and deceptive trade practices, as well as the Dodd-Frank Act.

42.     An ongoing investigation at this time by the NY DFS likewise indicated that Ocwen had violated New York State law and the terms of the Servicing Practices Agreement. Specifically, the NY DFS found that Ocwen had:

- in some instances, failed to send mortgagors 90 days' advance, written notice prior to commencing foreclosure actions, as required under Real Property Actions and Proceeding Law ("RPAPL") § 1304;

- commenced foreclosure actions on subprime loans without affirmatively alleging that it had standing to bring the actions, as required by RPAPL § 1302;

- commenced foreclosure actions without sufficient documentation of its standing to do so;

- violated the Servicing Practices Agreement by failing to provide certain borrowers direct contact information for their designated loss mitigation staff or a single point of contact;

- violated the Servicing Practices Agreement by pursuing foreclosure actions against certain borrowers who are seeking a loan modification;

- violated the Servicing Practices Agreement by failing to conduct an independent review of certain loan modification denials;

- violated the Servicing Practices Agreement by failing to demonstrate its adoption of policies and procedures to effectively track sanctioned third party vendors, including local foreclosure counsel;

- violated the Servicing Practices Agreement by failing to demonstrate its implementation of policies and procedures to verify borrower information on newly boarded accounts to accurately reflect the status and current balance of the borrower's account; and

14

- violated the Servicing Practices Agreement by failing to sufficiently document actions required to ensure that prior modification efforts are not rendered futile upon transfer of a servicing file to or from Ocwen.

43.     Following this determination, Ocwen and the NY DFS entered into a Consent Order on December 5, 2012 (the "2012 NY DFS Consent Order") aimed at rectifying Ocwen's noncompliance. The 2012 NY DFS Consent Order indicated that NY DFS had preliminary concerns that Ocwen's practices had, in some instances, deprived New York mortgagors of opportunities to cure delinquencies before foreclosure actions were commenced and failed to provide mortgagors information on where to contact housing counselors in furtherance of achieving a resolution that did not end in foreclosure. The 2012 NY DFS Consent Order therefore required that Ocwen identify an independent on-site monitor, acceptable to the NY DFS, to review Ocwen's service operations. In announcing the 2012 NY DFS Consent Order, NY DFS Superintendent Benjamin M. Lawsky ("Superintendent Lawsky") stated that:

> "It is not enough to have banks and mortgage servicers sign agreements promising to reform their businesses. The best unrealized reforms won't protect homeowners. To protect homeowners facing the risk of losing their homes, we must ensure that the companies are actually living up to their promises. . . . Following complaints about Ocwen's servicing practices, we conducted a targeted exam of Ocwen's performance and discovered gaps in the company's compliance. The Department is requiring the company to hire a monitor so that we can be sure that the reforms are implemented and homeowners have a real chance to avoid foreclosure."

44.     The 2012 NY DFS Consent Order further provided that the monitor would, following its review, identify necessary corrective measures, make recommendations to the Superintendent of the NY DFS, and oversee implementation of corrective measures approved by the Superintendent.

***The Company and AAMC Are Spun Off, Yet Remain Intertwined***

45.      While the CFPB and state investigatory bodies were conducting their investigations, Erbey planned the continued expansion of his empire through the spin-off of Erbey Companies beyond just ASPS. At the end of February 2012, Ocwen divested HLSS, a Cayman Islands enterprise that Erbey formed to act, effectively, as a holding company by buying from Ocwen MSRs relating to roughly $16 billion in subprime loans.

46.      In April 2012, ASPS announced a plan to spin off two companies: Residential, which ASPS had recently formed to acquire and own single-family rental assets, and AAMC, to ostensibly provide Residential with asset management and corporate governance services.

47.      The spin-offs were completed at the close of business on December 21, 2012, and shares were distributed to ASPS shareholders based on their holdings of ASPS stock on the record date of December 17, 2012. ASPS shareholders received one Residential share for every three ASPS shares they owned, and one AAMC share for every ten ASPS shares they owned. At the time of the spin-off, Pandey stated that "We are pleased to complete the spin-offs from Altisource and look forward to establishing Altisource Residential as a leading acquirer of single-family assets. We believe the extensive industry experience of AAMC's management team in valuing real estate and non-performing loan portfolios along with Residential's long term service agreements with Ocwen Mortgage Servicing, Inc., a leading mortgage loan servicer, and Altisource Solutions S.Á R.L., a leading provider of real estate and mortgage portfolio management, asset recovery and customer relationship management services, will support Residential's ability to successfully acquire and manage single family real-estate portfolios." Likewise, William B. Shepro, CEO of ASPS, acknowledged that the Erbey Companies would remain related: "We wish all the best to Residential and AAMC as independent companies.

While Residential and AAMC are now separate public companies, our relationship does not end here. We look forward to providing Residential and AAMC with high quality cost efficient construction management, leasing and property management services as they develop and grow a national rental portfolio."

48.     Residential is structured to make money in several ways. The Company acquires single-family rental assets, primarily through the acquisition of non-performing loan portfolios from Ocwen. Residential then works with Ocwen, which services the mortgage loans, to either modify the non-performing loans, thereby converting them into performing loans which generate regular payments, or foreclose on the property. Residential then either sells these properties or works with ASPS to renovate these now real estate owned ("REO") properties, whereupon they are sold or leased as single family rentals.

49.     Residential has also, since the third quarter of 2014, attempted to securitize NPLs. Residential's initial NPL securitization in September of 2014 was a success, but there was insufficient demand for the entirely of the Company's second securitization, which was offered in November 2014.

50.     Contemporaneous with its spinoff, Residential entered into an Asset Management Agreement with AAMC (the "Asset Management Agreement"). In the Asset Management Agreement the Companies provided for Residential to pay AAMC variable fees in exchange for AAMC's employees' services. Pursuant to § 4(a) of the Asset Management Agreement, AAMC received an incentive fee of:

> (i) *first,* 2% of the amount of cash dividends paid by Residential to its shareholders with respect to such cash during such fiscal quarter until the Quarterly Per Share Distribution Amount exceeds the First Threshold during such fiscal quarter, as such amount may be adjusted from time to time pursuant to Section 4(d) [of the Asset Management Agreement];

(ii) *second*, 15% of the amount of additional cash dividends paid by Residential to its shareholders with respect to such cash [up to the Second Threshold];

(iii) *third*, 25% of the amount of cash dividends paid by Residential to its shareholders with respect to such cash [up to the Third Threshold]; and

(iv) *thereafter*, 50% of the amount of cash dividends paid by Residential to its shareholders with respect to such cash during such fiscal quarter.

§4(c) of the Asset Management Agreement defines the First Threshold as $0.161 per share, the Second Threshold as $0.193 per share, the Third Threshold as $0.257 per share, and the Fourth Threshold as $.257 per share. In other words, on a distribution of $0.30 per share, AAMC would be paid an incentive fee of:

*((.02 x $.161) + (.15 x ($.193-$.161)) + (.25 x ($.257-$.193)) + (.5 x ($.3 - $.257))) x # of shares*

51.     The amount of cash available for distribution, however, is subject to determination by the employees provided to Residential by AAMC, who owe no fiduciary duties to Residential's shareholders and can manipulate cash distributions to extract as much money as possible from Residential to AAMC. These funds are in addition to the fees and expenses which Residential pays to AAMC for overhead, employee compensation, and other management expenses.

52.     In a March 19, 2014 analyst report, Glaucus Research Group ("Glaucus") stated that they believe that the incentive fee was four to seven times higher than compensation received by similarly situated asset managers.

53.     The mean fee charged to REITs by asset managers is 1.4% of shareholder equity book value, and the high end is 1.5%. According to the Form 10-K Annual Report Residential filed with the SEC on March 2, 2015, Residential paid an incentive management fee to AAMC of $67,959,000 for 2014, while the book value of total Residential shareholder equity was

$1,326,911,000. That is, Residential paid 5.1% of book value to AAMC, when the high end of market rates was 1.5%.

54.     The Asset Management Agreement was just one of several related party transactions which the Company conducted with other Erbey Companies. At the time of its spin-off, Residential also entered the long-term Servicing Agreement with (a subsidiary of) Ocwen and various agreements with ASPS.

55.     The servicing agreement provides for Ocwen to service the mortgage loans which Residential acquires and administer various loss mitigation programs with respect to those loans. The fees received by Ocwen are dependent upon the number and type of acquired mortgage loans serviced by Ocwen. Until Residential entered into relationships with two other servicers in early 2015, discussed in further detail below, Ocwen was responsible for servicing the vast majority of Residential mortgage loans.

56.     The agreements with ASPS provide for ASPS to provide to Residential: (i) construction management, leasing and property management services associated with the acquired single-family rental assets; (ii) services in such areas as human resources, vendor management operations, corporate services, risk management and six sigma, quality assurance, consumer psychology, treasury, finance and accounting, legal, tax, compliance and other support services; and (iii) a non-exclusive, non-transferable, non-sublicensable, and royalty-free license to use the name "Altisource."

57.     Residential claimed these relationships with Ocwen, AAMC, and ASPS provided a competitive advantage. As disclosed in the Company's Form 10-K Annual Report that Residential filed with the SEC on February 7, 2013:

> To help us achieve our business strategy, we are leveraging AAMC's strategic relationships with Ocwen and [ASPS]. We expect that our 15-year mortgage

19

servicing agreement with Ocwen, which we refer to as the "Ocwen servicing agreement," will enable us to shorten non-performing loan resolution timelines by (1) converting a portion of the non-performing loan portfolio to performing status and (2) managing the foreclosure process and timelines with respect to the remainder of the portfolio. We expect that a portion of the non-performing loans will be returned to performing status primarily through loan modifications. Once successfully modified, we expect the borrowers to refinance these loans at or near the estimated value of the underlying property, potentially generating very attractive returns for us. We also expect that, despite efforts to modify or return the mortgage loans to a performing status, a portion of these mortgage loans will enter into foreclosure, ultimately becoming REO that can be converted into single-family rental assets and added to our portfolio. Even after considering the foreclosure expenses and the time value of money, we should be able to acquire single-family rental assets efficiently and cost-effectively at a discount to the typical REO acquisition price. Additionally, as we intend to retain the majority of the underlying real estate assets, we will avoid some of the typical REO acquisition costs such as real estate brokerage commissions.

In addition, we expect that our 15-year master services agreement with [ASPS] for construction management, leasing and property management services, which we refer to as the "Altisource master services agreement," will allow us to operate single-family rental assets at a lower cost than our competitors due to [ASPS]'s established real property management experience and centralized vendor management model. Further, because of [ASPS]'s widely-distributed and established vendor model, we can acquire assets nationwide. We believe that this will enable us to competitively bid on large sub-performing or non-performing mortgage portfolios with assets dispersed throughout the United States.

58.    Moreover, the relationships between Erbey Companies have not been limited to just Ocwen, Residential, AAMC, and ASPS. For example, as described in the Ocwen August 18, 2014 10-Q, "Ocwen and HLSS provide each other certain professional services including valuation analysis of potential MSR acquisitions, treasury management services and other similar services, licensing and regulatory compliance support services, risk management services and other similar services under a Professional Services Agreement. [Ocwen has] also entered into a long-term servicing and a support services agreement with [RESI] and AAMC, respectively."

59.    These relationships were, purportedly, governed by Residential's Related Party Transactions Policy. As disclosed in a Form S-11 filed with the SEC on March 15, 2013:

**Related Party Transaction Policy**

20

Our Board of Directors has adopted a policy and procedure for review, approval and monitoring of transactions involving us and related persons (directors and named executive officers or their immediate family members or stockholders owning 5% or greater of our outstanding stock) within our written Code of Business Conduct and Ethics which is available at www.altisourceresi.com. This policy and procedure is not limited to related person transactions that meet the threshold for disclosure under the relevant SEC rules, as it broadly covers any situation in which a conflict of interest may arise.

Any situation that potentially qualifies as a conflict of interest is to be immediately disclosed to the General Counsel to assess the nature and extent of any concern as well as the appropriate next steps. ***The General Counsel will notify the Chairman of the Board of Directors if any such situation requires approval of the Board of Directors.*** Related persons are required to obtain the prior written approval of the Audit Committee of the Board of Directors before participating in any transaction or situation that may pose a conflict of interest. In considering a transaction, the Audit Committee will consider all relevant factors including (i) whether the transaction is in the best interests of Residential; (ii) alternatives to the related person transaction; (iii) whether the transaction is on terms comparable to those available to third parties; (iv) the potential for the transaction to lead to an actual or apparent conflict of interest and any safeguards imposed to prevent such actual or apparent conflicts; and (v) the overall fairness of the transaction to Residential. The Audit Committee will periodically monitor any approved transactions to ensure that there are no changed circumstances that would render it advisable for Residential to amend or terminate the transaction.

(emphasis added.) Notably, any potential conflict must go through Erbey prior to its consideration by the Board.

### Erbey's Control of the Erbey Companies and Diminishing Stake in Residential

60.    On December 31, 2012, ten days after Residential was spun off from ASPS, Erbey owned 27.9% of Residential, 30.1% of AAMC, 27.9% of ASPS, and 13.2% of Ocwen. By the record dates of the 2015 annual meetings for each of the Erbey Companies, Erbey had increased his ownership stakes to 30.7% of AAMC (April 13, 2015), 32.44% of ASPS (March 23, 2015), and 16.91% of Ocwen (March 27, 2015), but by the Company's April 9, 2015 record date he was not even disclosed as a 5% or greater shareholder in the Definitive 14A Proxy

Statement that Residential filed with the SEC on April 17, 2015. Indeed, at the time of the Company's 2014 Annual Meeting, Erbey had owned only 4.0% of Company equity.

61.     During this time, Residential had undertaken a series of public offerings. Specifically, the Company filed with the SEC Forms 424B1 relating to: (i) 15,000,000 shares ready for delivery on or about May 1, 2013; (ii) 15,000,000 shares ready for delivery on or about October 1, 2013; and (iii) 14,200,000 shares ready for delivery on or about January 22, 2014.  In total, Residential raised nearly $1 billion from public investors.

### Investigation Findings and Investor Criticism

62.     In 2013, based on their public representations, the Erbey Companies's business and operations were in a healthy state. Erbey gave the aforementioned, positive interviews to *TheStreet.com* and *Forbes* and, in the latter half of the year, each of the Erbey Companies enjoyed substantial growth.

63.     However, the Erbey Companies had to confront a significant problem underlying this rosy façade: the Reports of Examination issued by the Florida Office of Financial Regulation ("ROE"). As mentioned above, Ocwen had been the subject of investigation by the Multistate Mortgage Committee. The ROE, which constituted the results of investigations by forty-five regulatory agencies from various states and the District of Columbia, "identified practices that may otherwise violate the laws and regulations of the Participating States and related Federal law." Specifically, The ROE identified:

> a.     Lack of controls related to document execution, including evidence of robo-signing, unauthorized execution, assignment backdating, improper certification and notarization, chain of title irregularities, and other related practices affecting the integrity of documents relied upon in the foreclosure process;
>
> b.     Deficiencies in loss mitigation and loan modification processes, including but not limited to:

1. Failure to effectively communicate with borrowers regarding loss mitigation and other foreclosure avoidance alternatives;

2. Failure to account for documents submitted in tandem with application for loss mitigation assistance;

3. Lack of reasonable expedience in approving or denying loss mitigation applications;

4. Providing false or misleading reasons for denial of loan modifications; and

5. Failure to honor the terms loan modifications for transferred accounts and continued efforts to collect payments under the original note terms.

c.      Lack of controls related to general borrower account management, including but not limited to:

1. Misapplication of borrower payments;

2. Inaccurate escrow accounting and statements; and

3. Assessment of unauthorized fees and charges.

d.      Inadequate staffing and lack of internal controls related to customer service;

e.      Deficiencies in control and oversight of third-party providers, including but not limited to, local foreclosure counsel;

f.      Deficiencies in document maintenance processes, including but not limited to, failure to produce documents requested in tandem with examinations; and

g.      Deficiencies in management control and supervision necessary to ensure compliance with applicable laws and regulations.

64.     On December 19, 2013, the CFPB, 49 states, and the District of Columbia filed a complaint in the United States District Court for the District of Columbia, alleging that Ocwen violated, among other laws, the Unfair and Deceptive Acts and Practices laws of the Plaintiff States and the Consumer Financial Protection Act of 2010.  The action was styled *Consumer Financial Protection Bureau, et al. v. Ocwen Financial Corporation, et al.*, Docket No. 1:13-cv-02025-RMC (D. D.C.).  These entities concurrently entered into a settlement with Ocwen (the

23

"CFPB Consent Judgment"), the terms of which were incorporated into a separate settlement with the aforementioned regulatory agencies whose investigations resulted in the findings in the ROE.

65.     All told, Ocwen agreed to (i) pay $127.3 million into an interest bearing escrow account to provide cash payments to borrowers whose homes were sold in a foreclosure sale between and including January 1, 2009 and December 31, 2012 and who otherwise met certain qualifying criteria; (ii) provide $2 billion of relief to remediate harm to  consumers caused by the alleged unlawful conduct of Ocwen, Litton, and Homeward; and (iii) comply with servicing standards concerning the provision of information and documentation to be used in foreclosure proceedings, oversight of third party service providers, the servicing of loans relating to bankrupt borrowers, the provision of loss mitigation assistance, compliance with protections for active duty service members, restrictions on servicing fees, force-placed insurance, and general service duties and prohibitions.

66.     The following year, things went from bad to worse. In January 2014, Ocwen entered into a deal with Wells Fargo & Co. to purchase MSRs on loans with a total principal balance of roughly $39 billion. This deal was halted, however, by the NY DFS on February 6, 2014. Superintendent Lawsky's office had concerns about Ocwen's ability to handle the additional volume of mortgages given, among other things, the wide range of problems with Ocwen's mortgage servicing procedures identified by the NY DFS and other regulators.

67.     In the months that followed, Lawsky and the NY DFS wrote a series of letters to Ocwen concerning its business practices (the "NY DFS Letters"). Specifically,

- On February 26, 2014, Superintendent Lawsky wrote Ocwen's General Counsel and board of directors to advise that the NY DFS' "ongoing review of Ocwen's mortgage servicing practices has uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely

affiliated" that "cast serious doubt" on the Erbey Companies' representations that these transactions were conducted at arms' length. This letter noted that Ocwen's chief risk officer and ASPS' chief risk officer were one and the same, this person "reported directly to Mr. Erbey in both capacities," this person "seemed not to appreciate the potential conflicts of interest posed by this dual role, which was particularly alarming given his role as Chief Risk Officer," and it remained "unclear whether Altisource Portfolio paid any compensation for the Chief Risk Officer's services." The letter further noted that, while the individual had been removed, "his and Ocwen's failure to affirmatively recognize this conflict demonstrates that the relationship between Ocwen and the affiliated companies warrants further examination." The letter concluded by requesting that Ocwen provide information and documents to the independent monitor, so that the monitor could evaluate whether Ocwen's management, which owned stock in each of the Erbey Companies, had the opportunity and incentive to make conflicted decisions.

- On April 21, 2014, Superintendent Lawsky again wrote Ocwen's General Counsel and board of directors. In this missive, Lawsky was harshly critical of the specific relationship between Ocwen, ASPS, and Hubzu: "Hubzu, which Ocwen uses as its principal online auction site for the sale of its borrowers' homes facing foreclosure, as well as investor-owned properties following foreclosure." During its review, the NY DFS learned that "when Ocwen selects . . . Hubzu [the] auction fee is 4.5%; when Hubzu is competing for auction business on the open market, its fee is as low as 1.5%." The letter notes that "[t]hese higher fees, of course, ultimately get passed on to the investors and struggling borrowers," and requests extensive information about the operation of Hubzu and Ocwen's interactions with Hubzu via ASPS.

- On August 4, 2014, Superintendent Lawsky wrote with respect to "a troubling transaction" involving ASPS and the provision of force-placed insurance "designed to funnel as much as $65 million in fees annually from already-distressed homeowners to [ASPS] for minimal work," noting the role "Erbey played in approving this arrangement appears to be inconsistent with public statements Ocwen has made, as well as representations in [Ocwen] SEC filings." When Ocwen's existing force-placed insurer arrangement was set to expire in March 2014, Erbey effectively single-handedly approved retention of Southwest Business Corporation ("SWBC"), for which ASPS was to provide fee-based services. As a result of this arrangement, ASPS (i) would have received $60 million in commissions per year for providing services that weren't readily apparent to the NY DFS; (ii) would be paid an additional annual fee (namely, 75% of a fee paid to SWBC by Ocwen, which was double what Ocwen had previously paid) for services ASPS was already obligated to provide; and (iii) would provide loss draft management services for Ocwen borrowers, for which SWBC would pay ASPS $75 per loss draft, in addition to $10,000 per month for certain other services. The NY DFS again requested extensive documents about this arrangement, Erbey's role in approving transactions notwithstanding public claims by Ocwen and ASPS that he recuses himself from decisions involving

related companies, and Ocwen's inability to provide documentation showing that related party transactions were conducted at market rates.

- Finally, on October 21, 2014, the NY DFS wrote Ocwen because it had "uncovered serious issues with Ocwen's systems and processes, including Ocwen's backdating of potentially hundreds of thousands of letters to borrowers, likely causing them significant harm." The independent monitor learned that Ocwen had been sending letters denying mortgage loan modifications to borrowers that were dated in excess of thirty days prior to the date Ocwen mailed the letter, while borrowers were given only thirty days to appeal. In other words, through sending backdated letters, Ocwen had denied borrowers the opportunity to appeal modification denials. Moreover, Ocwen represented to the monitor that (1) the issue was isolated to letters of a specific type, (2) the problem affected approximately 6,100 letters, (3) Ocwen discovered the issue in April or May of 2014, and (4) Ocwen implemented changes to its systems in May 2014 that resolved the problem. In fact, the problem was not so limited, the monitor—within a few days—uncovered almost 1,000 additional backdated letters, the changes implemented by Ocwen did not resolve the issue, and the employee who reported the issue in April 2014 had, in fact, reported the same issue in November 2013. Due to the seriousness of the backdating and the enormity of the ramifications for borrowers, the NY DFS demanded that Ocwen take immediate steps to fix the issue and warned that, if Ocwen could not demonstrate immediately that it was competent to service mortgages, "the Department intend[ed] to take whatever action [was] necessary to ensure that borrowers [were] protected."

68.    In response to the October 21, 2014 letter, Ocwen initially claimed that there were 283 borrowers in New York who had received letters with incorrect dates. However, *later that same day*, Ocwen was forced to correct the earlier statement and admit that it was "aware of additional borrowers in New York who received letters with incorrect dates but [did] not yet know how many such letters there were."

69.    On June 12 2014, the SEC served a subpoena on Ocwen in which it requested "production of various documents relating to [Ocwen's] business dealings with [ASPS], HLSS, AAMC and [Residential] and the interests of [Ocwen's] directors and executive officers in these companies." The SEC also indicated an intention to issue an additional subpoena in relation to Ocwen's then-prospective restatement of earnings for the second quarter of 2014 because of potential "material weakness" in its previously-filed earnings statement.

26

70.     On October 22, 2014 the monitor appointed to ensure compliance with the terms of the CFPB consent judgment, entered in the U.S. District Court for the District of Columbia, filed a report with the Court. The monitor reported that Ocwen had failed four metrics in the third and fourth quarter of 2014, and was deemed to have failed an additional seven metrics on account of the aforementioned backdating of letters. The four metrics that Ocwen failed were:

- Metric 7, which evaluated the timeliness, accuracy, and completeness of pre-foreclosure initiation notification letters sent to borrowers;

- Metric 8, which tested whether the servicer complied with servicing standards regarding the propriety of default-related fees (*e.g.*, property preservation fees, valuation fees, and attorneys' fees) collected from borrowers;

- Metric 23, which tested the servicer's compliance with the requirement to notify borrowers of any missing documents within 30 days of a borrower's request for a short sale; and

- Metric 31, which tested whether the servicer sent a denial notification to a borrower that included the reason for the denial, the factual information considered by the servicer in making its decision, and a timeframe by which the borrower can provide evidence that an eligibility determination was made in error.

71.     The seven metrics which Ocwen was deemed to have failed under Ocwen's Global Corrective Action Plan, on account of the backdating of letters, related to: Third-party Vendor Management, Loan Modification Document Collection Timeline Compliance (5-day letter), Loan Modification Decision/Notification Timeline Compliance, Short Sale Decision Timeline Compliance, Short Sale Document Collection Timeline Compliance, Dual Track Failure to Postpone Foreclosure Compliance, and Loan Modification Process.

72.     In October 2014, both Moody's and Standard & Poor's downgraded Ocwen's servicer ratings.

73.     On December 16, 2014 a monitor appointed in *United States, et al. v. Bank of America Corp., et al.*, No. 12-CV-361 (D.D.C. 2012), issued a report finding that Ocwen lacked an internal quality control group that was independent from the line of business whose

27

performance is being measured, and had the authority, privileges and knowledge to effectively implement and conduct the reviews and metric assessments required by the enforcement terms previously entered in that action. The monitor observed a "dysfunctional and chaotic working environment" at Ocwen, and further noted that the processes and procedures of the quality control group were rife with "serious problems and flaws."

### The 2014 NY DFS Consent Order and Erbey's Forced Resignations

74.     On December 22, 2014, the NY DFS entered into another consent order with Ocwen (the "2014 NY DFS Consent Order"), with terms far more severe. The 2014 NY DFS Consent Order recounted the damning findings of the monitor appointed pursuant to the 2012 NY DFS Consent Order, findings that Ocwen agreed with:

- A limited review by the monitor of 478 New York loans that Ocwen had foreclosed upon revealed 1,358 violations of Ocwen's legal obligations, or about three violations per foreclosed loan, including: (i) failing to confirm that it had the right to foreclose before initiating foreclosure proceedings; (ii) failing to ensure that its statements to the court in foreclosure proceedings were correct; (iii) pursuing foreclosure even while modification applications were pending ("dual tracking"); (iv) failing to maintain records confirming that it is not pursuing foreclosure of servicemembers on active duty; and (v) failing to assign a designated customer care representative.

- Ocwen's information technology systems were a patchwork of legacy systems and largely incompatible systems inherited from acquired companies. One example was the use of more than 8,400 comment codes entered either manually or automatically to service Ocwen's portfolio. The use of this patchwork led to, among other things, the letter backdating problems.

- Relatedly, Ocwen did not properly investigate the letter backdating issue when it was first reported to Ocwen's Vice President of Compliance by an employee in 2013, and in fact ignored the issue for five months until the same employee raised it again.

- With respect to REALServicing, Ocwen's self-admitted practice of "training people to read the scripts and the dialogue engines with feeling" has "frustrated struggling borrowers who have complex issues that exceed the bounds of a script," that the scripts result in representatives "provid[ing] conflicting responses to [] borrower[s'] question[s]," and that "[r]epresentatives have also failed in many cases to record in Ocwen's servicing system the nature of the concerns that

28

a borrower has expressed, leading to inaccurate records of the issues raised by the borrower."

- Ocwen did not have a written policy that explicitly required potentially conflicted employees, officers, or directors to recuse themselves from involvement in transactions with the related companies. Without any such policy in place, Erbey participated in the approval of numerous transactions between the Erbey Companies, many of which operated to the detriment of borrowers and investors.

75.     The 2014 NY DFS Consent Order mandated that Ocwen, without seeking any tax deductions or credits, pay $100 million to the NY DFS as a civil monetary penalty pursuant to New York Banking Law § 44, to be used by the State of New York for housing, foreclosure relief, and community redevelopment programs supporting New York's housing recovery, and deposit a further $50 million into an escrow account to be paid as restitution to current and former Ocwen-serviced borrowers in New York, with $10,000 going to individuals whose homes were foreclosed on between January 1, 2009 and December 22, 2014 and the balance to be distributed equally among individuals who were subjected to foreclosure actions by Ocwen during that time that did not ultimately result in foreclosure.

76.     The 2014 NY DFS Consent Order also set forth requirements that Ocwen take measures to assist borrowers with applicable loan modifications and foreclosure alternatives, and the NY DFS appointed an operations monitor to oversee on-site operations at Ocwen and ensure that Ocwen complies with its obligations. The operations monitor was given authority to identify the criteria for determining what constitutes a "related party" for purposes of compliance with the 2014 NY DFS Consent Order, which further requires that Ocwen's board of directors consult with the monitor concerning the operations of its committees and, specifically, which decisions—including proposed transactions with related parties—should be committed to the specific oversight of Ocwen's independent directors. The board was further required to consult

29

with the monitor to determine whether any member of Ocwen's senior management should be terminated.

77.     The monitor appointed pursuant to the 2014 NY DFS Consent Order was further authorized to set benchmarks for the improvement of Ocwen's operations, and Ocwen's ability to acquire additional MSRs was conditioned upon satisfaction of the benchmarks and compliance with the terms of the 2014 NY DFS Consent Order.

78.     With respect to related party transactions, the 2014 NY DFS Consent Order requires Ocwen to conduct semiannual benchmarking studies of pricing and performance standards with respect to all fees or expenses charged to borrowers or investors on New York property by any related party to ensure that such fees and expenses are commensurate with market rates or otherwise reasonable. The 2014 NY DFS Consent Order requires that Ocwen not share officers or other employees, or risk, internal audit, or vendor oversight functions, with related parties, and that any Ocwen employee, officer, or director having more than $200,000 equity ownership in any related party be recused from negotiating or approving transactions with such related party.

79.     The terms of the 2014 NY DFS Consent Order also required Ocwen to enlarge its board of directors through the appointment of two additional independent directors who did not own equity in any of the other Erbey Companies, or any other related party, and provided that Ocwen's board was not to contain more than two executive directors at any time. Moreover, Erbey was required to resign at each of the Erbey Companies:

> Effective January 16, 2015, William Erbey will resign from his position as Executive Chairman of Ocwen, his position as Chairman of the Board of Directors of [ASPS], his position of Chairman of the Board of Directors of [Residential], his position of Chairman of the Board of Directors of [AAMC], and his position of Chairman of the Board of Directors of [HLSS]. Mr. Erbey will have no directorial, management, oversight, consulting, or any other role at

30

Ocwen or any related party, or at any of Ocwen's or the related parties' affiliates or subsidiaries as of the date of his resignation. Effective at his resignation, Ocwen's Board members and management will not disclose to Mr. Erbey any non-public information about Ocwen that is not available to other shareholders. In the event that Ocwen discovers a violation of the terms of this Paragraph, Ocwen will notify the Department of the violation within three (3) business days of discovery.

80.    On the December 22, 2014 conference call concerning the 2014 NY DFS Consent Order, Faris asserted that "Ocwen is committed to a culture of integrity, transparency, and accountability."

81.    On January 16, 2015, Erbey resigned his positions at each of the Erbey Companies.

### *Other Recent Developments*

82.    Erbey's ouster, however, did not mark the end of controversy involving the Erbey Companies. Indeed, the very week of his resignation the California Department of Business Oversight ("CDBO") stated that it would be going forward with its action, initiated on October 3, 2014, to suspend Ocwen's mortgage license in California. By this time, Ocwen had already been subject to three orders of forfeiture in connection with its failure to meet a deadline for production of requested information and documents in that action.

83.    On January 23, 2015, Ocwen and the CDBO entered into a consent order, pursuant to which Ocwen retained its license but was prohibited from acquiring additional MSRs in California until authorized by the CDBO. As with the 2014 NY DFS Consent Order, the January 23, 2015 consent order required that Ocwen retain a third-party auditor to review Ocwen's servicing practices in California, and the California order further required that Ocwen pay the CDBO's examination costs, as well as a $2,500,000 penalty in connection with Ocwen's failure to timely produce information and documents requested by the CDBO.

84.     Also on January 23, 2015, BlueMountain Capital Management, LLC ("BlueMountain") sent notices of default to Ocwen and HLSS concerning certain notes issued in connection with the HLSS Servicer Advance Receivables Trust (the "HSART Trust"). BlueMountain, the investment manager for an eponymous fund that owned the notes, sent a letter that day to, among others, Ocwen and HLSS, in which it asserted that Ocwen's concessions of violations of applicable law in the 2014 NY DFS Consent Order constituted an admission of violations of certain covenants to comply with applicable laws and requisite servicing obligations.

85.     In letters dated February 2, 2015 and February 9, 2015, The Mangrove Partners Master Fund, Ltd. ("Mangrove") wrote HLSS to demand it exercise its contractual rights to terminate its relationship with Ocwen without delay. In the initial letter, Mangrove asserted, as BlueMountain had, that Ocwen's wrongdoing and the resulting fallout, including credit downgrades, constituted various termination events that, pursuant to the sale supplements governing HLSS's purchases of rights to service MSRs from Ocwen, would allow HLSS to terminate its relationship with Ocwen. When HLSS's board of directors responded that it would not immediately terminate its relationship with Ocwen, Mangrove wrote back on February 9, 2015 to advise that it was Mangrove's "intention to nominate a slate of replacement directors for election [that] year because time is not [HLSS]'s friend and you as the [b]oard are showing no signs of taking concrete action to protect shareholders in this serious situation."

86.     On February 20, 2015, BlueMountain wrote to supplement its January 23, 2015 letter, asserting that two subsequent occurrences constituted incremental events of default. BlueMountain claimed that downgrades of Ocwen's servicer rating by Moody's and Fitch gave rise to defaults and termination events in agreements concerning Ocwen MSRs that were

32

collateral for obligations of the HSART Trust to noteholders. BlueMountain further claimed that the increased risk of loss arising from these defaults and termination events provided additional grounds to increase the note interest rate by 3%, which was the remedy provided for in the contracts governing the notes.

87.     On February 23, 2015 HLSS announced that it had entered into a definitive merger agreement with New Residential Investment ("NRZ"), which is managed by an affiliate of Fortress Investment Group. When certain shareholders lodged complaints about the proposed transaction, NRZ and HLSS restructured the deal as an asset sale, which was conducted without the need for shareholder approval. However, NRZ and HLSS also agreed to extend Ocwen's servicing contracts for multiple years.

88.     On March 23, 2015, Ocwen announced that it received a deficiency letter from NYSE Regulation, Inc. indicating that Ocwen was not in compliance with the continued listing standards of the New York Stock Exchange ("NYSE") as a result of its failure to timely file its annual report for the preceding fiscal year. Ocwen attributed this delay in filing to its need for additional time "to analyze and review [HLSS's] ability to continue to meet its obligations to fund new servicing advances."

89.     Meanwhile, at Residential, investors continued to call for termination of the Asset Management Agreement. Specifically, Capstone Equities Capital Management ("Capstone") a Residential shareholder, sent a demand letter to the Board dated February 25, 2015, demanding that the Board terminate the Asset Management Agreement for cause without paying a termination fee, as well as its servicing agreement with a subsidiary of Ocwen, because the admissions in the 2014 NY DFS Consent Order provided grounds for termination. Capstone also

demanded that the Board investigate any claims Residential may have had against AAMC, Ocwen, and those companies' officers and directors.

90.     Capstone was harshly critical of the incentive fee paid to AAMC, which it believed was more than four times higher than the mean market rate. Capstone also believed that, "[d]ivorced from Ocwen's inefficiencies, Residential could more effectively resolve or modify its non-performing loan ("NPL") portfolio. Ocwen has also limited Residential's ability to issue future NPL securitizations, hence limiting the Company's ability to grow." This increase in ability to sell off securities would offer benefits in addition to those arising from severance of the Company's service agreement with Ocwen, which Capstone believes "siphon[s] additional fees for no actual services provided." Capstone encouraged the Board to "terminate the Servicing Agreement for cause without making any further payment to Ocwen and exit the fundamentally conflicted relationship."

91.     On March 9, 2015, Residential announced, together with AAMC, that it was delaying the Company's earnings conference call to an undetermined date, because Residential and AAMC had been "working diligently . . . over the last several months to modify the asset management agreement and solidify a long-term relationship between the companies."

92.     On April 2, 2015, the Company announced that it had entered into a new asset management agreement with AAMC. As described by Residential in a press release issued that day, the new asset management agreement:

- Results in substantial management fee savings to Residential compared to the previous [Asset Management Agreement], and is expected to be immediately accretive to the Company's earnings. The new fee structure will replace the existing fee structure, as follows:

  - An annual base management fee equal to 1.5% of Residential's invested capital, payable quarterly in arrears, potentially increasing to a base management fee of up to 2% of invested capital, based on the number of Residential's rented homes;

- o A quarterly incentive management fee equal to 20% of the amount by which Residental's return on invested capital exceeds a hurdle return rate of between 7% and 8.25% (based on the 10-year treasury rate), potentially increasing to an incentive management fee of up to 25% of such amount, based on the number of Residential's rented homes; and

- o A quarterly conversion fee equal to 1.5% of the market value of the single-family homes leased by Residential for the first time during the quarter.

- Provides for an initial term of 15 years with two potential five-year extensions, subject to the Company's achieving an average annual return on invested capital of at least 7%, thereby providing protection for Residential and creating a strong alignment of interests between Residential and AAMC.

- Provides Residential the flexibility to pay up to 25% of the incentive management fee to AAMC in shares of common stock, further aligning both companies' interests.

93.     The revision to the agreement was in addition to recent service contracts Residential had entered into in late January 2015 with Fay Servicing, LLC ("Fay") and Servis One, Inc. d/b/a BSI Financial Services ("BSI"), the latter of which had also been sanctioned by the NY DFS for failure to apply for registration as a mortgage loan servicer. Pursuant to the terms of these agreements, the vendors "service and provide certain administration, management, modification and disposition services for residential mortgage loans and REO properties acquired by the company and its subsidiaries from time to time." Residential transferred MSRs on $485 million and $585 million of unpaid principal balance to Fay and BSI on February 28, 2015 and in April 2015, respectively.

94.     When Residential finally held its delayed earnings call on April 1, 2015, the Company announced its intention to decrease "overall exposure" to Ocwen by transferring further MSRs, until Ocwen services only 40% of Residential loans. As of the end of 2014, Residential held $2.936 billion in unpaid principal balance, $.1866 billion (or 64%) of which was serviced by Ocwen. The target set by Residential would mean that it intended to transfer loans with c. $691.6 million in unpaid principal balance from Ocwen to be serviced by other providers.

Nevertheless, on the call Pandey still took time "to emphasize that Ocwen servicing performance has been good on our loans, and explained that "the reasons for servicing transfers is primarily to diversify our risk, develop a strong performance history with multiple servicers, expand investor base for our non-performing loan securitizations, and be agile enough to respond to situations that would warrant quick transitions to a different servicer due to servicer-specific issues."

95.     On October 5, 2015, the SEC revealed in a cease-and-desist order that it had charged HLSS for making material misstatements about its handling of related party transactions and the value of its primary asset and for having inadequate internal accounting controls (the "SEC Cease & Desist Order"). Specifically, HLSS disclosed that it required Erbey to recuse himself from transactions with Ocwen and other related parties, including the Erbey Companies, when, in fact, it did not, and HLSS did not even have written policies or procedures on recusals for related party transactions. Erbey, in fact, had approved various transactions between HLSS and Ocwen. HLSS also misstated its net income in 2012, 2013, and first quarter of 2014 because its valuation of rights to service MSRs did not comply with generally accepted accounting principles. Moreover, HLSS executives and the company's audit committee did not adequately review the valuation methodology. HLSS agreed to pay a $1.5 million penalty to settle these charges.

## DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS

### *December 24, 2012 – Registration Statement*

96.     Residential shares begin regular trading on the New York Stock Exchange under the symbol "RESI" on December 24, 2012.  Shareholders of ASPS received one share of Residential stock for every three shares of ASPS common stock.  On December 24, 2012, Residential's stock price opened at $15.05 per share and closed at $14.55 per share.

97.     As of December 24, 2012, Amendment 4 to Residential's Registration Statement on Form 10-12B, dated December 5, 2012, was effective and available to the public.  Defendant Erbey signed the registration statement on behalf of the Company.  The registration statement, which attached and incorporated an information statement, contained materially misleading statements and omissions concerning the Company's operations and dealings with related parties.

98.     Residential's quarterly report misleadingly promoted the Company's relationship with Ocwen:

*Key Investment Strategies*

.   .   .   **As a subprime and Alt-A mortgage loan servicer, Ocwen has a significant amount of experience with special servicing.  Ocwen's collection strategies seek to identify payment problems at the early stage of delinquency and, if necessary, to address the delinquency in order to preserve the equity in a pre-foreclosure mortgage property.  Based on its in-depth experience as a leading mortgage servicer, Ocwen has developed a number of strategies to improve the collection process, including, a proactive consulting approach, defined call strategies, a variety of loan modification strategies and enhanced payment methods.**

Ocwen is licensed to service mortgage loans in all 50 states, the District of Columbia and two U.S. territories.  **Ocwen is a leading provider of residential and commercial mortgage loan servicing, special servicing and asset management services.**  As of September 30, 2012, Ocwen serviced 805,427 residential loans with an aggregate unpaid principal balance of $127.1 billion. Ocwen and its predecessors have been servicing mortgage loans since 1988. **Ocwen has been a leader in developing and implementing mortgage servicing industry best practices and utilizes advanced modeling of loan and consumer-specific resolution alternatives to reduce losses.**

(Registration Statement, Dec. 5, 2012, pp. 60-62)

99.     The above statement (identified in bold) in Paragraph 98 was materially misleading because it portrayed Ocwen as a benefit to the Company and Residential shareholders.  This was incorrect and misleading.  The NY DFS's letters to Ocwen (and copied

to Erbey) made it abundantly clear that Ocwen's loan servicing practices were illegal and doing great disservices to struggling homeowners.  Ocwen's practices ultimately led to the forced removal of Defendant Erbey from the Erbey Companies, as detailed in the NY DFS's Consent Order with Ocwen.  Given the truth about Ocwen and its practices, Residential's description of it was materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

100.    Residential's information statement contained a disclosure concerning Ocwen and the risk that Ocwen could potentially fail to effectively perform its servicing obligations:

> *Failure of Ocwen to effectively perform its servicing obligations under the Ocwen Servicing Agreement could have an adverse effect on our business and performance.*
>
> We will be contractually obligated to service the residential mortgage loans that we ultimately acquire.  We will not have any employees, servicing platform, licenses or technical resources necessary to service our acquired loans. Consequently, we will engage Ocwen to service the loans we acquire.  We believe that this relationship will provide us with significant competitive advantages. If for any reason Ocwen is unable to service the acquired loans at the level and/or the cost that the Company anticipates, an alternate servicer may not be readily available on acceptable terms or at all, which could adversely affect our operating results, thereby having an adverse effect on our ability to execute our business plan.
>
> In addition, under the Ocwen Servicing Agreement, we will be required to pay Ocwen fees for servicing our acquired mortgage loans.  If we fail to pay Ocwen or otherwise default under the Ocwen Servicing Agreement, Ocwen may cease to act as the servicer under the Ocwen Servicing Agreement which would adversely affect our operating results and our ability to execute our business plan.
>
> Any diminishment in Ocwen's performance under, or termination of, the Ocwen Servicing Agreement would negatively impact, or potentially eliminate, the competitive advantage provided by such agreement.
>
> (Registration Statement, Dec. 5, 2012, p. 11)

101.    The above statements in Paragraph 100 were materially misleading because they failed to disclose that Ocwen was already failing to effectively perform its servicing obligations.

Ocwen had been under investigation for illegal mortgage servicing practices since 2010 with the NY DFS.   In addition, organizations including the FTC, CFPB, and Multistate Mortgage Committee had also been investigating Ocwen's practices.   In fact, by the start of the Class Period, Ocwen had already entered into the 2012 NY DFS Consent Order, which, among other things, provided for the installation of an independent on-site monitor to supervise Ocwen going forward.   Notwithstanding the seriousness of Ocwen's violative conduct or the importance of Ocwen to Residential's business strategy, Residential did not disclose any of this information. Given the truth about Ocwen and the fact that it had already failed (and was continuing to fail) to effectively perform its servicing obligations, Residential's disclosure was materially misleading. This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

102.    Similarly, Residential's risk disclosure concerning the potential for conflicts of interest failed to inform investors that such risks had already materialized:

> *We could have conflicts with Altisource, Ocwen, Home Loan Servicing Solutions, Ltd. ("HLSS") and AAMC, and the Chairman and other members of our Board of Directors could have conflicts of interest due to his or their relationship with Altisource, Ocwen, HLSS and AAMC, which may be resolved in a manner adverse to us.*

> Conflicts may arise between Altisource and us as a result of our ongoing agreements and the nature of our respective businesses. Altisource will provide us with residential property management, leasing and construction management services for our acquired REO Properties. In addition, we will become a party to a variety of agreements with Altisource in connection with the Separation, and we may enter into further agreements with Altisource after the Separation. Certain of our directors may be subject to conflicts of interest with respect to such agreements and other matters due to their relationships with Altisource.

> Conflicts may arise between Ocwen and us as a result of our ongoing agreements and the nature of our respective businesses.  Ocwen will perform substantially all of the mortgage loan servicing functions relating to our acquisition and ownership of mortgage loans. Certain of our directors may be subject to conflicts of interest

with respect to such agreements and other matters due to their concurrent roles as directors of Ocwen.

The Chairman of our Board of Directors is the Chairman of the Board of Directors of Altisource, Ocwen, HLSS and AAMC. **As a result, he has obligations to us as well as to Altisource, Ocwen, HLSS and AAMC and may have conflicts of interest with respect to matters potentially or actually involving or affecting us and Altisource, Ocwen, HLSS or AAMC, as the case may be**.

David Reiner is a member of our Board of Directors and a member of the Board of Directors for HLSS.  As a result, he has obligations to us as well as to HLSS and may potentially have conflicts of interest with respect to matters potentially or actually involving or affecting us and HLSS.

Our Chairman currently owns a substantial amount of Altisource, Ocwen and HLSS common stock and Altisource and Ocwen stock options, and, subsequent to the Separation, will own a substantial amount of our common stock and AAMC's common stock. In addition, certain of our directors also may own Altisource and/or Ocwen common stock and stock options due to similar current relationships with Altisource and Ocwen. **Such ownership could create or appear to create potential conflicts of interest when the Chairman of our Board of Directors and our directors are faced with decisions that involve us, Altisource, Ocwen, HLSS, AAMC or any of their respective subsidiaries**.

Altisource, Ocwen, and HLSS are not limited in their ability to compete with us. **We will seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with them and through oversight by independent members of our Board of Directors. However, there can be no assurance that such measures will be effective, that we will be able to resolve all conflicts with Altisource, Ocwen, and HLSS or that the resolution of any such conflicts will be no less favorable to us than if we were dealing with third parties**.

(Registration Statement, Dec. 5, 2012, pp. 20-21)

103.    The above statements (identified in bold) in Paragraph 102 were materially misleading because they created the false impression that Residential (and, in particular, Defendant Erbey) was in compliance with the Company's policies pertaining to related-party transactions.  The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's

conduct with respect to HLSS (a related company affiliated with the Erbey Companies) raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  In light of Defendant Erbey's conduct, Residential's statements concerning compliance with the Company's related-party transaction policies were materially misleading. This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### *February 7, 2013 – Annual Report*

104.    On February 7, 2013, Residential filed an annual report (Form 10-K) with the SEC.  Defendants Pandey and Ridley signed the annual report on behalf of Residential and with the authority of Defendant Erbey.   Through the annual report, Residential materially misled investors about the Company's operations and dealings with related parties.

105.    Residential's annual report promoted the Company's loan resolution methodologies and relationship with Ocwen:

*Competition*

We face competition from various sources for the acquisition of sub-performing and non-performing loans. Our competition includes other REITs, pension funds, insurance companies, hedge funds, investment companies, partnerships and developers. To effectively compete, we will rely upon AAMC's management team and their substantial industry expertise which we believe provides us with a competitive advantage and helps us assess the investment risks and determine appropriate pricing. We expect our integrated approach of acquiring sub-performing and non-performing loans and converting them to REO will enable us to compete more effectively for attractive investment opportunities. **Furthermore, we believe that our access to Ocwen's servicing expertise helps us to maximize the value of our loan portfolios and provides us with a competitive advantage over other companies with a similar focus**. We also believe that our relationship with Altisource and access to its nationwide vendor network will enable us to competitively bid on large sub-performing or non-performing mortgage portfolios with assets dispersed throughout the United States. However, we cannot assure you that we will be able to achieve our business goals or expectations due to the competitive, pricing and other risks that we face. Our competitors may have higher risk tolerances, may be able to pay

higher prices for non-performing loans than we can or may be willing to accept lower returns on investment. As the inventory of available non-performing and sub-performing loans and REO will fluctuate, the competition for assets and financing may increase.

(Annual Report, Feb. 7, 2013, p. 4)

106.    The above statement (identified in bold) in Paragraph 105 was materially misleading because it portrayed Ocwen as a benefit to the Company and Residential shareholders.  This was incorrect and misleading.  The NY DFS's letters to Ocwen (and copied to Erbey) made it abundantly clear that Ocwen's loan servicing practices were illegal and doing great disservices to struggling homeowners.  Ocwen's practices ultimately led to the forced removal of Defendant Erbey from the Erbey Companies, as detailed in the NY DFS's Consent Order with Ocwen.  Given the truth about Ocwen and its practices, Residential's description of it was materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

107.    Similarly, Residential's information statement contained a disclosure concerning Ocwen and the risk that Ocwen could potentially fail to effectively perform its servicing obligations:

*Failure of Ocwen to effectively perform its servicing obligations under the Ocwen servicing agreement could have an adverse effect on our business and performance.*

We are contractually obligated to service the residential mortgage loans that we acquire. We do not have any employees, servicing platform, licenses or technical resources necessary to service our acquired loans. Consequently, we have engaged Ocwen to service the non-performing and sub-performing loans we acquire. If for any reason Ocwen is unable to service the acquired loans at the level and/or the cost that we anticipate, an alternate servicer may not be readily available on acceptable terms or at all which could have an adverse effect on our ability to execute our business plan and thereby adversely affecting our operating results.

> In addition, under the Ocwen servicing agreement, we are required to pay Ocwen fees for servicing our acquired mortgage loans. If we fail to pay Ocwen or otherwise default under the Ocwen servicing agreement, Ocwen may cease to act as the servicer under the Ocwen servicing agreement which would adversely affect our ability to execute our business plan and our operating results.

(Annual Report, Feb. 7, 2013, p. 6)

108.     The above statements in Paragraph 107 were materially misleading because they failed to disclose that Ocwen was already failing to effectively perform its servicing obligations (as opposed to risk that had yet to materialize).  Ocwen had been under investigation for illegal mortgage servicing practices since 2010 with the NY DFS.  In addition, organizations including the FTC, CFPB, and Multistate Mortgage Committee had also been investigating Ocwen's practices.  In fact, by the start of the Class Period, Ocwen had already entered into the 2012 NY DFS Consent Order, which, among other things, provided for the installation of an independent on-site monitor to supervise Ocwen going forward.  Notwithstanding the seriousness of Ocwen's violative conduct or the importance of Ocwen to Residential's business strategy, Residential did not disclose any of this information.  Given the truth about Ocwen and the fact that it had already failed (and was continuing to fail) to effectively perform its servicing obligations, Residential's disclosure was materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

109.     Similarly, Residential's risk disclosure concerning the potential for conflicts of interest failed to inform investors that such risks had already materialized:

> We could have conflicts with Altisource, Ocwen, Home Loan Servicing Solutions, Ltd., which we refer to as "HLSS", and AAMC, and the Chairman and other members of our Board of Directors could have conflicts of interest due to his/their relationship with Altisource, Ocwen, HLSS and AAMC which may be resolved in a manner adverse to us.

Conflicts may arise between Altisource and us as a result of our ongoing agreements and the nature of our respective businesses. Altisource will provide us with residential property management, leasing and construction management services for our acquired REO properties. In addition, we may enter into further agreements with Altisource involving purchase of assets, joint venture relationships, financing arrangements and other business transactions. Because both of our businesses involve construction, leasing and property management services, Altisource's interests may conflict with ours particularly if Altisource deploys its resources in favor of its other clients.

Conflicts may arise between Ocwen and us as a result of our ongoing agreements and the nature of our respective businesses. Ocwen will perform substantially all mortgage loan servicing functions relating to our acquisition and ownership of mortgage loans. In addition, we may enter into further agreements with Ocwen involving purchase of assets, joint venture relationships, financing arrangements and other business transactions. Because we outsource our servicing function to Ocwen and Ocwen services mortgages for its own clients, Ocwen's interests may conflict with ours particularly if is resources are deployed in favor of its other clients.

Altisource, Ocwen, and HLSS are not limited in their ability to compete with us. We will seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with them and through oversight by independent members of our Board of Directors. However, there can be no assurance that such measures will be effective, that we will be able to resolve all conflicts with Altisource, Ocwen, and HLSS or that the resolution of any such conflicts will be no less favorable to us than if we were dealing with third parties.

The Chairman of our Board of Directors is the Chairman of the Board of Directors of Altisource, Ocwen, HLSS and AAMC. **As a result, he has obligations to us as well as to Altisource, Ocwen, HLSS and AAMC and may have conflicts of interest with respect to matters potentially or actually involving or affecting us and Altisource, Ocwen, HLSS or AAMC, as the case may be.**

David Reiner is a member of our Board of Directors and a member of the Board of Directors for HLSS. As a result, he has obligations to us as well as to HLSS and may potentially have conflicts of interest with respect to matters potentially or actually involving or affecting us and HLSS.

Our Chairman currently owns a substantial amount of Altisource, Ocwen, HLSS, AAMC and our common stock and Altisource and Ocwen stock options. In addition, certain of our Directors in the future also may own Altisource and/or Ocwen common stock and stock options due to similar current relationships with Altisource and Ocwen. **Such ownership could create or appear to create potential conflicts of interest when the Chairman of our Board of Directors**

44

**and our Directors are faced with decisions that involve us, Altisource, Ocwen, HLSS, AAMC or any of their respective subsidiaries**.

(Annual Report, Feb. 7, 2013, p. 12)

110.    The above statements (identified in bold) in Paragraph 109 were materially misleading because they created the false impression that Residential (and, in particular, Defendant Erbey) was in compliance with the Company's policies pertaining to related-party transactions.  The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board. In light of Defendant Erbey's conduct, Residential's statements concerning compliance with the Company's related-party transaction policies were materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

111.    Residential's annual report also incorporated by reference the section titled "Transactions with Related Persons" from the Company's proxy statement (Schedule 14A) filed on April 19, 2013.  (Annual Report, Feb. 7, 2013, p. 26)  As explained below (April 19, 2013 – Proxy Statement, *infra*), Residential's descriptions of its related-party transactions were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions.  Further, Residential's descriptions of its related-party transactions omitted material information that was required to be disclosed pursuant to Item 404 of Regulation S-K (17 C.F.R. 229.404), including but not limited to Defendant Erbey's interest in each of the transactions and the detrimental effects they had upon Residential shareholders.

45

112.   Residential's annual report purported to disclose to investors the Company's various arrangements with the Erbey Companies.  Specifically, Residential disclosed its:

(a)   "Master Services Agreement" with ASPS, which provided ASPS with the exclusive right to serve as property manager for Residential's single-family rental properties.  The agreement contained an initial term of 15 years and would automatically renew for two-year terms.  Residential was allowed to terminate the agreement on notice, but would be required to reimburse costs and expenses.  (Annual Report, Feb. 7, 2013, p. F-10)

(b)   "Support Services Agreement" with ASPS, which allowed ASPS to provide service to Residential in the areas of human resources, vendor management operations, corporate services, etc.  (Annual Report, Feb. 7, 2013, pp. F-10 to F-11)

(c)   "Trademark License Agreement" with ASPS, which provided Residential with a license to use the name "Altisource."  (Annual Report, Feb. 7, 2013, p. F-11)

(d)   "Servicing Agreement" with Ocwen, which provided Ocwen the right to service Residential's mortgage loans for an initial term of 15 years. Regardless of which party terminated the agreement, Residential would be required to pay all servicing transfer costs and repay any unreimbursed servicing advances to Ocwen.  Ocwen's fees under the agreement depended upon the number and type of residential mortgage loans that Ocwen elected to service.  (Annual Report, Feb. 7, 2013, p. F-10)

(e)   "Asset Management Agreement" with AAMC, which was a 15-year agreement under which AAMC would effectively manage Residential's day-to-day affairs and overall business strategy.  In exchange, Residential was required to pay AAMC escalating "Incentive Management Fees" equal to an amount between 2% and 50% of the Company's available cash in any given quarter.  Additionally, Residential was required to reimburse AAMC for expenses and pay a fee upon termination equal to three times the average annual incentive management fee during the 24-month period preceding the termination.  (Annual Report, Feb. 7, 2013, pp. F-9 to F-10)

113.   The above statements in Paragraph 112 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions.  By presenting these related-party transactions immediately after discussing the Company's various

policies pertaining to related-party transactions (and representing the Company's affirmative compliance with these policies), Residential created the false impression that these transactions had been properly considered and approved.   However, the SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.   Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board. The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the expense of Residential shareholders.   This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

114.     Residential's annual report also materially misled investors with respect to the state of the Company's disclosure controls and procedures:

*Evaluation of Disclosure Controls and Procedures*

As of December 31, 2012, our management including our chief executive officer and chief financial officer evaluated the effectiveness of the design and operation of our disclosure controls and procedures. **Based on that evaluation, management including the chief executive officer and chief financial officer concluded that our disclosure controls and procedures were effective as of December 31, 2012 in providing a reasonable level of assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in applicable SEC rules and forms including providing a reasonable level of assurance that information required to be disclosed by us in such reports is accumulated and communicated to our management including our chief executive officer and our chief financial officer as appropriate to allow timely decisions regarding required disclosure. However, in evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated can provide only reasonable assurance of**

**achieving the desired control objectives, and management was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.**

(Annual Report, Feb. 7, 2013, p. 25)

115. Additionally, in connection with Residential's annual report, Defendants Pandey and Ridley submitted Certifications Pursuant to the Sarbanes-Oxley Act of 2002. The certifications stated as follows:

1. I have reviewed this quarterly report on Form 10-K of Altisource Residential Corporation;

2. Based on my knowledge, this **report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

48

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and

(b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(Annual Report, Feb. 7, 2013, Exhibits 31.1 and 31.2)

116.    The above statements (identified in bold) in Paragraphs 114-115 were materially misleading because they materially misrepresented the state of the Company's internal controls. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  Given the Company's true state of internal controls, the above statements were materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

*April 19, 2013 – Proxy Statement*

117.    On April 19, 2013, Residential issued a proxy statement (Schedule 14A) in advance of the Company's annual shareholder meeting.  Defendants Erbey and Pandey signed the cover letter to the proxy statement.  Through the proxy statement, Residential materially misled investors about the Company's operations and dealings with related parties.

118.     Residential's proxy statement represented to investors that the Company was in compliance with SEC and applicable exchange rules with respect to reporting violations of Residential's Code of Business Conduct and Code of Ethics:

> We have adopted a Code of Business Conduct and Ethics that applies to our Directors, officers and employees. **Any waivers from the Code of Business Conduct and Ethics for Directors or named executive officers must be approved by our Board of Directors or the Audit Committee and will be subsequently disclosed when required by SEC or applicable exchange rules**. The Code of Business Conduct and Ethics is available on our website at www.altisourceresi.com and is available to any stockholder who requests a copy by writing to our Corporate Secretary at c/o Altisource Asset Management Corporation, 402 Strand Street, Frederiksted, U.S. Virgin Islands 00840-3531. Any amendments to the Code of Business Conduct and Ethics, as well as **any waivers that are required to be disclosed under SEC or exchange rules, either will be posted on our website or otherwise disclosed in accordance with such rules**.

(Proxy Statement, April 19, 2013, p. 9)

119.    Residential's proxy statement purported to disclose to investors the Company's various arrangements with the Erbey Companies.  Specifically, Residential disclosed its:

> (a)    "Master Services Agreement" with ASPS, which provided ASPS with the exclusive right to serve as property manager for Residential's single-family rental properties.  The agreement contained an initial term of 15 years and would automatically renew for two-year terms.  Residential was allowed to terminate the agreement on notice, but would be required to reimburse costs and expenses.  (Proxy Statement, April 19, 2013, pp. 22)

> (b)    "Support Services Agreement" with ASPS, which allowed ASPS to provide service to Residential in the areas of human resources, vendor

management operations, corporate services, etc.  (Proxy Statement, April 19, 2013, pp. 22-23)

(c)   "Trademark License Agreement" with ASPS, which provided Residential with a license to use the name "Altisource."  (Proxy Statement, April 19, 2013, p. 23)

(d)   "Servicing Agreement" with Ocwen, which provided Ocwen the right to service Residential's mortgage loans for an initial term of 15 years. Regardless of which party terminated the agreement, Residential would be required to pay all servicing transfer costs and repay any unreimbursed servicing advances to Ocwen.  Ocwen's fees under the agreement depended upon the number and type of residential mortgage loans that Ocwen elected to service.  (Proxy Statement, April 19, 2013, p. 23)

(e)   "Purchase of Non-Performing Mortgage Portfolio" from Ocwen, which consisted of a $64.4 million purchase of non-performing loans from Ocwen to Residential.  (Proxy Statement, April 19, 2013, pp. 23-24)

(f)   "Asset Management Agreement" with AAMC, which was a 15-year agreement under which AAMC would effectively manage Residential's day-to-day affairs and overall business strategy.  In exchange, Residential was required to pay AAMC escalating "Incentive Management Fees" equal to an amount between 2% and 50% of the Company's available cash in any given quarter.  Additionally, Residential was required to reimburse AAMC for expenses and pay a fee upon termination equal to three times the average annual incentive management fee during the 24-month period preceding the termination.  (Proxy Statement, April 19, 2013, pp. 24-26)

120.   The above statements in Paragraph 118-119 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions.  By presenting these related-party transactions immediately after discussing the Company's various policies pertaining to related-party transactions (and representing the Company's affirmative compliance with these policies), Residential created the false impression that these transactions had been properly considered and approved.  However, the SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference

51

that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board. The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the expense of Residential shareholders.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### *April 25, 2013 - Prospectus*

121.    On April 25, 2013, Residential filed a prospectus (Form 424) with the SEC in connection with a public offering of 15 million shares of common stock at $18.75 per share for total proceeds of nearly $270 million.  The prospectus was dated April 25, 2013.  The prospectus was part of the Company's registration statement which was signed by Defendant Najour (with the authority of Defendant Erbey) on behalf of the Company.   The prospectus contained materially misleading statements and omissions concerning the Company's operations and dealings with related parties.

122.    Residential's prospectus promoted the Company's loan resolution methodologies and relationship with Ocwen:

*Relationship with Ocwen and Proven Loan Resolution Methodologies*

We intend to capitalize on the servicing capabilities of Ocwen, which we view as superior relative to other servicers in terms of cost, management experience, technology infrastructure and platform scalability. Ocwen will service our acquired residential mortgage loan portfolios in accordance with the terms of their servicing agreement with us. **Ocwen's servicing approach is focused on the psychological principles of influencing borrower behavior and uses non-linear optimization models for deciding the best resolution for a loan. Ocwen's use of artificial intelligence and scripting engines seeks to remove variability and human error from the process and provides scalability. Ocwen is a leader in its ability to convert loans that are 90 days or more past**

**due to current status**. Ocwen has successfully grown its servicing portfolio to approximately $204 billion as of December 31, 2012.

**Importantly, by using Ocwen's servicing platform to modify as many loans as possible, we believe that more families may remain in their homes because of our efforts**.

(Prospectus, Apr. 25, 2013, p. 6)

. . .

Our principal objective is to generate attractive risk-adjusted returns for our stockholders over the long-term through dividends and capital appreciation. We believe that the events affecting the housing and mortgage market in recent years have created a significant supply of single-family rental properties available for rental purposes. We believe we have an opportunity to acquire single-family rental properties through the acquisition of sub-performing and non-performing loan portfolios at attractive valuations relative to historical levels. We expect our integrated approach of acquiring sub-performing and non-performing residential mortgage loans and converting them to REO will enable us to compete more effectively for attractive investment opportunities. Furthermore, **we believe that our access to Ocwen's servicing expertise helps us maximize the value of our loan portfolios and provides us with a competitive advantage over other companies with a similar focu**s. . . .

(Prospectus, Apr. 25, 2013, p. 51)

. . .

*Our Strengths*

*Relationship with Ocwen and Proven Loan Resolution Methodologies*

**We intend to capitalize on the servicing capabilities of Ocwen, which we view as superior relative to other servicers in terms of cost, management experience, technology infrastructure and platform scalability**. Ocwen will service our acquired residential mortgage loan portfolios in accordance with the terms of their servicing agreement with us. **Ocwen's servicing approach is focused on the psychological principles of influencing borrower behavior and uses non-linear optimization models for deciding the best resolution for a loan. Ocwen's use of artificial intelligence and scripting engines seeks to remove variability and human error from the process and provides scalability. Ocwen is a leader in its ability to convert loans that are 90 days or more past due to current status**. Ocwen has successfully grown its servicing portfolio to approximately $204 billion as of December 31, 2012.

The information below highlights the recognition by various industry constituents of Ocwen's servicing capabilities:

- Moody's (January 2013) — Ocwen outranks, Chase, Wells Fargo, GMAC and Bank of America in generating cash flow from non-performing loans as well as has the shortest timeline of foreclosure referral to foreclosure sale.

- Morningstar Credit Ratings (September 2012) — Ocwen received the highest ranking, MOR RS1, noting that it "exceeds prudent loan servicing standards in key areas of risk."

- Freddie Mac (August 2009 – Present) — Ocwen is hired by Freddie Mac to perform special servicing and interim servicing on non-performing loans.

- Bank of America (July 2009) — Ocwen had the highest roll rate from 90+ delinquent to current on both fixed rate and adjustable rate subprime loans. Ocwen's results were more than double the midpoint for all servicers reported.

**Importantly, by using Ocwen's servicing platform to modify as many loans as possible, we believe that more families may remain in their homes because of our efforts**.

(Prospectus, Apr. 25, 2013, pp. 68-69)

123.   The above statements (identified in bold) in Paragraphs 122 were materially misleading because they portrayed Ocwen as a benefit to the Company and Residential shareholders.  This was incorrect and misleading.  The NY DFS's letters to Ocwen (and copied to Erbey) made it abundantly clear that Ocwen's loan servicing practices were illegal and doing great disservices to struggling homeowners.  Ocwen's practices ultimately led to the forced removal of Defendant Erbey from the Erbey Companies, as detailed in the NY DFS's Consent Order with Ocwen.  Given the truth about Ocwen and its practices, Residential's description of it was materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

124.    Similarly, Residential's information statement contained a disclosure concerning Ocwen and the risk that Ocwen could potentially fail to effectively perform its servicing obligations:

> *Failure of Ocwen to effectively perform its servicing obligations under the servicing agreement could have a material adverse effect on us.*
>
> We are contractually obligated to service the residential mortgage loans that we acquire. We do not have any employees, servicing platform, licenses or technical resources necessary to service our acquired loans. Consequently, we have engaged Ocwen to service the non-performing and sub-performing loans we acquire. If for any reason Ocwen is unable to service these loans at the level and/or the cost that we anticipate, or if we fail to pay Ocwen or otherwise default under the Ocwen servicing agreement, and Ocwen ceases to act as our servicer, an alternate servicer may not be readily available on favorable terms, or at all, which could have a material adverse effect on us.

(Prospectus, Apr. 25, 2013, p. 33)

125.    The above statements in Paragraph 124 were materially misleading because they failed to disclose that Ocwen was already failing to effectively perform its servicing obligations (as opposed to risk that had yet to materialize).  Ocwen had been under investigation for illegal mortgage servicing practices since 2010 with the NY DFS.  In addition, organizations including the FTC, CFPB, and Multistate Mortgage Committee had also been investigating Ocwen's practices.  In fact, by the start of the Class Period, Ocwen had already entered into the 2012 NY DFS Consent Order, which, among other things, provided for the installation of an independent on-site monitor to supervise Ocwen going forward.  Notwithstanding the seriousness of Ocwen's violative conduct or the importance of Ocwen to Residential's business strategy, Residential did not disclose any of this information.  Given the truth about Ocwen and the fact that it had already failed (and was continuing to fail) to effectively perform its servicing obligations, Residential's disclosure was materially misleading.  This information is material because it would have altered

the total mix of information available to investors when considering whether to invest in Residential.

126.    Residential's prospectus also materially misled shareholders with respect to the Company's oversight of related-party transactions.  Residential disclosed the terms of its Asset Management Agreement with AAMC, but omitted that Defendant Erbey was benefiting as a result of the agreement to the detriment of the Company and its shareholders:

> Upon completion of our separation and AAMC's separation from Altisource on December 21, 2012, we entered into a 15-year asset management agreement with AAMC. Pursuant to the asset management agreement, AAMC will design and implement our business strategy, administer our business activities and day-to-day operations and provide corporate governance services, subject to oversight by our Board of Directors. AAMC is responsible for, among other duties: (1) performing and administering all our day-to-day operations, (2) determining investment criteria through our Investment Policy in cooperation with our Board of Directors, (3) sourcing, analyzing and executing asset acquisitions, including our acquisition of sub-performing and non-performing residential mortgage loan portfolios and related financing activities, (4) analyzing and performing sales of properties, (5) overseeing Altisource's renovation, leasing and property management of our single-family rentals, (6) overseeing Ocwen's servicing of our residential mortgage loan portfolios, (7) performing asset management duties and (8) performing corporate governance and other management functions, including financial, accounting and tax management services. AAMC will provide us with a management team and appropriate support personnel who have substantial sub-performing and non-performing loan portfolio experience. AAMC's management also has significant corporate governance experience that will enable us to manage our business and organizational structure efficiently. AAMC has agreed not to provide the same or substantially similar services to any other party so long as the company and the operating partnership have on hand an average of $50,000,000 in capital available for investment over the previous two fiscal quarters. Notwithstanding the foregoing, AAMC may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other investment based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the company or the operating partnership, so long as its services to the company and the operating partnership are not impaired thereby.

> (Prospectus, Apr. 25, 2013, p. 85)

127.    In addition to the above statements, Residential's prospectus purported to disclose to investors the Company's various arrangements with the Erbey Companies.   Specifically, Residential disclosed its:

(a)    "Master Services Agreement" with ASPS, which provided ASPS with the exclusive right to serve as property manager for Residential's single-family rental properties.   The agreement contained an initial term of 15 years and would automatically renew for two-year terms.  (Prospectus, Apr. 25, 2013, p. 92)

(b)    "Support Services Agreement" with ASPS, which allowed ASPS to provide service to Residential in the areas of human resources, vendor management operations, corporate services, etc.  (Prospectus, Apr. 25, 2013, p. 92)

(c)    "Trademark License Agreement" with ASPS, which provided Residential with a license to use the name "Altisource."  (Prospectus, Apr. 25, 2013, p. 93)

(d)    "Servicing Agreement" with Ocwen, which provided Ocwen the right to service Residential's mortgage loans for an initial term of 15 years. Ocwen's fees under the agreement depended upon the number and type of residential mortgage loans that Ocwen elected to service.  (Prospectus, Apr. 25, 2013, p. 93)

(e)    "Recent Purchase of Non-Performing Mortgage Portfolio" from Ocwen, which consisted of a $64.4 million purchase of non-performing loans from Ocwen to Residential.  (Prospectus, Apr. 25, 2013, p. 93)

(f)    "Asset Management Agreement" with AAMC, which was a 15-year agreement under which AAMC would effectively manage Residential's day-to-day affairs and overall business strategy.  In exchange, Residential was required to pay AAMC escalating "Incentive Management Fees" equal to an amount between 2% and 50% of the Company's available cash in any given quarter.  Additionally, Residential was required to reimburse AAMC for expenses and pay a fee upon termination equal to three times the average annual incentive management fee during the 24-month period preceding the termination.  (Prospectus, Apr. 25, 2013, pp. 85-87, 93)

128.    Immediately after disclosing the Company's various related-party transactions, Residential's prospectus provided investors with a description of the Company's "Related Party Transaction Policy," which fostered the incorrect belief the policy was being followed:

*Related Party Transaction Policy*

Our Board of Directors has adopted a policy and procedure for review, approval and monitoring of transactions involving us and related persons (directors and named executive officers or their immediate family members or stockholders owning 5% or greater of our outstanding stock) within our written Code of Business Conduct and Ethics. This policy and procedure is not limited to related person transactions that meet the threshold for disclosure under the relevant SEC rules, as it broadly covers any situation in which a conflict of interest may arise.

Any situation that potentially qualifies as a conflict of interest is to be immediately disclosed to the General Counsel to assess the nature and extent of any concern as well as the appropriate next steps. The General Counsel will notify the Chairman of the Board of Directors if any such situation requires approval of the Board of Directors. Related persons are required to obtain the prior written approval of the Audit Committee of the Board of Directors before participating in any transaction or situation that may pose a conflict of interest. In considering a transaction, the Audit Committee will consider all relevant factors including (i) whether the transaction is in the best interests of Residential; (ii) alternatives to the related person transaction; (iii) whether the transaction is on terms comparable to those available to third parties; (iv) the potential for the transaction to lead to an actual or apparent conflict of interest and any safeguards imposed to prevent such actual or apparent conflicts; and (v) the overall fairness of the transaction to Residential. The Audit Committee will periodically monitor any approved transactions to ensure that there are no changed circumstances that would render it advisable for Residential to amend or terminate the transaction.

(Prospectus, Apr. 25, 2013, p. 95)

129.    Similarly, while Residential's annual report warned of a risk that certain officers could have conflicts of interests, the Company did not disclose that such a risk already materialized:

> *We have conflicts of interest with our Manager and our service providers, and the Chairman and other members of our Board of Directors, as well as our management team, have, or could have in the future, conflicts of interest due to their respective relationships with these entities, and such conflicts may be resolved in a manner adverse to us.*
>
> We have entered into an asset management agreement with AAMC for administering our business, providing portfolio management services and performing certain of our corporate governance functions. **This agreement was not negotiated in an arm's length transaction and, accordingly, could contain terms, including the basis of calculation of the amount of incentive**

**management fee payable to AAMC, that are less favorable to us than agreements negotiated with unaffiliated third parties might contain**. Furthermore, since the calculation of AAMC's incentive management fee is based on the amount of cash available for distribution to our stockholders, it may cause AAMC to take risks that could increase our cash available for distribution at the expense of other criteria, such as preservation of capital. Actions taken in that regard may fail to generate any returns.

As an externally managed REIT, we have no management or employees and are entirely managed by AAMC, which negotiates all our agreements and deals with all our contractual counterparties on our behalf. **For example, we have numerous complex, and critically important, agreements with Ocwen (our servicing agreement) and Altisource (our master services agreement, support services agreement and trademark license agreement), and AAMC acts for us in connection with all those agreements, including monitoring the performance of Ocwen and Altisource under those agreements and exercising any available rights or remedies on our behalf. In addition, we may have additional dealings with Ocwen and Altisource beyond those agreements, such as our February 14, 2013 purchase from Ocwen of a portfolio of non-performing residential mortgage loans**.

Altisource and Ocwen are not limited in their ability to compete with us. **We will seek to manage these potential conflicts through provisions of our agreements with them and through oversight by independent members of our Board of Directors or general dispute resolution methods. However, there can be no assurance that such measures will be effective, that we will be able to resolve all conflicts with Altisource and Ocwen or that the resolution of any such conflicts will be no less favorable to us than if we were dealing with unaffiliated third parties**.

As noted under "Certain Relationships and Related Party Transactions—Share Ownership of our Chairman," our Chairman currently owns a substantial amount of Altisource, Ocwen and AAMC and our common stock and stock options of Altisource and Ocwen and ours. Each of our executive officers is also an executive officer of AAMC and has interests in our relationship with AAMC that may be different than the interests of our stockholders. In particular, these individuals have a direct interest in the financial success of AAMC, which may encourage these individuals to support strategies in furtherance of the financial success of AAMC that adversely impact us. In addition, certain of our other directors and members of our management team own or may own Altisource and/or Ocwen common stock and stock options due to similar current relationships with Altisource and Ocwen. **Such ownership creates conflicts of interest when the Chairman of our Board of Directors and such directors or members of our management team are faced with decisions that involve us and Altisource, Ocwen, AAMC or any of their respective subsidiaries**.

(Quarterly Report, Apr. 25, 2013, pp. 30-31)

. . .

*Our agreements with our service providers were not negotiated in arms'-length transactions.*

We have entered into the master services agreement, the support services agreement and the trademark license agreement with Altisource, and the servicing agreement with Ocwen. The material terms of these are agreements are described in "Certain Relationships and Related Transactions." **None of these agreements were negotiated by arms'-length transactions; accordingly, each of the agreements may contain terms that are less favorable to us than agreements negotiated with unaffiliated third parties might contain**.

(Quarterly Report, Apr. 25, 2013, p. 32)

130.    The above statements in Paragraphs 126-129 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions.  By presenting these related-party transactions immediately after discussing the Company's various policies pertaining to related-party transactions (and representing the Company's affirmative compliance with these policies), Residential created the false impression that these transactions had been properly considered and approved.  However, the SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board. The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the expense of Residential shareholders.  This information is material because it would have altered

the total mix of information available to investors when considering whether to invest in Residential.

*May 9, 2013 – Quarterly Report*

131.    On May 9, 2013, Residential filed a quarterly report (Form 10-Q) with the SEC. Defendant Najour signed the quarterly report on behalf of Residential.  Through the quarterly report, Residential materially misled investors about the Company's operations and dealings with related parties.

132.    Residential's quarterly report misleadingly reported the Company's related-party transactions.  For the three-months ended March 31, 2013 (respectively), Residential reported payments of: (i) $392,000 to Ocwen for "[r]elated party mortgage loan servicing costs"; (ii) $183,000 to ASPS for "[d]ue diligence costs"; and (iii) $895,000 to AAMC for "[e]xpense reimbursements."  (Quarterly Report, May 9, 2013, p. 12)

133.    Residential's quarterly report also disclosed that: "[d]uring the three months ended March 31, 2013, [Residential] acquired a portfolio from Ocwen of non-performing first lien residential mortgage loans having aggregate collateral market value of $94.2 million as of the February 1, 2013 cut-off date for the transaction."

134.    The above statements in Paragraphs 132-133 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  The above statements omitted that (i) Residential's

related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the expense of Residential shareholders. This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

135.   The above statements in Paragraphs 132-133 also omitted material information that was required to be disclosed pursuant to Item 404 of Regulation S-K (17 C.F.R. 229.404), including but not limited to Defendant Erbey's interest in each of the transactions and the detrimental effects they had upon Residential shareholders. Defendant Erbey used the related-party transactions to siphon money from Residential to his other companies where he was able to profit handsomely via his relatively superior ownership interests (*i.e.*, compared to his 4% ownership interest in Residential, Defendant Erbey held a 29.6% stake in AAMC, 14.95% stake in Ocwen, and 29.34% stake in ASPS). As the NY DFS explained in its letter dated August 4, 2014, Defendant Erbey was able to "direct[] profits" between his companies and, as a result, benefit financially. In accordance with Item 404, Residential should have disclosed the amount by which Defendant Erbey was benefitting personally as a result of each of the related-party transactions as well as the harm each transaction caused to the Company and its investors. This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

136.   Residential's quarterly report contained a disclosure concerning Ocwen and the risk that Ocwen could potentially fail to effectively perform its servicing obligations:

> *Failure of Ocwen to effectively perform its servicing obligations under the servicing agreement could have a material adverse effect on us.*

We are contractually obligated to service the residential mortgage loans that we acquire. We do not have any employees, servicing platform, licenses or technical resources necessary to service our acquired loans. Consequently, we have engaged Ocwen to service the non-performing and sub-performing loans we acquire. If for any reason Ocwen is unable to service these loans at the level and/or the cost that we anticipate, or if we fail to pay Ocwen or otherwise default under the Ocwen servicing agreement, and Ocwen ceases to act as our servicer, an alternate servicer may not be readily available on favorable terms, or at all, which could have a material adverse effect on us.

(Quarterly Report, May 9, 2013, p. 37)

137.    The above statements in Paragraph 136 were materially misleading because they failed to disclose that Ocwen was already failing to effectively perform its servicing obligations (as opposed to risk that had yet to materialize).  Ocwen had been under investigation for illegal mortgage servicing practices since 2010 with the NY DFS.  In addition, organizations including the FTC, CFPB, and Multistate Mortgage Committee had also been investigating Ocwen's practices.  In fact, by the start of the Class Period, Ocwen had already entered into the 2012 NY DFS Consent Order, which, among other things, provided for the installation of an independent on-site monitor to supervise Ocwen going forward.  Notwithstanding the seriousness of Ocwen's violative conduct or the importance of Ocwen to Residential's business strategy, Residential did not disclose any of this information.  Given the truth about Ocwen and the fact that it had already failed (and was continuing to fail) to effectively perform its servicing obligations, Residential's disclosure was materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

138.    Similarly, while Residential's annual report warned of a risk that certain officers could have conflicts of interests, the Company did not disclose that such a risk already materialized:

*We have conflicts of interest with our Manager and our service providers, and the Chairman and other members of our Board of Directors, as well as our management team, have, or could have in the future, conflicts of interest due to their respective relationships with these entities, and such conflicts may be resolved in a manner adverse to us.*

We have entered into an asset management agreement with AAMC for administering our business, providing portfolio management services and performing certain of our corporate governance functions. **This agreement was not negotiated in an arm's length transaction and, accordingly, could contain terms, including the basis of calculation of the amount of incentive management fee payable to AAMC, that are less favorable to us than agreements negotiated with unaffiliated third parties might contain**. Furthermore, since the calculation of AAMC's incentive management fee is based on the amount of cash available for distribution to our stockholders, it may cause AAMC to take risks that could increase our cash available for distribution at the expense of other criteria, such as preservation of capital. Actions taken in that regard may fail to generate any returns.

As an externally managed REIT, we have no management or employees and are entirely managed by AAMC, which negotiates all our agreements and deals with all our contractual counterparties on our behalf. **For example, we have numerous complex, and critically important, agreements with Ocwen (our servicing agreement) and Altisource (our master services agreement, support services agreement and trademark license agreement), and going forward AAMC will act for us in connection with all those agreements, including monitoring the performance of Ocwen and Altisource under those agreements and exercising any available rights or remedies on our behalf. In addition, we may have additional dealings with Ocwen and Altisource beyond those agreements, such as our February 14, 2013 purchase from Ocwen of a portfolio of non-performing residential mortgage loans**.

Altisource and Ocwen are not limited in their ability to compete with us. **We will seek to manage these potential conflicts through provisions of our agreements with them and through oversight by independent members of our Board of Directors or general dispute resolution methods. However, there can be no assurance that such measures will be effective, that we will be able to resolve all conflicts with Altisource and Ocwen or that the resolution of any such conflicts will be no less favorable to us than if we were dealing with unaffiliated third parties**.

Our Chairman currently owns a substantial amount of Altisource, Ocwen and AAMC and our common stock and stock options of Altisource and Ocwen and ours. Each of our executive officers is also an executive officer of AAMC and has interests in our relationship with AAMC that may be different than the interests of our stockholders. In particular, these individuals will have a direct interest in the

64

financial success of AAMC, which may encourage these individuals to support strategies in furtherance of the financial success of AAMC that adversely impact us. In addition, certain of our other directors and members of our management team own or may own Altisource and/or Ocwen common stock and stock options due to similar current relationships with Altisource and Ocwen. **Such ownership creates conflicts of interest when the Chairman of our Board of Directors and such directors or members of our management team are faced with decisions that involve us and Altisource, Ocwen, AAMC or any of their respective subsidiaries**.

(Quarterly Report, May 9, 2013, pp. 35-36)

. . .

*Our agreements with our service providers were not negotiated in arms'-length transactions.*

We have entered into the master services agreement, the support services agreement and the trademark license agreement with Altisource, and the servicing agreement with Ocwen. **None of these agreements were negotiated by arms'-length transactions; accordingly, each of the agreements may contain terms that are less favorable to us than agreements negotiated with unaffiliated third parties might contain**.

(Quarterly Report, May 9, 2013, p. 36)

139.    The above statements (identified in bold) in Paragraphs 138 were materially misleading because they created the false impression that Residential (and, in particular, Defendant Erbey) was in compliance with the Company's policies pertaining to related-party transactions.  The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  In light of Defendant Erbey's conduct, Residential's statements concerning compliance with the Company's related-party transaction policies were materially misleading.  This information is material because it would

have altered the total mix of information available to investors when considering whether to invest in Residential.

140.    Residential's quarterly report also materially misrepresented the status of the Company's internal controls.  Specifically, Residential stated that:

*Item 4. Controls and procedures*

SEC rules require us to maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our annual and periodic reports filed with the SEC is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. **Our CEO and CFO have concluded that the disclosure controls and procedures were effective at the end of the period covered by this quarterly report**. SEC rules also require us to establish and maintain internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepting accounting principles. There were no changes in internal control over financial reporting during the three months ended March 31, 2013 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Quarterly Report, May 9, 2013, pp. 22-23)

141.    In connection with Residential's quarterly report, Defendants Pandey and Najour submitted Certifications Pursuant to the Sarbanes-Oxley Act of 2002.  The certifications stated as follows:

1. I have reviewed this quarterly report on Form 10-Q of Altisource Residential Corporation;

2. Based on my knowledge, this **report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

66

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and

(b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(Quarterly Report, May 9, 2013, Exhibits 31.1 and 31.2)

142.     The above statements (identified in bold) in Paragraphs 140-141 were materially misleading because they materially misrepresented the state of the Company's internal controls. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.   Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.   Given the Company's true state of internal controls, the above statements were materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### *May 11, 2013 – Conference Call*

143.     On May 11, 2013, Defendants Erbey, Pandey, and Najour hosted an investor conference call to discuss the Company's first-quarter earnings for fiscal 2013.

144.     During his opening remarks, Defendant Erbey promoted Ocwen's capabilities and the supposed benefits it provided to Residential:

> We have developed a differentiated business model that leverages the capabilities of our strategic relationships with our partners, Ocwen and Altisource, which are highlighted on Slide 4. The key to our model is the existing operating infrastructure of our partners where Ocwen provides non-performing loan servicing to Residential and Altisource provides renovation, leasing and property management services to Residential. Those amongst you who know the lineage of AAMC and Residential will understand that operations is in our DNA.
>
> **Ocwen is one of the few players to have a successful track record in NPL acquisition and management. Throughout the 1990s Ocwen was one of the largest acquirers of non-performing loans**. Today, Ocwen is the fifth largest servicer in the United States, servicing loans of $470 billion of Unpaid Principal Balance or UPV at March 31, 2013. **With a focus on non-performing and difficult to service loans, Ocwen has been very effective in creating value by resolving approximately 70% of non-performing loans it services without foreclosing**. This servicing effectiveness is attested by many organizations as depicted on Slide 5.

Ocwen's operating cost of approximately 60% lower than average industry costs for servicing NPLs. Both operating efficiency and resolution effectiveness are very important to the success of Residential. One of our primary resolution methodologies is to modify NPLs. Modification and subsequent refinancing of NPLs generates near term cash flows as an optimal economic outcome for Residential, along with being a socially responsible business strategy. Altisource provides renovation, leasing and property management services to us.

145. The above statement (identified in bold) in Paragraph 144 was materially misleading because it portrayed Ocwen as a benefit to the Company and Residential shareholders. This was incorrect and misleading. The NY DFS's letters to Ocwen (and copied to Erbey) made it abundantly clear that Ocwen's loan servicing practices were illegal and doing great disservices to struggling homeowners. Ocwen's practices ultimately led to the forced removal of Defendant Erbey from the Erbey Companies, as detailed in the NY DFS's Consent Order with Ocwen. Given the truth about Ocwen and its practices, Residential's description of it was materially misleading. This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

146. Defendant Najour discussed Residential's related-party transactions during the call:

The $2.5 million of expenses include reimbursable expenses to AAMC of $895,000, NPL management expenses of $392,000 and NPL acquisition fees of $367,000. Please note that we acquired our first portfolio of loans in February but incurred expenses for the full quarter.

As disclosed earlier, Residential entered into and has a management agreement with AAMC to receive corporate governance, asset management and advisory services. AAMC provides these services in exchange for incentive fees payable only upon delivering dividends to our shareholders and reimbursement of certain overhead and operating expenses.

For the quarter, we did not incur incentive fee expense, but did incur $895,000 of expense reimbursement to AAMC for certain overhead and operating expenses. While we did not make any distributions to stockholders in the first quarter, we intend to elect and qualify to be taxes (inaudible) in 2013. This will require us among other things to distribute annually at least 90% of our REIT taxable

income to our stockholders. As a REIT, we generally will not be subject to U.S Federal Income Tax on our taxable income that we distribute to our stockholders.

147.    The above statements in Paragraph 146 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the expense of Residential shareholders.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### July 23, 2013 – Quarterly Report

148.    On July 23, 2013, Residential filed a quarterly report (Form 10-Q) with the SEC. Defendant Najour signed the quarterly report on behalf of Residential.  Through the quarterly report, Residential materially misled investors about the Company's operations and dealings with related parties.

149.    Residential's quarterly report misleadingly reported the Company's related-party transactions.  For the three- and six-months ended June 30, 2013 (respectively), Residential reported payments of: (i) $1,242,000 and $1,634,000 to Ocwen for "[r]elated party mortgage loan servicing costs"; (ii) "—" and $183,000 to ASPS for "[d]ue diligence costs"; and (iii)

$1,156,000 and $2,057,000 to AAMC for "[e]xpense reimbursements."  (Quarterly Report, July 23, 2013, p. 11)

150.    Residential also told investors that "[d]uring the six months ended June 30, 2013, we acquired a portfolio from Ocwen of non-performing first lien residential mortgage loans having aggregate collateral market value of $94.2 million as of the February 1, 2013 cut-off date for the transaction. The aggregate purchase price for this portfolio was $64.4 million." (Quarterly Report, July. 22, 2013, p. 10)

151.    The above statements in Paragraphs 149-150 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the expense of Residential shareholders.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

152.    The above statements in Paragraphs 149-150 also omitted material information that was required to be disclosed pursuant to Item 404 of Regulation S-K (17 C.F.R. 229.404), including but not limited to Defendant Erbey's interest in each of the transactions and the detrimental effects they had upon Residential shareholders.  Defendant Erbey used the related-

party transactions to siphon money from Residential to his other companies where he was able to profit handsomely via his relatively superior ownership interests (*i.e.*, compared to his 4% ownership interest in Residential, Defendant Erbey held a 29.6% stake in AAMC, 14.95% stake in Ocwen, and 29.34% stake in ASPS).  As the NY DFS explained in its letter dated August 4, 2014, Defendant Erbey was able to "direct[] profits" between his companies and, as a result, benefit financially.  In accordance with Item 404, Residential should have disclosed the amount by which Defendant Erbey was benefitting personally as a result of each of the related-party transactions as well as the harm each transaction caused to the Company and its investors.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

153.   Residential's quarterly report also materially misrepresented the status of the Company's internal controls.  Specifically, Residential stated that:

> *Item 4. Controls and procedures*
>
> SEC rules require us to maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our annual and periodic reports filed with the SEC is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. **Our CEO and CFO have concluded that the disclosure controls and procedures were effective at the end of the period covered by this quarterly report**.
>
> SEC rules also require us to establish and maintain internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepting accounting principles. There were no changes in internal control over financial reporting during the three months ended June 30, 2013 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.
>
> (Quarterly Report, July 23, 2013, pp. 22-23)

72

154.    In connection with Residential's quarterly report, Defendants Pandey and Najour submitted Certifications Pursuant to the Sarbanes-Oxley Act of 2002.  The certifications stated as follows:

1. I have reviewed this quarterly report on Form 10-Q of Altisource Residential Corporation;

2. Based on my knowledge, this **report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual

73

report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and

> (b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(Quarterly Report, July 23, 2013, Exhibits 31.1 and 31.2)

155.     The above statements (identified in bold) in Paragraphs 153-154 were materially misleading because they materially misrepresented the state of the Company's internal controls. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  Given the Company's true state of internal controls, the above statements were materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### *July 23, 2013 – Conference Call*

156.     On July 23, 2013, Defendants Erbey, Pandey, and Najour hosted an investor conference call to discuss the Company's second-quarter earnings for fiscal 2013.

157.    Defendant Najour discussed Residential's related-party transactions during the call: "During the quarter we raised, we recorded $3.9 million in expenses which include $1.2 million of reimbursable expenses to AAMC and $1.2 million of surge on fees to Auckland."

158.    The above statements in Paragraph 157 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the expense of Residential shareholders.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### September 25, 2013 - Prospectus

159.    On September 25, 2013, Residential filed a prospectus (Form 424) with the SEC in connection with a public offering of 15 million shares of common stock at $21 per share for total proceeds of nearly $305 million.  The prospectus was dated September 25, 2013.  The prospectus was part of the Company's registration statement which was signed by Defendant Najour (with the authority of Defendant Erbey) on behalf of the Company.  The prospectus contained materially misleading statements and omissions concerning the Company's operations and dealings with related parties.

160.   Residential's prospectus promoted the Company's loan resolution methodologies and relationship with Ocwen:

*Relationship with Ocwen and Proven Loan Resolution Methodologies*

We intend to capitalize on the servicing capabilities of Ocwen, which we view as superior relative to other servicers in terms of cost, management experience, technology infrastructure and platform scalability. Ocwen services our acquired residential mortgage loan portfolios in accordance with the terms of their servicing agreement with us. **Ocwen's servicing approach is focused on the psychological principles of influencing borrower behavior and uses non-linear optimization models for deciding the best resolution for a loan. Ocwen's use of artificial intelligence and scripting engines seeks to remove variability and human error from the process and provides scalability. Ocwen is a leader in its ability to convert loans that are 90 days or more past due to current status**. Ocwen has successfully grown its servicing portfolio to approximately $437 billion as of June 30, 2013.

**Importantly, by using Ocwen's servicing platform to modify as many loans as possible, we believe that more families may remain in their homes because of our efforts.**

(Prospectus, Sept. 25, 2013, p. 6)

. . .

Our principal objective is to generate attractive risk-adjusted returns for our stockholders over the long term through dividends and capital appreciation. We believe that the events affecting the housing and mortgage market in recent years have created a significant supply of single-family rental properties available for rental purposes. We believe we have an opportunity to acquire single-family rental properties through the acquisition of sub-performing and non-performing loan portfolios at attractive valuations relative to historical levels. We expect our integrated approach of acquiring sub-performing and non-performing residential mortgage loans and converting them to REO will enable us to compete more effectively for attractive investment opportunities. **Furthermore, we believe that our access to Ocwen's servicing expertise helps us maximize the value of our loan portfolios and provides us with a competitive advantage over other companies with a similar focus**. . . .

(Prospectus, Sept. 25, 2013, p. 68)

. . .

*Our Strengths*

76

*Relationship with Ocwen and Proven Loan Resolution Methodologies*

**We intend to capitalize on the servicing capabilities of Ocwen, which we view as superior relative to other servicers in terms of cost, management experience, technology infrastructure and platform scalability**. Ocwen services our acquired residential mortgage loan portfolios in accordance with the terms of their servicing agreement with us. **Ocwen's servicing approach is focused on the psychological principles of influencing borrower behavior and uses non-linear optimization models for deciding the best resolution for a loan. Ocwen's use of artificial intelligence and scripting engines seeks to remove variability and human error from the process and provides scalability. Ocwen is a leader in its ability to convert loans that are 90 days or more past due to current status**. Ocwen has successfully grown its servicing portfolio to approximately $437 billion as of June 30, 2013

The information below highlights the recognition by various industry constituents of Ocwen's servicing capabilities:

- Moody's (January 2013) — Ocwen outranks, Chase, Wells Fargo, GMAC and Bank of America in generating cash flow from non-performing loans as well as has the shortest timeline of foreclosure referral to foreclosure sale.

- Morningstar Credit Ratings (September 2012) — Ocwen received the highest ranking, MOR RS1, noting that it "exceeds prudent loan servicing standards in key areas of risk."

- Freddie Mac (August 2009 – Present) — Ocwen is hired by Freddie Mac to perform special servicing and interim servicing on non-performing loans.

- Bank of America (July 2009) — Ocwen had the highest roll rate from 90+ delinquent to current on both fixed rate and adjustable rate subprime loans. Ocwen's results were more than double the midpoint for all servicers reported.

**Importantly, by using Ocwen's servicing platform to modify as many loans as possible, we believe that more families may remain in their homes because of our efforts**.

(Prospectus, Sept. 25, 2013, pp. 68-69)

161.   The above statements (identified in bold) in Paragraph 160 were materially misleading because they portrayed Ocwen as a benefit to the Company and Residential

shareholders.  This was incorrect and misleading.  The NY DFS's letters to Ocwen (and copied to Erbey) made it abundantly clear that Ocwen's loan servicing practices were illegal and doing great disservices to struggling homeowners.  Ocwen's practices ultimately led to the forced removal of Defendant Erbey from the Erbey Companies, as detailed in the NY DFS's Consent Order with Ocwen.  Given the truth about Ocwen and its practices, Residential's description of it was materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

162.    Similarly, Residential's information statement contained a disclosure concerning Ocwen and the risk that Ocwen could potentially fail to effectively perform its servicing obligations:

> *Failure of Ocwen to effectively perform its servicing obligations under the servicing agreement could have a material adverse effect on us.*
>
> We are contractually obligated to service the residential mortgage loans that we acquire. We do not have any employees, servicing platform, licenses or technical resources necessary to service our acquired loans. Consequently, we have engaged Ocwen to service the non-performing and sub-performing loans we acquire. If for any reason Ocwen is unable to service these loans at the level and/or the cost that we anticipate, or if we fail to pay Ocwen or otherwise default under the Ocwen servicing agreement, and Ocwen ceases to act as our servicer, an alternate servicer may not be readily available on favorable terms, or at all, which could have a material adverse effect on us.

(Prospectus, Sept. 25, 2013, p. 33)

163.    The above statements in Paragraph 162 were materially misleading because they failed to disclose that Ocwen was already failing to effectively perform its servicing obligations (as opposed to risk that had yet to materialize).  Ocwen had been under investigation for illegal mortgage servicing practices since 2010 with the NY DFS.  In addition, organizations including the FTC, CFPB, and Multistate Mortgage Committee had also been investigating Ocwen's practices.  In fact, by the start of the Class Period, Ocwen had already entered into the 2012 NY

DFS Consent Order, which, among other things, provided for the installation of an independent on-site monitor to supervise Ocwen going forward. Notwithstanding the seriousness of Ocwen's violative conduct or the importance of Ocwen to Residential's business strategy, Residential did not disclose any of this information. Given the truth about Ocwen and the fact that it had already failed (and was continuing to fail) to effectively perform its servicing obligations, Residential's disclosure was materially misleading. This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

164. Residential's prospectus also materially misled shareholders with respect to the Company's oversight of related-party transactions. Residential disclosed the terms of its Asset Management Agreement with AAMC, but omitted that Defendant Erbey was benefiting as a result of the agreement to the detriment of the Company and its shareholders:

> Upon completion of our separation and AAMC's separation from Altisource on December 21, 2012, we entered into a 15-year asset management agreement with AAMC. Pursuant to the asset management agreement, AAMC designs and implements our business strategy, administer our business activities and day-to-day operations and provides corporate governance services, subject to oversight by our Board of Directors. AAMC is responsible for, among other duties: (1) performing and administering all our day-to-day operations, (2) determining investment criteria through our Investment Policy in cooperation with our Board of Directors, (3) sourcing, analyzing and executing asset acquisitions, including our acquisition of sub-performing and non-performing residential mortgage loan portfolios and related financing activities, (4) analyzing and performing sales of properties, (5) overseeing Altisource's renovation, leasing and property management of our single-family rentals, (6) overseeing Ocwen's servicing of our residential mortgage loan portfolios, (7) performing asset management duties and (8) performing corporate governance and other management functions, including financial, accounting and tax management services. AAMC provides us with a management team and appropriate support personnel who have substantial sub-performing and non-performing loan portfolio experience. AAMC's management also has significant corporate governance experience that enables us to manage our business and organizational structure efficiently. AAMC has agreed not to provide the same or substantially similar services to any other party so long as the company and the operating partnership have on hand an average of $50,000,000

in capital available for investment over the previous two fiscal quarters. Notwithstanding the foregoing, AAMC may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other investment based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the company or the operating partnership, so long as its services to the company and the operating partnership are not impaired thereby.

(Prospectus, Sept. 25, 2013, p. 91)

165.   In addition to the above statements, Residential's prospectus purported to disclose to investors the Company's various arrangements with the Erbey Companies.   Specifically, Residential disclosed its:

(a)   "Master Services Agreement" with ASPS, which provided ASPS with the exclusive right to serve as property manager for Residential's single-family rental properties.  The agreement contained an initial term of 15 years and would automatically renew for two-year terms.  (Prospectus, Apr. 25, 2013, p. 98)

(b)   "Support Services Agreement" with ASPS, which allowed ASPS to provide service to Residential in the areas of human resources, vendor management operations, corporate services, etc.  (Prospectus, Sept. 25, 2013, p. 98)

(c)   "Trademark License Agreement" with ASPS, which provided Residential with a license to use the name "Altisource."  (Prospectus, Sept. 25, 2013, p. 98)

(d)   "Servicing Agreement" with Ocwen, which provided Ocwen the right to service Residential's mortgage loans for an initial term of 15 years. Ocwen's fees under the agreement depended upon the number and type of residential mortgage loans that Ocwen elected to service.  (Prospectus, Sept. 25, 2013, p. 99)

(e)   "Purchase of Non-Performing Mortgage Portfolio" from Ocwen, which consisted of a $64.4 million purchase of non-performing loans from Ocwen to Residential.  (Prospectus, Sept. 25, 2013, p. 99)

(f)   "Asset Management Agreement" with AAMC, which was a 15-year agreement under which AAMC would effectively manage Residential's day-to-day affairs and overall business strategy.  In exchange, Residential was required to pay AAMC escalating "Incentive Management Fees" equal to an amount between 2% and 50% of the Company's available cash

in any given quarter.  Additionally, Residential was required to reimburse AAMC for expenses and pay a fee upon termination equal to three times the average annual incentive management fee during the 24-month period preceding the termination.  (Prospectus, Sept. 25, 2013, pp. 91-94, 99)

166.   Immediately after disclosing the Company's various related-party transactions, Residential's prospectus provided investors with a description of the Company's "Related Party Transaction Policy," which fostered the incorrect belief the policy was being followed:

*Related Party Transaction Policy*

Our Board of Directors has adopted a policy and procedure for review, approval and monitoring of transactions involving us and related persons (directors and named executive officers or their immediate family members or stockholders owning 5% or greater of our outstanding stock) within our written Code of Business Conduct and Ethics. This policy and procedure is not limited to related person transactions that meet the threshold for disclosure under the relevant SEC rules, as it broadly covers any situation in which a conflict of interest may arise.

Any situation that potentially qualifies as a conflict of interest is to be immediately disclosed to the General Counsel to assess the nature and extent of any concern as well as the appropriate next steps. The General Counsel will notify the Chairman of the Board of Directors if any such situation requires approval of the Board of Directors. Related persons are required to obtain the prior written approval of the Audit Committee of the Board of Directors before participating in any transaction or situation that may pose a conflict of interest. In considering a transaction, the Audit Committee will consider all relevant factors including (i) whether the transaction is in the best interests of Residential; (ii) alternatives to the related person transaction; (iii) whether the transaction is on terms comparable to those available to third parties; (iv) the potential for the transaction to lead to an actual or apparent conflict of interest and any safeguards imposed to prevent such actual or apparent conflicts; and (v) the overall fairness of the transaction to Residential. The Audit Committee will periodically monitor any approved transactions to ensure that there are no changed circumstances that would render it advisable for Residential to amend or terminate the transaction.

(Prospectus, Sept. 25, 2013, pp. 100-01)

167.   Similarly, while Residential's annual report warned of a risk that certain officers could have conflicts of interests, the Company did not disclose that such a risk already materialized:

*We have conflicts of interest with our Manager and our service providers, and the Chairman and other members of our Board of Directors, as well as our management team, have, or could have in the future, conflicts of interest due to their respective relationships with these entities, and such conflicts may be resolved in a manner adverse to us.*

We have entered into an asset management agreement with AAMC for administering our business, providing portfolio management services and performing certain of our corporate governance functions. **This agreement was not negotiated in an arm's length transaction and, accordingly, could contain terms, including the basis of calculation of the amount of incentive management fee payable to AAMC, that are less favorable to us than agreements negotiated with unaffiliated third parties might contain**. Furthermore, since the calculation of AAMC's incentive management fee is based on the amount of cash available for distribution to our stockholders, it may cause AAMC to take risks that could increase our cash available for distribution at the expense of other criteria, such as preservation of capital. Actions taken in that regard may fail to generate any returns.

As an externally managed REIT, we have no management or employees and are entirely managed by AAMC, which negotiates all our agreements and deals with all our contractual counterparties on our behalf. **For example, we have numerous complex, and critically important, agreements with Ocwen (our servicing agreement) and Altisource (our master services agreement, support services agreement and trademark license agreement), and AAMC acts for us in connection with all those agreements, including monitoring the performance of Ocwen and Altisource under those agreements and exercising any available rights or remedies on our behalf. In addition, we may have additional dealings with Ocwen and Altisource beyond those agreements, such as our February 14, 2013 purchase from Ocwen of a portfolio of non-performing residential mortgage loans**.

Altisource and Ocwen are not limited in their ability to compete with us. **We will seek to manage these potential conflicts through provisions of our agreements with them and through oversight by independent members of our Board of Directors or general dispute resolution methods. However, there can be no assurance that such measures will be effective, that we will be able to resolve all conflicts with Altisource and Ocwen or that the resolution of any such conflicts will be no less favorable to us than if we were dealing with unaffiliated third parties**.

As noted under "Certain Relationships and Related Party Transactions—Share Ownership of our Chairman," our Chairman currently owns a substantial amount of Altisource, Ocwen and AAMC and our common stock and stock options of Altisource and Ocwen and ours. Each of our executive officers is also an executive officer of AAMC and has interests in our relationship with AAMC that

may be different than the interests of our stockholders. In particular, these individuals have a direct interest in the financial success of AAMC, which may encourage these individuals to support strategies in furtherance of the financial success of AAMC that adversely impact us. In addition, certain of our other directors and members of our management team own or may own Altisource and/or Ocwen common stock and stock options due to similar current relationships with Altisource and Ocwen. **Such ownership creates conflicts of interest when the Chairman of our Board of Directors and such directors or members of our management team are faced with decisions that involve us and Altisource, Ocwen, AAMC or any of their respective subsidiaries**.

(Quarterly Report, Sept. 25, 2013, pp. 30-31)

. . .

*Our agreements with our service providers were not negotiated in arms'-length transactions.*

We have entered into the master services agreement, the support services agreement and the trademark license agreement with Altisource, and the servicing agreement with Ocwen. The material terms of these are agreements are described in "Certain Relationships and Related Transactions." **None of these agreements were negotiated by arms'-length transactions; accordingly, each of the agreements may contain terms that are less favorable to us than agreements negotiated with unaffiliated third parties might contain**.

(Quarterly Report, Sept. 25, 2013, p. 32)

168.     The above statements in Paragraphs 164-167 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions.  By presenting these related-party transactions immediately after discussing the Company's various policies pertaining to related-party transactions (and representing the Company's affirmative compliance with these policies), Residential created the false impression that these transactions had been properly considered and approved.   However, the SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference

that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board. The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the expense of Residential shareholders. This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### *October 22, 2013 – Quarterly Report*

169.    On October 22, 2013, Residential filed a quarterly report (Form 10-Q) with the SEC. Defendant Najour signed the quarterly report on behalf of Residential. Through the quarterly report, Residential materially misled investors about the Company's operations and dealings with related parties.

170.    Residential's quarterly report misleadingly reported the Company's related-party transactions.  For the three- and nine-months ended September 30, 2013 (respectively), Residential reported payments of: (i) $138,000 and $246,000 to Ocwen and ASPS for "[r]esidential property operating expenses"; (ii) $2,134,000 and $3,335,000 to Ocwen for "[m]ortgage loan servicing costs"; (iii) $651,000 and $1,004,000 to ASPS for "[d]ue diligence and dead deal costs"; (iv) $1,307,000 and $3,371,000 to AAMC for "[e]xpense reimbursements"; and (v) $51,000 and $51,000 to AAMC for "[m]anagement incentive fee."  (Quarterly Report, Oct. 22, 2013, p. 10)

171.    Residential also told investors that "[d]uring the nine months ended September 30, 2013, [Residential] acquired a portfolio from Ocwen of non-performing first lien residential mortgage loans having aggregate market value of underlying properties of $94 million. The

aggregate purchase price for this portfolio was $64.4 million." (Quarterly Report, Oct. 22, 2013, p. 10)

172.    The above statements in Paragraphs 170-171 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions. Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board. The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the expense of Residential shareholders. This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

173.    The above statements in Paragraphs 170-171 also omitted material information that was required to be disclosed pursuant to Item 404 of Regulation S-K (17 C.F.R. 229.404), including but not limited to Defendant Erbey's interest in each of the transactions and the detrimental effects they had upon Residential shareholders. Defendant Erbey used the related-party transactions to siphon money from Residential to his other companies where he was able to profit handsomely via his relatively superior ownership interests (*i.e.*, compared to his 4% ownership interest in Residential, Defendant Erbey held a 29.6% stake in AAMC, 14.95% stake in Ocwen, and 29.34% stake in ASPS). As the NY DFS explained in its letter dated August 4, 2014, Defendant Erbey was able to "direct[] profits" between his companies and, as a result,

benefit financially.  In accordance with Item 404, Residential should have disclosed the amount by which Defendant Erbey was benefitting personally as a result of each of the related-party transactions as well as the harm each transaction caused to the Company and its investors.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

174.    Residential's quarterly report also materially misrepresented the status of the Company's internal controls.  Specifically, Residential stated that:

> *Item 4. Controls and procedures*
>
> SEC rules require us to maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our annual and periodic reports filed with the SEC is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. **Our CEO and CFO have concluded that the disclosure controls and procedures were effective at the end of the period covered by this quarterly report**.
>
> SEC rules also require us to establish and maintain internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepting accounting principles. There were no changes in internal control over financial reporting during the three months ended September 30, 2013 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.
>
> (Quarterly Report, Oct. 22, 2013, p. 25)

175.    In connection with Residential's quarterly report, Defendants Pandey and Najour submitted Certifications Pursuant to the Sarbanes-Oxley Act of 2002.  The certifications stated as follows:

> 1. I have reviewed this quarterly report on Form 10-Q of Altisource Residential Corporation;
>
> 2. Based on my knowledge, this **report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and

(b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(Quarterly Report, Oct. 22, 2013, Exhibits 31.1 and 31.2)

176.    The above statements (identified in bold) in Paragraphs 174-175 were materially misleading because they materially misrepresented the state of the Company's internal controls. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.   Given the Company's true state of internal controls, the above statements were materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### *October 22, 2013 – Conference Call*

177.    On February 20, 2014, Defendants Erbey, Pandey, and Najour hosted an investor conference call to discuss the Company's fourth-quarter and full year earnings for fiscal 2013. Defendant Najour discussed Residential's related-party transactions:

> During the quarter, we recorded $6 million of expenses which includes the following three items. $2.2 million of servicing costs which includes approximately $600,000 of contractual servicing fees payable to Ocwen and $1.6 million of reimbursement of servicing event made by Ocwen on our behalf to cover insurance and other expenses, $1.3 million of reimbursable expenses to AAMC and $1 million of due diligence cost.

178.    The above statements in Paragraphs 177 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or

procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the expense of Residential shareholders.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### *January 15, 2014 – Prospectus*

179.    On January 16, 2014, Residential filed a prospectus (Form 424) with the SEC in connection with a public offering of 14.2 million shares of common stock at $34 per share for total proceeds of nearly $475 million.  The prospectus was dated January 15, 2014.  The prospectus was part of the Company's registration statement which was signed by Defendant Najour (with the authority of Defendant Erbey) on behalf of the Company.  The prospectus contained materially misleading statements and omissions concerning the Company's operations and dealings with related parties.

180.    Residential's prospectus promoted the Company's loan resolution methodologies and relationship with Ocwen:

*Our Strengths*

*Relationship with Ocwen and Proven Loan Resolution Methodologies*

We intend to capitalize on the servicing capabilities of Ocwen, which we view as superior relative to other servicers in terms of cost, management experience, technology infrastructure and platform scalability. Ocwen services our acquired residential mortgage loan portfolios in accordance with the terms of their servicing agreement with us. **Ocwen's servicing approach is focused on the psychological principles of influencing borrower behavior and uses non-**

89

**linear optimization models for deciding the best resolution for a loan. Ocwen's use of artificial intelligence and scripting engines seeks to remove variability and human error from the process and provides scalability. Ocwen is a leader in its ability to convert loans that are 90 days or more past due to current status.** Ocwen has successfully grown its servicing portfolio to approximately $435 billion as of September 30, 2013.

**Importantly, by using Ocwen's servicing platform to modify as many loans as possible, we believe that more families may remain in their homes because of our efforts.**

(Prospectus, Jan. 15, 2014, p. 6)

. . .

Our principal objective is to generate attractive risk-adjusted returns for our stockholders over the long term through dividends and capital appreciation. We believe that the events affecting the housing and mortgage market in recent years have created a significant supply of single-family rental properties available for rental purposes. We believe we have an opportunity to acquire single-family rental properties through the acquisition of sub-performing and non-performing loan portfolios at attractive valuations relative to historical levels. We expect our integrated approach of acquiring sub-performing and non-performing residential mortgage loans and converting them to REO will enable us to compete more effectively for attractive investment opportunities. Furthermore, **we believe that our access to Ocwen's servicing expertise helps us maximize the value of our loan portfolios and provides us with a competitive advantage over other companies with a similar focus**.

(Prospectus, Jan. 15, 2014, p. 68)

. . .

*Our Strengths*

*Relationship with Ocwen and Proven Loan Resolution Methodologies*

**We intend to capitalize on the servicing capabilities of Ocwen, which we view as superior relative to other servicers in terms of cost, management experience, technology infrastructure and platform scalability**. Ocwen services our acquired residential mortgage loan portfolios in accordance with the terms of their servicing agreement with us. **Ocwen's servicing approach is focused on the psychological principles of influencing borrower behavior and uses non-linear optimization models for deciding the best resolution for a loan. Ocwen's use of artificial intelligence and scripting engines seeks to remove variability and human error from the process and provides**

**scalability. Ocwen is a leader in its ability to convert loans that are 90 days or more past due to current status.** Ocwen has successfully grown its servicing portfolio to approximately $435 billion as of September 30, 2013.

The information below highlights the recognition by various industry constituents of Ocwen's servicing capabilities:

- Moody's (January 2013) — Ocwen outranks, Chase, Wells Fargo, GMAC and Bank of America in generating cash flow from non-performing loans as well as has the shortest timeline of foreclosure referral to foreclosure sale.

- Morningstar Credit Ratings (September 2012) — Ocwen received the highest ranking, MOR RS1, noting that it "exceeds prudent loan servicing standards in key areas of risk."

- Freddie Mac (August 2009 – Present) — Ocwen is hired by Freddie Mac to perform special servicing and interim servicing on non-performing loans.

- Bank of America (July 2009) — Ocwen had the highest roll rate from 90+ delinquent to current on both fixed rate and adjustable rate subprime loans. Ocwen's results were more than double the midpoint for all servicers reported.

**Importantly, by using Ocwen's servicing platform to modify as many loans as possible, we believe that more families may remain in their homes because of our efforts**.

(Prospectus, Jan. 15, 2014, pp. 74-75)

181.    The above statements (identified in bold) in Paragraph 180 were materially misleading because they portrayed Ocwen as a benefit to the Company and Residential shareholders.  This was incorrect and misleading.  The NY DFS's letters to Ocwen (and copied to Erbey) made it abundantly clear that Ocwen's loan servicing practices were illegal and doing great disservices to struggling homeowners.  Ocwen's practices ultimately led to the forced removal of Defendant Erbey from the Erbey Companies, as detailed in the NY DFS's Consent Order with Ocwen.  Given the truth about Ocwen and its practices, Residential's description of it

was materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

182.    Similarly, Residential's information statement contained a disclosure concerning Ocwen and the risk that Ocwen could potentially fail to effectively perform its servicing obligations:

> *Failure of Ocwen to effectively perform its servicing obligations under the servicing agreement could have a material adverse effect on us.*
>
> We are contractually obligated to service the residential mortgage loans that we acquire. We do not have any employees, servicing platform, licenses or technical resources necessary to service our acquired loans. Consequently, we have engaged Ocwen to service the non-performing and sub-performing loans we acquire. If for any reason Ocwen is unable to service these loans at the level and/or the cost that we anticipate, or if we fail to pay Ocwen or otherwise default under the Ocwen servicing agreement, and Ocwen ceases to act as our servicer, an alternate servicer may not be readily available on favorable terms, or at all, which could have a material adverse effect on us.

(Prospectus, Jan. 15, 2014, pp. 32)

183.    The above statements in Paragraph 182 were materially misleading because they failed to disclose that Ocwen was already failing to effectively perform its servicing obligations (as opposed to risk that had yet to materialize).  Ocwen had been under investigation for illegal mortgage servicing practices since 2010 with the NY DFS.  In addition, organizations including the FTC, CFPB, and Multistate Mortgage Committee had also been investigating Ocwen's practices.  In fact, by the start of the Class Period, Ocwen had already entered into the 2012 NY DFS Consent Order, which, among other things, provided for the installation of an independent on-site monitor to supervise Ocwen going forward.  Notwithstanding the seriousness of Ocwen's violative conduct or the importance of Ocwen to Residential's business strategy, Residential did not disclose any of this information.  Given the truth about Ocwen and the fact that it had already failed (and was continuing to fail) to effectively perform its servicing obligations, Residential's

disclosure was materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

184.   Residential's prospectus also materially misled shareholders with respect to the Company's oversight of related-party transactions.  Residential disclosed the terms of its Asset Management Agreement with AAMC, but omitted that Defendant Erbey was benefiting as a result of the agreement to the detriment of the Company and its shareholders:

> Upon completion of our separation and AAMC's separation from Altisource on December 21, 2012, we entered into a 15-year asset management agreement with AAMC. Pursuant to the asset management agreement, AAMC designs and implements our business strategy, administer our business activities and day-to-day operations and provides corporate governance services, subject to oversight by our Board of Directors. AAMC is responsible for, among other duties: (1) performing and administering all our day-to-day operations, (2) determining investment criteria through our Investment Policy in cooperation with our Board of Directors, (3) sourcing, analyzing and executing asset acquisitions, including our acquisition of sub-performing and non-performing residential mortgage loan portfolios and related financing activities, (4) analyzing and performing sales of properties, (5) overseeing Altisource's renovation, leasing and property management of our single-family rentals, (6) overseeing Ocwen's servicing of our residential mortgage loan portfolios, (7) performing asset management duties and (8) performing corporate governance and other management functions, including financial, accounting and tax management services. AAMC provides us with a management team and appropriate support personnel who have substantial sub-performing and non-performing loan portfolio experience. AAMC's management also has significant corporate governance experience that enables us to manage our business and organizational structure efficiently. AAMC has agreed not to provide the same or substantially similar services to any other party so long as the company and the operating partnership have on hand an average of $50,000,000 in capital available for investment over the previous two fiscal quarters. Notwithstanding the foregoing, AAMC may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other investment based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the company or the operating partnership, so long as its services to the company and the operating partnership are not impaired thereby.

(Prospectus, Jan. 15, 2014, p. 91)

185.    In addition to the above statements, Residential's prospectus purported to disclose to investors the Company's various arrangements with the Erbey Companies.   Specifically, Residential disclosed its:

(a)    "Master Services Agreement" with ASPS, which provided ASPS with the exclusive right to serve as property manager for Residential's single-family rental properties.   The agreement contained an initial term of 15 years and would automatically renew for two-year terms.   (Prospectus, Jan. 15, 2014, p. 98)

(b)    "Support Services Agreement" with ASPS, which allowed ASPS to provide service to Residential in the areas of human resources, vendor management operations, corporate services, etc.   (Prospectus, Jan. 15, 2014, p. 98)

(c)    "Trademark License Agreement" with ASPS, which provided Residential with a license to use the name "Altisource."   (Prospectus, Jan. 15, 2014, p. 99)

(d)    "Servicing Agreement" with Ocwen, which provided Ocwen the right to service Residential's mortgage loans for an initial term of 15 years.   Ocwen's fees under the agreement depended upon the number and type of residential mortgage loans that Ocwen elected to service.   (Prospectus, Jan. 15, 2014, p. 99)

(e)    "Aircraft Time Sharing Agreement" with Ocwen, which allowed Residential to use Ocwen's corporate plan for business-related travel.   The agreement required Residential to reimburse Ocwen for all operational expenses plus a charge equal to 100% of the expenses.   (Prospectus, Jan. 15, 2014, p. 99)

(f)    "Purchase of Non-Performing Mortgage Portfolio" from Ocwen, which consisted of a $64.4 million purchase of non-performing loans from Ocwen to Residential.   (Prospectus, Jan. 15, 2014, p. 99)

(g)    "Asset Management Agreement" with AAMC, which was a 15-year agreement under which AAMC would effectively manage Residential's day-to-day affairs and overall business strategy.   In exchange, Residential was required to pay AAMC escalating "Incentive Management Fees" equal to an amount between 2% and 50% of the Company's available cash in any given quarter.   Additionally, Residential was required to reimburse AAMC for expenses and pay a fee upon termination equal to three times the average annual incentive management fee during the 24-month period preceding the termination.   (Prospectus, Jan. 15, 2014, pp. 91-94, 100)

186. Immediately after disclosing the Company's various related-party transactions, Residential's prospectus provided investors with a description of the Company's "Related Party Transaction Policy," which fostered the incorrect belief the policy was being followed:

*Related Party Transaction Policy*

Our Board of Directors has adopted a policy and procedure for review, approval and monitoring of transactions involving us and related persons (directors and named executive officers or their immediate family members or stockholders owning 5% or greater of our outstanding stock) within our written Code of Business Conduct and Ethics. This policy and procedure is not limited to related person transactions that meet the threshold for disclosure under the relevant SEC rules, as it broadly covers any situation in which a conflict of interest may arise.

Any situation that potentially qualifies as a conflict of interest is to be immediately disclosed to the General Counsel to assess the nature and extent of any concern as well as the appropriate next steps. The General Counsel will notify the Chairman of the Board of Directors if any such situation requires approval of the Board of Directors. Related persons are required to obtain the prior written approval of the Audit Committee of the Board of Directors before participating in any transaction or situation that may pose a conflict of interest. In considering a transaction, the Audit Committee will consider all relevant factors including (i) whether the transaction is in the best interests of Residential; (ii) alternatives to the related person transaction; (iii) whether the transaction is on terms comparable to those available to third parties; (iv) the potential for the transaction to lead to an actual or apparent conflict of interest and any safeguards imposed to prevent such actual or apparent conflicts; and (v) the overall fairness of the transaction to Residential. The Audit Committee will periodically monitor any approved transactions to ensure that there are no changed circumstances that would render it advisable for Residential to amend or terminate the transaction.

(Prospectus, Jan. 15, 2014, p. 101)

187. Similarly, while Residential's annual report warned of a risk that certain officers could have conflicts of interests, the Company did not disclose that such a risk already materialized:

*We have conflicts of interest with our Manager and our service providers, and the Chairman and other members of our Board of Directors, as well as our management team, have, or could have in the future, conflicts of interest due to*

95

*their respective relationships with these entities, and such conflicts may be resolved in a manner adverse to us.*

We have entered into an asset management agreement with AAMC for administering our business, providing portfolio management services and performing certain of our corporate governance functions. **This agreement was not negotiated in an arm's length transaction and, accordingly, could contain terms, including the basis of calculation of the amount of incentive management fee payable to AAMC, that are less favorable to us than agreements negotiated with unaffiliated third parties might contain**. Furthermore, since the calculation of AAMC's incentive management fee is based on the amount of cash available for distribution to our stockholders, it may cause AAMC to take risks that could increase our cash available for distribution at the expense of other criteria, such as preservation of capital. Actions taken in that regard may fail to generate any returns.

As an externally managed REIT, we have no management or employees and are entirely managed by AAMC, which negotiates all our agreements and deals with all our contractual counterparties on our behalf. **For example, we have numerous complex, and critically important, agreements with Ocwen (our servicing agreement) and Altisource (our master services agreement, support services agreement and trademark license agreement), and AAMC acts for us in connection with all those agreements, including monitoring the performance of Ocwen and Altisource under those agreements and exercising any available rights or remedies on our behalf. In addition, we may have additional dealings with Ocwen and Altisource beyond those agreements, such as our February 14, 2013 purchase from Ocwen of a portfolio of non-performing residential mortgage loans**.

Altisource and Ocwen are not limited in their ability to compete with us. **We will seek to manage these potential conflicts through provisions of our agreements with them and through oversight by independent members of our Board of Directors or general dispute resolution methods. However, there can be no assurance that such measures will be effective, that we will be able to resolve all conflicts with Altisource and Ocwen or that the resolution of any such conflicts will be no less favorable to us than if we were dealing with unaffiliated third parties**.

As noted under "Certain Relationships and Related Party Transactions—Share Ownership of our Chairman," our Chairman currently owns a substantial amount of Altisource, Ocwen and AAMC and our common stock and stock options of Altisource and Ocwen and ours. Each of our executive officers is also an executive officer of AAMC and has interests in our relationship with AAMC that may be different than the interests of our stockholders. In particular, these individuals have a direct interest in the financial success of AAMC, which may encourage these individuals to support strategies in furtherance of the financial

success of AAMC that adversely impact us. In addition, certain of our other directors and members of our management team own or may own Altisource and/or Ocwen common stock and stock options due to similar current relationships with Altisource and Ocwen. **Such ownership creates conflicts of interest when the Chairman of our Board of Directors and such directors or members of our management team are faced with decisions that involve us and Altisource, Ocwen, AAMC or any of their respective subsidiaries**.

(Quarterly Report, Jan. 5, 2014, pp. 29-30)

. . .

*Our agreements with our service providers were not negotiated in arms'-length transactions.*

We have entered into the master services agreement, the support services agreement and the trademark license agreement with Altisource, and the servicing agreement with Ocwen. The material terms of these are agreements are described in "Certain Relationships and Related Transactions." **None of these agreements were negotiated by arms'-length transactions; accordingly, each of the agreements may contain terms that are less favorable to us than agreements negotiated with unaffiliated third parties might contain**.

(Quarterly Report, Jan. 5, 2014, p. 31)

188.    The above statements in Paragraphs 184-187 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions.  By presenting these related-party transactions immediately after discussing the Company's various policies pertaining to related-party transactions (and representing the Company's affirmative compliance with these policies), Residential created the false impression that these transactions had been properly considered and approved.  However, the SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  The above statements omitted that (i) Residential's related-party transactions were not approved

in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the expense of Residential shareholders.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### *February 20, 2014 – Annual Report*

189.    On February 20, 2014, Residential filed an annual report (Form 10-K) with the SEC.  Defendants Pandey and Najour signed the annual report on behalf of Residential and with the authority of Defendant Erbey.   Through the annual report, Residential materially misled investors about the Company's operations and dealings with related parties.

190.    Residential's annual report promoted the Company's loan resolution methodologies and relationship with Ocwen:

*Our Strengths*

*Relationship with Ocwen and Proven Loan Resolution Methodologies*

We intend to capitalize on the servicing capabilities of Ocwen, which we view as superior relative to other servicers in terms of cost, management experience, technology infrastructure and platform scalability. Ocwen services our acquired residential mortgage loan portfolios in accordance with the terms of their servicing agreement with us. **Ocwen's servicing approach is focused on the psychological principles influencing borrower behavior and uses non-linear optimization models for deciding the best resolution for a loan. Ocwen's use of artificial intelligence and dialogue engines seeks to remove variability and human error from the process and provides scalability. Ocwen is a leader in its ability to convert loans that are 90 days or more past due to current status**. Ocwen has successfully grown its servicing portfolio to approximately $435 billion as of September 30, 2013.

**Importantly, by using Ocwen's servicing platform to modify as many loans as possible, we believe that more families may remain in their homes because of our efforts.**

(Annual Report, Feb. 20, 2014, p. 7)

191.    The above statements (identified in bold) in Paragraph 190 were materially misleading because they portrayed Ocwen as a benefit to the Company and Residential shareholders.  This was incorrect and misleading.  The NY DFS's letters to Ocwen (and copied to Erbey) made it abundantly clear that Ocwen's loan servicing practices were illegal and doing great disservices to struggling homeowners.  Ocwen's practices ultimately led to the forced removal of Defendant Erbey from the Erbey Companies, as detailed in the NY DFS's Consent Order with Ocwen.  Given the truth about Ocwen and its practices, Residential's description of it was materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

192.    Residential's information statement contained a disclosure concerning Ocwen and the risk that Ocwen could potentially fail to effectively perform its servicing obligations:

> *Failure of Ocwen to effectively perform its servicing obligations under the servicing agreement could have a material adverse effect on us.*
>
> We are contractually obligated to service the residential mortgage loans that we acquire. We do not have any employees, servicing platform, licenses or technical resources necessary to service our acquired loans. Consequently, we have engaged Ocwen to service the non-performing and sub-performing loans we acquire. If for any reason Ocwen is unable to service these loans at the level and/or the cost that we anticipate, or if we fail to pay Ocwen or otherwise default under the Ocwen servicing agreement, and Ocwen ceases to act as our servicer, an alternate servicer may not be readily available on favorable terms, or at all, which could have a material adverse effect on us.

(Annual Report, Feb. 20, 2014, pp. 30-31)

193.    The above statements in Paragraph 192 were materially misleading because they failed to disclose that Ocwen was already failing to effectively perform its servicing obligations (as opposed to risk that had yet to materialize).  Ocwen had been under investigation for illegal mortgage servicing practices since 2010 with the NY DFS.  In addition, organizations including

the FTC, CFPB, and Multistate Mortgage Committee had also been investigating Ocwen's practices. In fact, by the start of the Class Period, Ocwen had already entered into the 2012 NY DFS Consent Order, which, among other things, provided for the installation of an independent on-site monitor to supervise Ocwen going forward. Notwithstanding the seriousness of Ocwen's violative conduct or the importance of Ocwen to Residential's business strategy, Residential did not disclose any of this information. Given the truth about Ocwen and the fact that it had already failed (and was continuing to fail) to effectively perform its servicing obligations, Residential's disclosure was materially misleading. This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

194. Residential's annual report also materially misled shareholders with respect to the Company's oversight of related-party transactions. Residential disclosed the terms of its Asset Management Agreement with AAMC, but omitted that Defendant Erbey was benefiting as a result of the agreement to the detriment of the Company and its shareholders:

> Under our asset management agreement with AAMC, which we refer to as the "asset management agreement," AAMC is responsible for, among other duties: (1) performing and administering all our day-to-day operations, (2) defining investment criteria in our Investment Policy in cooperation with our Board of Directors, (3) sourcing, analyzing and executing asset acquisitions, including our acquisition of sub-performing and non-performing residential mortgage loan portfolios and related financing activities, (4) analyzing sales of properties, (5) overseeing Altisource's renovation, leasing and property management of our single-family rental properties, (6) overseeing Ocwen's servicing of our residential mortgage loan portfolios, (7) performing asset management duties and (8) performing corporate governance and other management functions, including financial, accounting and tax management services. AAMC provides us with a management team and appropriate support personnel who have substantial sub-performing and non-performing loan portfolio experience. AAMC's management also has significant corporate governance experience that enables us to manage our business and organizational structure efficiently. AAMC has agreed not to provide the same or substantially similar services to any other party so long as the company and the operating partnership have on hand an average of $50,000,000

in capital available for investment over the previous two fiscal quarters. Notwithstanding the foregoing, AAMC may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other investment based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the company or the operating partnership, so long as its services to the company and the operating partnership are not impaired thereby.

(Annual Report, Feb. 20, 2014, pp. 10-11)

195.     The above statements in Paragraph 194 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions.  By presenting these related-party transactions immediately after discussing the Company's various policies pertaining to related-party transactions (and representing the Company's affirmative compliance with these policies), Residential created the false impression that these transactions had been properly considered and approved.   However, the SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board. The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the expense of Residential shareholders.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

196.     Residential's annual report also incorporated by reference the section titled "Transactions with Related Persons" from the Company's proxy statement (Schedule 14A) filed

on April 16, 2014.  (Annual Report, Feb. 20, 2014, p. 57)  As explained below (April 16, 2014 –
Proxy Statement, *infra*), Residential's descriptions of its related-party transactions was materially
misleading because it created the false impression that the disclosed related-party transactions
had been properly approved in accordance with the Company's policies pertaining to related-
party transactions.  Further, Residential's descriptions of its related-party transactions omitted
material information that was required to be disclosed pursuant to Item 404 of Regulation S-K
(17 C.F.R. 229.404), including but not limited to Defendant Erbey's interest in each of the
transactions and the detrimental effects they had upon Residential shareholders.

197.    Similarly, while Residential's annual report warned of a risk that certain officers
could have conflicts of interests, the Company did not disclose that such a risk already
materialized:

> *We could have conflicts with AAMC, Altisource and Ocwen, and the Chairman,*
> *other members of our Board of Directors or management could have conflicts of*
> *interest due to his or their relationship with AAMC, Altisource or Ocwen, which*
> *may be resolved in a manner adverse to us.*
>
> We do a substantial amount of business with AAMC, Altisource and Ocwen.
> Conflicts may arise between AAMC, Altisource or Ocwen and us because of our
> ongoing agreements with them and because of the nature of our respective
> businesses. We may also have additional dealings with these parties from time to
> time beyond our ongoing agreements, such as our February 14, 2013 purchase
> from Ocwen of a portfolio of non-performing residential mortgage loans.
>
> Our Chairman is also the Chairman of AAMC, Altisource and Ocwen. As a result,
> he has obligations to us as well as to these other entities and could have conflicts
> of interest with respect to matters potentially or actually involving or affecting us
> and AAMC, Altisource or Ocwen, as the case may be. Our Chairman also
> currently has substantial investments in AAMC, Altisource and Ocwen, and
> certain of our other officers and directors own stock or options in one or more of
> AAMC, Altisource and Ocwen. **Such ownership interests could create or**
> **appear to create conflicts of interest with respect to matters potentially or**
> **actually involving or affecting us and AAMC, Altisource and Ocwen, as the**
> **case may be**.

Each of our executive officers is also an executive officer of AAMC and has interests in our relationship with AAMC that may be different than the interests of our stockholders. **As a result, they may have obligations to us and AAMC and could have conflicts of interest with respect to matters potentially or actually involving or affecting us and AAMC. In particular, these individuals have a direct interest in the financial success of AAMC which may encourage these individuals to support strategies in furtherance of the financial success of AAMC that could potentially adversely impact us**.

**We follow policies, procedures and practices to avoid potential conflicts with respect to our dealings with AAMC, Altisource and Ocwen, including our Chairman recusing himself from negotiations regarding, and approvals of, transactions with these entities (or where necessary, certain of our officers recusing themselves from discussions on, and approvals of transactions with AAMC)**. We also manage potential conflicts of interest through oversight by independent members of our Board of Directors (independent directors constitute a majority of our Board of Directors), and we will seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with AAMC, Altisource and Ocwen. There can be no assurance that such measures will be effective, that we will be able to resolve all conflicts with AAMC, Altisource or Ocwen, or that the resolution of any such conflicts will be no less favorable to us than if we were dealing with a third party that had none of the connections we have with these businesses.

(Annual Report, Feb. 20, 2014, p. 29)

198.    The above statements (identified in bold) in Paragraph 197 were materially misleading because they created the false impression that Residential (and, in particular, Defendant Erbey) was in compliance with the Company's policies pertaining to related-party transactions.  The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  In light of Defendant Erbey's conduct, Residential's statements concerning compliance with the Company's related-party transaction policies were materially misleading.  This information is material because it would

have altered the total mix of information available to investors when considering whether to invest in Residential.

199.    Residential's annual report also materially misled investors with respect to the Company's state of disclosure controls and procedures:

*Evaluation of Disclosure Controls and Procedures*

We carried out an evaluation required by the 1934 Act, under the supervision and with the participation of our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) of the 1934 Act, as of December 31, 2013. **Based on this evaluation, our principal executive officer and principal financial officer concluded that, as of December 31, 2013, our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the 1934 Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and to provide reasonable assurance that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures.**

(Annual Report, Feb. 20, 2014, pp. 55-56)

200.    Additionally, in connection with Residential's annual report, Defendants Pandey and Najour submitted Certifications Pursuant to the Sarbanes-Oxley Act of 2002.   The certifications stated as follows:

1. I have reviewed this quarterly report on Form 10-K of Altisource Residential Corporation;

2. Based on my knowledge, this **report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and

> (b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(Annual Report, February 20, 2014, Exhibits 31.1 and 31.2)

201.   The above statements (identified in bold) in Paragraphs 199-200 were materially misleading because they materially misrepresented the state of the Company's internal controls. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.   Given the Company's true state of internal controls, the above statements were materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### February 20, 2014 – Conference Call

202.   On February 20, 2014, Defendants Erbey, Pandey, and Najour hosted an investor conference call to discuss the Company's fourth-quarter and full year earnings for fiscal 2013. During his opening remarks, Defendant Erbey discussed Residential's agreement with AAMC while in the course of presenting Residential's performance for the year.   Erbey stated, in pertinent part, as follows:

> Before I turn the call over to Ashish, I would also like to touch on our management fee structure. As you know, we pay AAMC a quarterly incentive management fee based on the level of distributable cash per share. Unlike most externally managed REITs we do not pay a management fee based on the amount of equity or market capitalization.
>
> We believe that this structure better aligns our interest with AAMC. It incentivizes the AAMC to clear equity and attractive opportunities; we are not incentivized to grow equity and assets at any cost.

203.   Later in the call, Defendant Najour further discussed Residential's related-party transactions:

> During the quarter, we recorded $20.3 million of expenses and $6 million of expenses in the third quarter. Expenses during the quarter include the following

four items. One, $6.6 million of servicing cost which include approximately $1.7 million of contractual servicing fees payable to Ocwen, and $4.9 million of reimbursement of servicing advances made by Ocwen on our behalf to cover insurance and other expenses; two, $4.8 million of incentive fee to AAMC; three, $2 million of reimbursable expenses to AAMC; and four, $2 million of due diligence cost related to the acquisitions.

204.    The above statements in Paragraphs 202-203 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the expense of Residential shareholders.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### April 16, 2014 – Proxy Statement

205.    On April 16, 2014, Residential issued a proxy statement (Schedule 14A) in advance of the Company's annual shareholder meeting.  Defendants Erbey and Pandey signed the cover letter to the proxy statement.  Through the proxy statement, Residential materially misled investors about the Company's operations and dealings with related parties.

206.    Residential's proxy statement represented investors that the Company was in compliance with SEC and applicable exchange rules with respect to reporting violations of Residential's Code of Business Conduct and Code of Ethics:

We adopted a Code of Business Conduct and Ethics that applies to our Directors, officers and employees. We also adopted a Code of Ethics for Senior Financial Officers. **Any waivers from the Code of Business Conduct and Ethics for Directors or named executive officers or the Code of Ethics for Senior Financial Officers must be approved by our Board of Directors or the Audit Committee and will be subsequently disclosed when required by SEC or applicable exchange rules**. The Code of Business Conduct and Ethics and the Code of Ethics for Senior Financial Officers are available on our website at www.altisourceresi.com and is available to any stockholder who requests a copy by writing to our Corporate Secretary at c/o Altisource Asset Management Corporation, 402 Strand Street, Frederiksted, United States Virgin Islands 00840-3531. Any amendments to the Code of Business Conduct and Ethics or the Code of Ethics for Senior Financial Officers, as well as **any waivers that are required to be disclosed under SEC or exchange rules, will either be posted on our website or otherwise disclosed in accordance with such rules**.

(Proxy Statement, April 16, 2014, p. 9)

207.    Residential's proxy statement also told investors that Defendant Erbey recused

himself from decisions involving the various Erbey Companies:

Mr. Erbey currently serves as the non-executive Chairman of Residential, as Executive Chairman of Ocwen Financial Corporation ("Ocwen") and as non-executive Chairman of AAMC and ASPS ("Altisource"). As a result, he has obligations to the Company as well as to Ocwen, AAMC and Altisource. As of December 31, 2013, Mr. Erbey owned or controlled approximately 13% of Ocwen's common stock, 26% of Altisource's common stock and 27% of AAMC's common stock. As of December 31, 2013, Mr. Erbey also held 4,620,498 options to purchase Ocwen common stock, of which 2,845,498 were exercisable, and he held 873,501 options to purchase Altisource common stock and 87,350 options to purchase AAMC common stock, all of which were exercisable. Mr. Erbey is also the non-executive Chairman of Home Loan Servicing Solutions, Ltd. ("HLSS") and owned approximately 1% of HLSS' ordinary shares as of December 31, 2013.  **Due to the nature of Mr. Erbey's obligations to each of the companies, he recuses himself from decisions pertaining to any transactions between them**.

(Proxy Statement, April 16, 2014, p. 19)

208.    The above statements (identified in bold) in Paragraphs 206-207 were materially

misleading because they created the false impression that Residential (and, in particular,

Defendant Erbey) was in compliance with the Company's policies pertaining to related-party

transactions. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions. Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board. In light of Defendant Erbey's conduct, Residential's statements concerning compliance with the Company's related-party transaction policies were materially misleading. This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

209. In addition to the above statements, Residential's proxy statement purported to disclose to investors the Company's various arrangements with the Erbey Companies. Specifically, Residential disclosed its:

    (a)    "Master Services Agreement" with ASPS, which provided ASPS with the exclusive right to serve as property manager for Residential's single-family rental properties. The agreement contained an initial term of 15 years and would automatically renew for two-year terms. Residential was allowed to terminate the agreement on notice, but would be required to reimburse costs and expenses. (Proxy Statement, April 16, 2014, pp. 19-20)

    (b)    "Support Services Agreement" with ASPS, which allowed ASPS to provide service to Residential in the areas of human resources, vendor management operations, corporate services, etc. (Proxy Statement, April 16, 2014, p. 20)

    (c)    "Trademark License Agreement" with ASPS, which provided Residential with a license to use the name "Altisource." (Proxy Statement, April 16, 2014, p. 20)

    (d)    "Servicing Agreement" with Ocwen, which provided Ocwen the right to service Residential's mortgage loans for an initial term of 15 years. Regardless of which party terminated the agreement, Residential would be required to pay all servicing transfer costs and repay any unreimbursed servicing advances to Ocwen. Ocwen's fees under the agreement depended upon the number and type of residential mortgage loans that Ocwen elected to service. (Proxy Statement, April 16, 2014, p. 21)

(e)    "Aircraft Time Sharing Agreement" with Ocwen, which allowed Residential to use Ocwen's corporate plan for business-related travel. The agreement required Residential to reimburse Ocwen for all operational expenses plus a charge equal to 100% of the expenses. (Proxy Statement, April 16, 2014, p. 21)

(f)    "Purchase of Non-Performing Mortgage Portfolio" from Ocwen, which consisted of a $64.4 million purchase of non-performing loans from Ocwen to Residential. (Proxy Statement, April 16, 2014, p. 21)

(g)    "Asset Management Agreement" with AAMC, which was a 15-year agreement under which AAMC would effectively manage Residential's day-to-day affairs and overall business strategy. In exchange, Residential was required to pay AAMC escalating "Incentive Management Fees" equal to an amount between 2% and 50% of the Company's available cash in any given quarter. Additionally, Residential was required to reimburse AAMC for expenses and pay a fee upon termination equal to three times the average annual incentive management fee during the 24-month period preceding the termination. (Proxy Statement, April 16, 2014, pp. 21-22)

210.    The above statements in Paragraph 209 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions. By presenting these related-party transactions immediately after discussing the Company's various policies pertaining to related-party transactions (and representing the Company's affirmative compliance with these policies), Residential created the false impression that these transactions had been properly considered and approved. However, the SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions. Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board. The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the

expense of Residential shareholders.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

*April 29, 2014 – Quarterly Report*

211.    On April 29, 2014, Residential filed a quarterly report (Form 10-Q) with the SEC. Defendant Najour signed the quarterly report on behalf of Residential.  Through the quarterly report, Residential materially misled investors about the Company's operations and dealings with related parties.

212.    Residential's quarterly report misleadingly promoted the Company's relationship with Ocwen:

> On the separation date, we entered into long-term service agreements with Ocwen Financial Corporation ("Ocwen"), **a leading residential mortgage loan servicer**, and with Altisource, a leading provider of real estate and mortgage portfolio management, asset recovery and customer relationship management services. **We believe that our access to Ocwen's servicing expertise and multifaceted resolution methodologies helps us maximize the value of our loan portfolios and provides us with a competitive advantage over other companies with a similar focus**.

> (Quarterly Report, April 29, 2014, p. 6)

213.    The above statement (identified in bold) in Paragraph 212 was materially misleading because it portrayed Ocwen as a benefit to the Company and Residential shareholders.  This was incorrect and misleading.  The NY DFS's letters to Ocwen (and copied to Erbey) made it abundantly clear that Ocwen's loan servicing practices were illegal and doing great disservices to struggling homeowners.  Ocwen's practices ultimately led to the forced removal of Defendant Erbey from the Erbey Companies, as detailed in the NY DFS's Consent Order with Ocwen.  Given the truth about Ocwen and its practices, Residential's description of it

was materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

214.   Residential's quarterly report also misleadingly reported the Company's related-party transactions.  For the three-months ended March 31, 2014, Residential reported payments of: (i) $1,050,000 to ASPS for "[r]esidential property operating expenses"; (ii) $10,490,000 to Ocwen for "[m]ortgage loan servicing costs"; (iii) $111,000 to ASPS for "[d]ue diligence and unsuccessful deal costs"; (iv) $1,469,000 to AAMC for "[e]xpense reimbursements"; and (v) $10,911,000 to AAMC for "[m]anagement incentive fee."  (Quarterly Report, April 29, 2014, p. 13)

215.   Residential also reported in its quarterly report that:

> During the three months ended March 31, 2013 [sic], we acquired a portfolio from Ocwen of non-performing first lien residential mortgage loans having aggregate market value of underlying properties of $94 million. The aggregate purchase price for this portfolio was $64 million.

(Quarterly Report, April 29, 2014, p. 13)

216.   The above statements in Paragraphs 214-215 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the expense of Residential shareholders.  This

information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

217.    The above statements in Paragraphs 214-215 also omitted material information that was required to be disclosed pursuant to Item 404 of Regulation S-K (17 C.F.R. 229.404), including but not limited to Defendant Erbey's interest in each of the transactions and the detrimental effects they had upon Residential shareholders.  Defendant Erbey used the related-party transactions to siphon money from Residential to his other companies where he was able to profit handsomely via his relatively superior ownership interests (*i.e.*, compared to his 4% ownership interest in Residential, Defendant Erbey held a 29.6% stake in AAMC, 14.95% stake in Ocwen, and 29.34% stake in ASPS).  As the NY DFS explained in its letter dated August 4, 2014, Defendant Erbey was able to "direct[] profits" between his companies and, as a result, benefit financially.  In accordance with Item 404, Residential should have disclosed the amount by which Defendant Erbey was benefitting personally as a result of each of the related-party transactions as well as the harm each transaction caused to the Company and its investors.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

218.    Residential's quarterly report also materially misrepresented the status of the Company's internal controls.  Specifically, Residential stated that:

*Item 4. Controls and procedures*

SEC rules require us to maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our annual and periodic reports filed with the SEC is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. **Our CEO and CFO have concluded that the disclosure controls and procedures were effective at the end of the period covered by this quarterly report**.

SEC rules also require us to establish and maintain internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepting accounting principles. There were no changes in internal control over financial reporting during the three months ended March 31, 2014 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Quarterly Report, Apr. 29, 2014, p. 31)

219.   In connection with Residential's quarterly report, Defendants Pandey and Najour submitted Certifications Pursuant to the Sarbanes-Oxley Act of 2002.  The certifications stated as follows:

1. I have reviewed this quarterly report on Form 10-Q of Altisource Residential Corporation;

2. Based on my knowledge, this **report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of

114

financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and

(b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(Quarterly Report, April 29, 2014, Exhibits 31.1 and 31.2)

220.    The above statements (identified in bold) in Paragraphs 218-219 were materially misleading because they materially misrepresented the state of the Company's internal controls. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  Given the Company's true state of internal controls, the above statements were materially misleading.  This information is material because

it would have altered the total mix of information available to investors when considering whether to invest in Residential.

*April 29, 2014 – Conference Call*

221.    On April 29, 2014, Defendants Erbey, Pandey, and Najour hosted an investor conference call to discuss the Company's first-quarter earnings for fiscal 2014.   During his opening remarks, Defendant Erbey discussed Residential's agreement with AAMC while in the course of presenting Residential's performance for the quarter.   Erbey stated, in pertinent part, as follows:

> As shown on slide three, during the quarter, Residential has estimated taxable income of $25.8 million and paid a cash dividend of $0.40 per share or $22.8 million. Including the catch-up dividend we distributed in March 2014 with respect to Residential's 2013 taxable income, Residential distributed an aggregate of $27.4 million to Residential's stockholders in the quarter, representing an annualized return on equity of 10.7%.

> It's important to keep in mind that the 10.7% return on equity is net of the incentive fees payable to AAMC. **As you know, Residential pays AAMC a quarterly incentive management fee based on Residential's level of distributable cash per share**.

222.    The above statements in Paragraphs 221 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.   Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.   The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions

for the purpose of benefitting himself at the expense of Residential shareholders.   This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### July 22, 2014 – Quarterly Report

223.     On July 22, 2014, Residential filed a quarterly report (Form 10-Q) with the SEC. Defendant Najour signed the quarterly report on behalf of Residential.   Through the quarterly report, Residential materially misled investors about the Company's operations and dealings with related parties.

224.     Residential's quarterly report misleadingly promoted the Company's relationship with Ocwen:

> On the separation date, we entered into long-term service agreements with Ocwen Financial Corporation ("Ocwen"), **a leading residential mortgage loan servicer**, and with Altisource, a leading provider of real estate and mortgage portfolio management, asset recovery and customer relationship management services. **We believe that our access to Ocwen's servicing expertise and multifaceted resolution methodologies helps us maximize the value of our loan portfolios and provides us with a competitive advantage over other companies with a similar focus**.

> (Quarterly Report, July 22, 2014, p. 6)

225.     The above statement (identified in bold) in Paragraph 224 was materially misleading because it portrayed Ocwen as a benefit to the Company and Residential shareholders.   This was incorrect and misleading.   The NY DFS's letters to Ocwen (and copied to Erbey) made it abundantly clear that Ocwen's loan servicing practices were illegal and doing great disservices to struggling homeowners.   Ocwen's practices ultimately led to the forced removal of Defendant Erbey from the Erbey Companies, as detailed in the NY DFS's Consent Order with Ocwen.   Given the truth about Ocwen and its practices, Residential's description of it

was materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

226.    Residential's quarterly report also misleadingly reported the Company's related-party transactions.  For the three- and six-months ended June 30, 2014 (respectively), Residential reported payments of: (i) $3,150,000 and $4,200,000 to ASPS for "[r]esidential property operating expenses"; (ii) $14,942,000 and $25,432,000 to Ocwen for "[m]ortgage loan servicing costs"; (iii) $1,655 and $1,766,000 to ASPS for "[d]ue diligence and unsuccessful deal costs"; (iv) $1,789,000 and $3,258,000 to AAMC for "[e]xpense reimbursements"; and (v) $13,715,000 and $24,626,000 to AAMC for "[m]anagement incentive fee."  (Quarterly Report, July 22, 2014, p. 14)

227.    Residential also reported in its quarterly report that:

During the six months ended June 30, 2013, we acquired a portfolio from Ocwen of non-performing first lien residential mortgage loans having aggregate market value of underlying properties of $94 million. The aggregate purchase price for this portfolio was $64 million.

(Quarterly Report, July 22, 2014, p. 14)

228.    The above statements in Paragraphs 226-227 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions

for the purpose of benefitting himself at the expense of Residential shareholders. This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

229.   The above statements in Paragraphs 226-227 also omitted material information that was required to be disclosed pursuant to Item 404 of Regulation S-K (17 C.F.R. 229.404), including but not limited to Defendant Erbey's interest in each of the transactions and the detrimental effects they had upon Residential shareholders. Defendant Erbey used the related-party transactions to siphon money from Residential to his other companies where he was able to profit handsomely via his relatively superior ownership interests (*i.e.*, compared to his 4% ownership interest in Residential, Defendant Erbey held a 29.6% stake in AAMC, 14.95% stake in Ocwen, and 29.34% stake in ASPS). As the NY DFS explained in its letter dated August 4, 2014, Defendant Erbey was able to "direct[] profits" between his companies and, as a result, benefit financially. In accordance with Item 404, Residential should have disclosed the amount by which Defendant Erbey was benefitting personally as a result of each of the related-party transactions as well as the harm each transaction caused to the Company and its investors. This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

230.   Residential's quarterly report also materially misrepresented the status of the Company's internal controls. Specifically, Residential stated that:

> *Item 4. Controls and procedures*
>
> Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and Rule 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this quarterly report. **Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this quarterly**

119

**report were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.**

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the quarter ended June 30, 2014 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Quarterly Report, July 22, 2014, p. 33)

231.    In connection with Residential's quarterly report, Defendants Pandey and Najour

submitted Certifications Pursuant to the Sarbanes-Oxley Act of 2002.  The certifications stated as

follows:

1. I have reviewed this quarterly report on Form 10-Q of Altisource Residential Corporation;

2. Based on my knowledge, this **report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and

(b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(Quarterly Report, July 22, 2014, Exhibits 31.1 and 31.2)

232.   The above statements (identified in bold) in Paragraphs 230-231 were materially misleading because they materially misrepresented the state of the Company's internal controls. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.   Given the Company's true state of internal

controls, the above statements were materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### July 22, 2014 – Conference Call

233.    On July 22, 2014, Defendants Erbey, Pandey, and Najour hosted an investor conference call to discuss the Company's second-quarter earnings for fiscal 2014.  During his opening remarks, Defendant Erbey promoted Ocwen's capabilities and the supposed benefits it provided to Residential:

> On slide 6, we show the impact of three key variables on NPL pricing. The first variable is rental conversion rate, our estimated 50% conversion rate provides us with a four point advantage against a competitor that does not have a rental strategy and therefore incurs the brokerage and closing cost associated with REO liquidation. The second variable is the loan modification rate. **Our service, Ocwen has been ranked best in class in modifying loans by many third party servicing performance reports**.
>
> Modifications are our most desired outcome as they lead to a win-win situation for both our borrowers and our shareholders. At 10% increase in the modification rates would result in a 2.5 points increase in the price that we can pay for NPLs and meet our targeted returns. The third variable is the foreclosure timeline. A reduction for closure timelines by three months will result in a 2 point increase in the price that we can pay for NPLs and meet our targeted returns.
>
> Ocwen is recognized as an industry leader in managing foreclosure timelines. In summary on pools that meet our investment criteria, these factors provide us with a significant advantage over other market players.
>
> I will conclude by saying that we continue to see the NPL acquisition strategy as an effective sustainable source of rental properties for Residential.

234.    The above statement (identified in bold) in Paragraph 233 was materially misleading because it portrayed Ocwen as a benefit to the Company and Residential shareholders.  This was incorrect and misleading.  The NY DFS's letters to Ocwen (and copied to Erbey) made it abundantly clear that Ocwen's loan servicing practices were illegal and doing

great disservices to struggling homeowners.  Ocwen's practices ultimately led to the forced removal of Defendant Erbey from the Erbey Companies, as detailed in the NY DFS's Consent Order with Ocwen.  Given the truth about Ocwen and its practices, Residential's description of it was materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### *November 4, 2014 – Conference Call*

235.    On November 4, 2014, Defendants Erbey, Pandey, and Lowe hosted an investor conference call to discuss the Company's third-quarter earnings for fiscal 2014.  During his opening remarks, Defendant Pandey discussed the NY DFS's ongoing investigation into Ocwen:

> Before I turn the call over to Robin, I would like to comment on the Ocwen letter dating matter and its potential impact on our portfolio. **Based on information provided to us by Ocwen as our servicer, of the 6,100 misdated letters referenced in our regulatory letter to Ocwen, only four relate to our portfolio.**
>
> In all four cases, the letter dating issue occurred in 2012 prior to our acquisition of the loans. None of the four loans have been foreclosed. Three of the loans were brought current and one loan is non-performing.
>
> **Based on the information available to us today, we do not believe that Ocwen letter dating issue will have an impact either on our portfolio or on operations.**

236.    Defendant Pandey reiterated his remarks concerning the NY DFS investigation later in the call in response to a question from an analyst.  Defendant Pandey states as follows:

> Q <Stephen Laws - Deutsche Bank>: . . . Can you maybe give us a little more color on why you're confident there's not an impact at REO or [Residential]?
>
> A <Defendant Pandey>: Sure. **There are four loans out of the 6,100 loans that were referenced in the letter to Ocw[e]n which are [owned] by [Residential] today.** None of these loans have been converted to REO. The misdating of letter happened prior to the time when [Residential] acquired these loans and three of the loans have been brought current, one of the loan is in delinquent status. **That's why I say that, we don't expect an impact.**

237.    The above statements (identified in bold) in Paragraphs 235-236 were materially misleading because they downplayed the extent of Ocwen's illegal loan servicing practices and created the false impression these practices would not have an impact on the Company's operations.  The NY DFS's letter to Ocwen (copied to Defendant Erbey) dated October 21, 2014 explained that "[w]ithin a few days, the [NY DFS's investigation] uncovered nearly a thousand additional backdated letters that Ocwen evidently failed to find in the prior three months." Additionally, following Defendant Erbey's forced removal from the Erbey Companies in December 2014, Residential experienced significant difficulty disentangling itself from Ocwen. As Residential explained in its quarterly report (Form 10-Q) filed with the SEC on November 9, 2015, transferring the majority of its servicing from Ocwen to other providers "hampered [Residential's] resolution efforts . . . which negatively impacted [the Company's] results *for the first three quarters of 2015*" and "hampered [Residential's] ability to convert loans to [real estate owned properties] during 2015, and *may continue to hamper our resolution efforts in the short term*" (emphasis added).  Residential's operations were heavily dependent upon and interrelated with Ocwen.  Accordingly, Defendant Pandey's statements concerning Ocwen's impact on Residential were materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

### *November 5, 2014 – Quarterly Report*

238.    On November 5, 2014, Residential filed a quarterly report (Form 10-Q) with the SEC.  Defendant Lowe signed the quarterly report on behalf of Residential.  Through the quarterly report, Residential materially misled investors about the Company's operations and dealings with related parties.

239.     Residential's quarterly report misleadingly promoted the Company's relationship with Ocwen:

> On the separation date, we entered into long-term service agreements with Ocwen Financial Corporation ("Ocwen"), **a leading residential mortgage loan servicer**, and with Altisource, a leading provider of real estate and mortgage portfolio management, asset recovery and customer relationship management services. **We believe that our access to Ocwen's servicing expertise and multifaceted resolution methodologies helps us maximize the value of our loan portfolios and provides us with a competitive advantage over other companies with a similar focus**.

(Quarterly Report, Nov. 5, 2014, p. 6)

240.     The above statement (identified in bold) in Paragraph 239 was materially misleading because it portrayed Ocwen as a benefit to the Company and Residential shareholders.  This was incorrect and misleading.  The NY DFS's letters to Ocwen (and copied to Erbey) made it abundantly clear that Ocwen's loan servicing practices were illegal and doing great disservices to struggling homeowners.  Ocwen's practices ultimately led to the forced removal of Defendant Erbey from the Erbey Companies, as detailed in the NY DFS's Consent Order with Ocwen.  Given the truth about Ocwen and its practices, Residential's description of it was materially misleading.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

241.     Residential's quarterly report also misleadingly reported the Company's related-party transactions.  For the three- and nine-months ended September 30, 2014 (respectively), Residential reported payments of: (i) $7,038,000 and $11,238,000 to Ocwen and ASPS for "[r]esidential property operating expenses"; (ii) $22,173,000 and $47,605,000 to Ocwen for "[m]ortgage loan servicing costs"; (iii) $4,000 and $1,770,000 to ASPS for "[d]ue diligence and unsuccessful deal costs"; (iv) $1,591,000 and $4,849,000 to AAMC for "[e]xpense

reimbursements"; and (v) $19,503,000 and $44,129,000 to AAMC for "[m]anagement incentive fee."  (Quarterly Report, Nov. 5, 2014, p. 15)

242.    Residential also reported in its quarterly report that:

On September 30, 2014, pursuant to a master repurchase agreement, our TRS sold $15.0 million of the Class M Notes to NewSource for a purchase price of $15.0 million. The master repurchase agreement requires the TRS to repurchase the Class M Notes from NewSource at a 5.0% yield on December 28, 2014, with the parties having the option to extend the master repurchase agreement for an additional 89 day period. In no event can the master repurchase agreement be extended beyond September 29, 2015.

During the nine months ended September 30, 2013, we acquired a portfolio from Ocwen of non-performing first lien residential mortgage loans having aggregate market value of underlying properties of $94 million. The aggregate purchase price for this portfolio was $64 million.

(Quarterly Report, Nov. 5, 2014, pp. 15-16)

243.    The above statements in Paragraphs 241-242 were materially misleading because they created the false impression that the disclosed related-party transactions had been properly approved in accordance with the Company's policies pertaining to related-party transactions. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  The above statements omitted that (i) Residential's related-party transactions were not approved in accordance with the Company's related-party transaction policies and (ii) Defendant Erbey caused the Company to enter into the transactions for the purpose of benefitting himself at the expense of Residential shareholders.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

244.     The above statements in Paragraphs 241-242 also omitted material information that was required to be disclosed pursuant to Item 404 of Regulation S-K (17 C.F.R. 229.404), including but not limited to Defendant Erbey's interest in each of the transactions and the detrimental effects they had upon Residential shareholders.  Defendant Erbey used the related-party transactions to siphon money from Residential to his other companies where he was able to profit handsomely via his relatively superior ownership interests (*i.e.*, compared to his 4% ownership interest in Residential, Defendant Erbey held a 29.6% stake in AAMC, 14.95% stake in Ocwen, and 29.34% stake in ASPS).  As the NY DFS explained in its letter dated August 4, 2014, Defendant Erbey was able to "direct[] profits" between his companies and, as a result, benefit financially.  In accordance with Item 404, Residential should have disclosed the amount by which Defendant Erbey was benefitting personally as a result of each of the related-party transactions as well as the harm each transaction caused to the Company and its investors.  This information is material because it would have altered the total mix of information available to investors when considering whether to invest in Residential.

245.     Residential's quarterly report also materially misrepresented the status of the Company's internal controls.  Specifically, Residential stated that:

*Item 4. Controls and procedures*

Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and Rule 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this quarterly report. **Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this quarterly report were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive**

127

**Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure**.

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the quarter ended September 30, 2014 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Quarterly Report, Nov. 5, 2014, p. 35)

246.    In connection with Residential's quarterly report, Defendants Pandey and Lowe submitted Certifications Pursuant to the Sarbanes-Oxley Act of 2002.  The certifications stated as follows:

1. I have reviewed this quarterly report on Form 10-Q of Altisource Residential Corporation;

2. Based on my knowledge, this **report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of

financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and

(b) **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

(Quarterly Report, Nov. 5, 2014, Exhibits 31.1 and 31.2)

247.    The above statements (identified in bold) in Paragraphs 245-246 were materially misleading because they materially misrepresented the state of the Company's internal controls. The SEC determined that Defendant Erbey failed and/or refused to follow any policies or procedures concerning approval of related-party transactions.  Defendant Erbey's conduct with respect to HLSS raises a strong inference that he engaged in similar violative conduct in his capacity as Chairman of Residential's Board.  Given the Company's true state of internal controls, the above statements were materially misleading.  This information is material because

it would have altered the total mix of information available to investors when considering whether to invest in Residential.

## **INVESTORS RECEIVED PARTIAL CORRECTIVE DISCLOSURES**

248.   The truth concerning the Erbey Companies and the detrimental effects they had on Residential shareholders became gradually known to the investing public over time.  While information pertaining to the operations of Residential and the other Erbey Companies was released through various sources, the full extent of fraud was not made public until at least the end of the Class Period.

### *December 19, 2013 – CFPB Consent Judgment*

249.   On December 19, 2013, Bloomberg News reported that Ocwen had agreed to a $2.1 billion settlement with the CFPB.  In the CFPB Consent Judgment, the CFPB disclosed that "Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process."

250.   In response to this news, Residential's stock price declined significantly.   On December 20, 2013, the following day, Residential's stock had an adjusted closing price of $26.49 per share.  From there, Residential's stock price declined by $1.56 per share on unusually heavy trading volume to close at $24.93 per share on December 26, 2013.

### *February 6, 2014 – NY DFS Suspension*

251.   On February 6, 2014, Ocwen revealed that the NY DFS had placed an "indefinite hold" on its agreement to purchase nearly $40 billion in mortgage servicing rights from Wells Fargo.  The NY DFS's suspension was due in part to "concerns about Ocwen's servicing portfolio growth."

252.   In response to this news, Residential's stock price declined significantly.   On February 7, 2014, the following day, Residential's stock had an adjusted closing price of $25.32

per share.  From there, Residential's stock price declined by $0.95 per share on unusually heavy trading volume to close at $24.36 per share on February 12, 2014.

### *February 26, 2014 – NY DFS Letter*

253.    On February 26, 2014, the NY DFS sent a letter to Ocwen reporting serious concerns over Ocwen's transactions with related parties.  The NY DFS indicated the possibility of conflicts of interest that could produce adverse results to homeowners.

254.    In response to this news, Residential's stock price declined significantly.   On February 26, 2014, Residential's stock opened at $28.96 per share and closed at $26.72 per share on unusually heavy trading volume.

### *August 4, 2014 – NY DFS Letter*

255.    On August 4, 2014, the NY DFS sent Ocwen a second letter reprimanding Ocwen over its related-party transactions and Defendant Erbey's involvement in their approval.

256.    In response to this news, Residential's stock price declined significantly.   On August 2014, Residential's stock opened at $23.69 per share and closed at $23.51 per share on unusually heavy trading volume.

### *October 21, 2014 – NY DFS Letter*

257.    On October 21, 2014, the NY DFS send Ocwen a third letter.  This letter, similar to the one before it, continued to reprimand Ocwen over its related-party transactions and Defendant Erbey's involvement in their approval.

258.    In response to this news, Residential's stock price declined significantly.   On October 21, 2014, Residential's stock had an adjusted closing price of $20.51 per share.  From there, Residential's stock price declined by $1.25 per share on unusually heavy trading volume to close at $19.26 per share on October 27, 2014.

***November 12, 2014 – Discontinuance of Force-Placed Insurance***

259.    On November 12, 2014, ASPS announced publicly that it would be discontinuing its force-placed insurance program due to "industry-wide litigation and the regulatory environment."   The force-placed insurance discussed by ASPS was the subject of a recently publicized letter from the NY DFS.

260.    In response to this news, Residential's stock price declined significantly.   On November 12, 2014, Residential's stock had an adjusted closing price of $17.50 per share.  From there, Residential's stock price declined by $1.21 per share on unusually heavy trading volume to close at $16.28 per share on November 14, 2014.

***December 22, 2014 – NY DFS Consent Order***

261.    On December 22, 2014, Residential filed a current report (Form 8-K) with the SEC.  The current report revealed that Defendant Erbey notified the Board on December 21, 2014 that he would be stepping down from his position as Director and Chairman of the Company, effective January 16, 2015.   The current report indicated that Defendant Erbey's resignation was the result of the Consent Order entered into by Ocwen and the NY DFS.   The current report attached a press release dated December 22, 2014 reiterating Defendant Erbey's departure from the Company.

262.    The market reacted sharply to the news of Erbey's departure from the Company. In the span of just one day, Residential's stock price declined by $1.23 per share (or 6.8%) on unusually heavy volume.  On December 19, 2014 (the day most recent trading day immediately preceding December 22, 2014), Residential's stock closed at $18.07 per share.  On December 22, 2014, Residential's stock price closed at $16.84 per share.

## DEFENDANTS ACTED WITH SCIENTER

263.    Defendants' statements and omissions materially misled investors concerning Residential's relationships and transactions with the other Erbey Companies.  Defendants made these statements with either (i) an intent to deceive shareholders or (ii) a reckless disregard over the risk of misleading the public.  As Defendants misled investors, Defendant Erbey and his associates benefited by millions upon millions of dollars.  Meanwhile, investors in Residential lost nearly everything.

### *Defendants Benefited Financially from the Fraud*

264.    Between 2012 and 2014, Defendants received substantial personal benefits while retail investors suffered significant losses.  Defendant Erbey alone received over $26.1 million in director and executive compensation from his involvement in each of the Erbey Companies.  As indicated in the table below, Erbey received huge sums of money from each of the companies in his syndicate:

|  | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|
| ASPS – Director Compensation | $484,073 | $178,903 | $151,078 | $814,054.00 |
| AAMC – Director Compensation | $310,012 | $113,070 | $274,624 | $697,706.00 |
| Ocwen – Executive Compensation | $19,616,885 | $2,942,858 | $2,082,444 | $24,642,187.00 |
| Residential – Director Compensation | n/a | $92,773 | $170,503 | $263,276.00 |
| HLSS – Director Compensation | $145,000 | $141,250 | n/a | $286,250.00 |
|  |  |  | **TOTAL:** | **$26,703,473.00** |

265.    In addition to the director and executive compensation he received, Erbey also profited dramatically in connection with his stock options in each of the companies.  In total, Erbey reaped over **$19 million** in realized and unrealized gains:

- For AAMC, Erbey exercised options on October 29, 2013 and January 14, 2015 at average prices of $.66 and $.81 per share, respectively. Based on the market value

of AAMC at the time of exercise, Erbey realized approximate gains of $1.3 million and $326,400, respectively, on these transactions.

- For ASPS, Erbey exercised options on November 23, 2012 and January 14, 2015 at average prices of $2.90 and $9.19 per share, respectively. Based on the market value of ASPS at the time of exercise, Erbey realized approximate gains of $2.9 million and $141,500, respectively, on these transactions. Moreover, Erbey also exercised options and sold the corresponding stock on August 29, 2013, resulting in a gain of approximately $2.8 million.

- For Ocwen, Erbey exercised options on November 23, 2012 and November 5, 2013 at average prices of $1.47 and $5.92, respectively. Based on the market value of Ocwen at the time of exercise, Erbey realized approximate gains of $2.8 million and $2.9 million, respectively, on these transactions.

- For Residential, Erbey exercised Residential options covering shares at ludicrously low prices. On October 29, 2013 and February 10, 2014 Erbey exercised options at average prices of $1.24 and $1.03, respectively, thereby realizing approximate gains of $181,000 and $8.5 million, respectively, based on the then-market value of Residential stock.

266. Similar to Erbey, Defendants Pandey, Najour, Lowe, and Ridley also profited as a result of their involvement with the Erbey Companies. Between 2012 and 2014, these individual defendants received $2,059,287, $1,419,440, $14,8367,715, and $195,979, respectively. Moreover, through AAMC, Erbey provided these individual defendants with reimbursement of expenses related to their relocation to the Virgin Islands, supplemental living expenses, car allowances, education allowances, travel allowances, housing expenses, and medical benefits.

267. Defendants were able to profit in this manner as a result of their fraudulent conduct. By withholding the truth about the Erbey Companies from shareholders, Defendants were able to artificially inflate Residential's stock price, generate significant influxes of cash from public equity, and continue to fuel the machine that was the Erbey Companies.

### Defendants Used Public Money to Fund the Erbey Companies

268. Defendants needed to raise significant capital in order to fund the Erbey Companies. Defendants accomplished this through Residential, which laid at the center of

Defendants' scheme, by orchestrating a number of public offerings throughout the Class Period: on April 25, 2013, Residential sold 15 million shares at $18.75 per share for net proceeds of approximately $270 million; on September 25, 2013, Residential sold another 15 million shares, but this time at a price of $21 per share for net proceeds of approximately $305 million; and on January 16, 2014, Residential sold 14.2 million shares at a price of $34 per share for net proceeds of nearly $475 million. Residential's stock currently trades for less than $10 per share.

269.    Defendants were able to successfully raise the money they did by withholding material information from investors.  Significantly, Defendants never told investors that the Company was not abiding by its rules and policies concerning related-party transactions. Moreover, Defendants never told investors that Residential's agreements with the other Erbey Companies were executed for the benefit of Defendants and in fact had a detrimental effect to Residential's public shareholders.  Had investors been told this information, Residential's public offerings would not have been at the prices they were and, in turn, Defendants would not have been able to raise the money they did during the Class Period.

270.    Defendants' intent in this regard is evidenced by the fact that Erbey orchestrated multiple public offerings of Residential stock (thereby diluting his position) while increasing his ownership of the other Erbey Companies.  During the course of the Class Period, Erbey's stake in Residential went from 27.9% to barely 4.0% while his positions in AAMC, ASPS, and Ocwen increased from 30.1%, 27.9%, and 13.2% to 30.7%, 32.44%, and 16.91%, respectively.

### Defendants Knew that the Erbey Companies Were Detrimental to Residential

271.    Residential's agreements with Ocwen, ASPS, and AAMC (in particular) were especially harmful to Residential and its shareholders.  Notwithstanding, Defendants continued to withhold from shareholders the truth concerning these agreements.

272.    Throughout the Class Period, Defendants promoted the Company's longstanding relationship with Ocwen as a premiere loan servicer.  Defendants' representations included statements such as:

- "Based on its in-depth experience as a leading mortgage servicer, Ocwen has developed a number of strategies to improve the collection process, including, a proactive consulting approach, defined call strategies, a variety of loan modification strategies and enhanced payment methods."  (Registration Statement, Dec. 5, 2012, pp. 60-62)

- "[W]e believe that our access to Ocwen's servicing expertise helps us to maximize the value of our loan portfolios and provides us with a competitive advantage over other companies with a similar focus." (Annual Report, Feb. 7, 2013, p. 4)

- "Ocwen's servicing approach is focused on the psychological principles of influencing borrower behavior and uses non-linear optimization models for deciding the best resolution for a loan.  . . .  Importantly, by using Ocwen's servicing platform to modify as many loans as possible, we believe that more families may remain in their homes because of our efforts."  (Prospectus, Jan. 15, 2014, p. 6)

- "We believe that our access to Ocwen's servicing expertise and multifaceted resolution methodologies helps us maximize the value of our loan portfolios and provides us with a competitive advantage over other companies with a similar focus."  (Quarterly Report, July 22, 2014, p. 6)

- "Our service, Ocwen has been ranked best in class in modifying loans by many third party servicing performance reports."  (Transcript, July 22, 2014)

- "Based on information provided to us by Ocwen as our servicer, of the 6,100 misdated letters referenced in our regulatory letter to Ocwen, only four relate to our portfolio.  . . .  Based on the information available to us today, we do not believe that Ocwen letter dating issue will have an impact either on our portfolio or on operations."  (Transcript, Nov. 4, 2014)

273.    Contrary to Defendants' statements, Ocwen presented an extreme risk to Residential.  More importantly, Defendants knew about Ocwen's problems throughout the entire Class Period, but made the above statements regardless.

274.     By the start of the Class Period, Ocwen had already entered into the 2012 NY DFS Consent Order, which, among other things, provided for the installation of an independent on-site monitor to supervise Ocwen going forward.

275.     The following year, on December 19, 2013, the CFPB along with 49 states and the District of Columbia filed a federal complaint United States District Court for the District of Columbia alleging that Ocwen had been violating the Unfair and Deceptive Acts and Practices laws of the Plaintiff States and the Consumer Financial Protection Act of 2010.   The lawsuit resulted in a Consent Judgment executed on December 13, 2013 which, among other things, required Ocwen to pay $127.3 million.

276.     Shortly thereafter, the NY DFS began writing letters to Ocwen reporting that the NY DFS's on-site monitor (who had been installed under the 2012 NY DFS Consent Order) had identified a number of serious compliance errors: on February 26, 2014, the NY DFS alerted Ocwen of the risk for misconduct arising from Erbey's numerous related-party transactions; on April 21, 2014, the NY DFS reprimanded Ocwen for its abusive use of Hubzu; on August 4, 2014, the NY DFS again reprimanded Ocwen for its use of force-placed insurance through related-party transactions that Erbey approved single-handedly; and on October 21, 2014, the NY DFS alerted Ocwen that its on-site manager in the span of just "a few days" had uncovered almost 1,000 additional backdated letters that had not been previously identified and/or disclosed by Ocwen.   These repeated violations culminated in the 2014 NY DFS Consent Order, which called for the removal of Erbey from the Erbey Companies.

277.     Defendants were aware of each of the above instances, notwithstanding their materially misleading statements concerning Ocwen.   Defendant Erbey signed Ocwen's annual reports which discussed in detail the 2012 NY DFS Consent Order (Ocwen Annual Report, Mar.

1, 2013, p. F-57) as well as the CFPB Consent Judgment (Ocwen Annual Report, Mar. 3, 2014, p. F-64).  Additionally, Defendant Erbey was copied on each of the letters from the NY DFS to Ocwen.

278.   Similar to Residential's involvement with Ocwen, Residential's Asset Management Agreement with AAMC was also detrimental to the Company.  The Asset Management Agreement allowed Erbey to improperly transfer millions of dollars from Residential to AAMC in the form of "incentive fees" and "expenses."  Between 2012 and 2014, AAMC received over $84 million from Residential.  This is compared to total Residential dividends during the same time period of $132 million.  According to public analyst reports, AAMC's "incentive fees" are expected to be over six times higher than amounts paid by similarly situated companies for external management services.

279.   Defendants were aware of the AAMC's detrimental effect on the Company from the moment the Asset Management Agreement was created, as Erbey himself created it and was one of the agreement's primary beneficiaries (through AAMC).  Moreover, beginning in May 2014, Residential began receiving correspondence from shareholders concerning the unfair terms of the Asset Management Agreement.  In a letter written by counsel, Residential's Board was advised that AAMC was charging Residential exorbitant fees well above market rates.  The letter also demanded that the Board take immediate action to remove AAMC and engage alternate management.  Notwithstanding the truth about AAMC, Defendants continued to transact business with AAMC on behalf of Residential without any disclosure to shareholders.

280.   These fact—*i.e.*, that Defendants spoke so misleadingly about Ocwen and AAMC while at the same time possessing material adverse information—strongly suggests that Defendants acted with scienter.

***Defendants Disregarded Residential's Internal Controls***

281.   Throughout the Class Period, Defendants presented their numerous related-party transactions to investors as if they had each been vetted and approved appropriately in accordance with the Company's "Related Party Transaction Policy."   While Defendants represented their adherence to Residential's internal controls, in reality they paid no regard to the Company's policies concerning related-party transactions.

282.   On October 5, 2015, the SEC issued the SEC Cease & Desist Order.  The SEC Cease & Desist Order focused on HLSS, one of companies Erbey used in connection with the Erbey Companies.  According to the SEC Cease & Desist Order, Erbey had improperly approved a number of related-party transactions between HLSS and Ocwen in violation of HLSS's internal policies concerning related-party transactions.   Specifically, according to the SEC Cease & Desist Order, HLSS's "Credit Committee" was supposed to approve certain transactions with Ocwen (referred to as "Flow Transactions").   Erbey, as a member of the "Credit Committee," approved these transactions.  Additionally, Erbey also approved the transactions on Ocwen's side of the arrangement.  This conduct occurred throughout 2012, 2013, and 2014 and involved over $2 billion of loan balances.

283.   Defendant Erbey's conduct at HLSS supports a strong inference of scienter with regard his conduct at Residential.  Given the fact that Erbey intentionally violated HLSS's internal controls over related-party transactions, a strong inference exists in support of the same conclusion with respect to the related-party transactions at Residential.

**<u>PRESUMPTION OF RELIANCE:</u>**
**<u>FRAUD-ON-THE-MARKET DOCTRINE</u>**

284.   Pursuant to his claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-

on-the-market doctrine, as enunciated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and *Erica P. John Fund, Inc. v. Halliburton Co.*, No. 09-1403, 563 U.S. 804 (2011), such that:

a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b)   the omissions and misrepresentations were material;

c)   Residential's shares traded in an open and efficient market;

d)   The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Residential's shares; and

e)   Plaintiff and other members of the Class purchased and/or otherwise acquired their shares of Residential stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

285.   At all relevant times, the market for Residential shares was an efficient market for the following reasons, among others:

a)   Residential's stock met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient and automated market;

b)   as a regulated issuer, Residential filed periodic public reports with the SEC and NYSE;

c)   Residential regularly communicated with public investors via established market communication mechanisms, including through conference calls and regular disseminations of press releases on the national circuits of

140

major   newswire   services   and   through   other   wide-ranging   public disclosures,   such   as   communications   with   the   financial   press   and   other similar reporting services; and

d)   Residential was followed by several securities analysts employed by major brokerage   firms   who   wrote   reports   which   were   distributed   to   the   sales force and certain customers of their respective brokerage firm.

286.   As a result of the foregoing, the market for Residential common stock promptly digested   current   information   regarding   the   Company   from   all   publicly   available   sources   and reflected such information in Residential's stock price. Under these circumstances, all purchasers of Residential securities during the Class Period suffered similar injury through their purchase of Residential -securities at artificially inflated prices and a presumption of reliance applies.

## THE PSLRA SAFE HARBOR DOES NOT APPLY

287.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the misrepresentations and omissions pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results   to   differ   materially   from   those   in   the   purportedly   forward-looking   statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew   that   the   particular   forward-looking   statement   was   false,   and/or   the   forward-looking statement was authorized and/or approved by an executive officer of Residential who knew that those statements were false when made.

## LOSS CAUSATION

288.    At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the otherwise-foreseeable damages sustained by Plaintiff and other members of the Class. As described above, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements, as well as omissions of information they were required to disclose, about related-party transactions at the Erbey Companies and Residential's internal controls regarding related-party transactions. These material misstatements and omissions, which were disseminated to the SEC and the public market, had the cause and effect of investors purchasing shares in spite of the wrongdoing complained of herein.

289.    Defendants failed to disclose to investors material information concerning the Company's related-party transactions.  Defendant Erbey laid at the center of the fraud alleged herein, as he created the Erbey Companies, employed the Individual Defendants through AAMC, profited significantly at the expense of Residential's investors, and was responsible for approving and orchestrating the related-party transactions at issue.  Accordingly, in light of the fact that each material decline was in response to a corrective disclosure that came about as a result of a consent judgment, cease-and-desist order, regulatory letter, etc., issued in response to his conduct, Defendant Erbey was responsible for the material decline in Residential's stock price.  From a Class Period high of $33.69 per share on January 13, 2014, Residential's stock price has declined by approximately 300% to nearly $10 per share at its current trading price.

290.    Defendant Erbey's fraudulent conduct while serving in his director and officer positions at the Erbey Companies resulted in repeated losses, increased regulatory scrutiny, and severely poor stock performance.  The losses sustained by Residential shareholders are the direct

result of the materialization of the risk that was concealed by Defendants throughout the Class Period.

## CLASS ACTION ALLEGATIONS

291.    Plaintiff brings this action as a class action pursuant to Rule 23 of Federal Rule of Civil Procedure on behalf of all persons who purchased or otherwise acquired shares of Residential during the Class Period. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

292.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. At all relevant times, millions of Residential shares were issued and outstanding.

293.    While the Class size is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Residential and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

294.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

295.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class and securities litigation. Plaintiff has no interests which conflict with those of the Class.

296.     Questions of law and fact common to the members of the Class predominate over any questions solely affecting individual members of the Class, and include:

    a)      whether the Exchange Act was violated by Defendants;

    b)      whether Defendants omitted and/or misrepresented material facts;

    c)      whether Defendants' statements omitted material facts necessary to make such statements, in light of the circumstances under which they were made, not misleading;

    d)      whether Defendants knew or deliberately disregarded that their statements were false and misleading;

    e)      whether the prices of Residential shares were artificially inflated; and

    f)      the extent of damage sustained by Class members and the appropriate measure of damages.

297.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

### COUNT ONE

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

298.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

299.     This Count is asserted by Plaintiff on behalf of himself and the Class against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder.

300.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Residential's common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Residential's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

301.   Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted statements of material facts necessary to make other statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for Residential's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

302.   As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, the Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.  Defendants' material misrepresentations and omissions as set forth herein violated that duty.

303.   Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff

145

and the Class. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

304. As a result of Defendants' fraudulent activity, the market price of Residential was artificially inflated during the Class Period.

305. In ignorance of the true financial condition of Residential, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Residential containing the misleading information, purchased or otherwise acquired Residential's common stock at artificially inflated prices during the Class Period.

306. Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in Residential's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased Residential's stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of Residential's common stock through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of, among other things, the lack of sufficient internal controls over related party transactions and the extent of Residential's exposure to both the wrongdoing admitted to by Ocwen and the impermissible relationships between the Erbey Companies.

307. Throughout the Class Period, Defendants were aware of material non-public information concerning Residential's fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

146

308.     As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Residential common stock during the Class Period.

## COUNT TWO

**Violation of Section 20 of the Exchange Act
Against Erbey, Pandey, Najour, Lowe, and Ridley**

309.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

310.     Residential is liable as a primary violator of Section 10(b) of the Exchange Act and Rule 10b-5 as set forth herein.

311.     The Individual Defendants acted as controlling persons of Residential within the meaning of Section 20(a) of the Exchange Act. Because of their positions, the Individual Defendants had the power and authority to cause Residential to engage in the wrongful conduct complained of herein. By reason of such conduct, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a)     Declaring this action to be a proper class action pursuant to Fed. R Civ. R. 23;

b)     Awarding Plaintiff and the members of the Class damages, including interest;

c)     Awarding Plaintiff reasonable costs and attorneys' fees; and

d)     Awarding such equitable/injunctive or other relief in Plaintiff's favor as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.


Dated: January 22, 2016                    Respectfully submitted,


                                     _____

K. A. RAMES, P.C.
Kevin A. Rames (VI Bar No. 193)
Suite 3, 2111 Company Street
Christiansted, St. Croix, U.S.V.I. 00820
Tel: (340) 773-7284
Fax: (340) 773-7282

*Liaison Counsel for Lead Plaintiff Lei Shi*

LEVI & KORSINSKY, LLP
Nicholas I. Porritt (admitted *pro hac vice*)
Donald J. Enright (admitted *pro hac vice*)
Adam M. Apton (to be admitted *pro hac vice*)
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121

*Attorneys for Lead Plaintiff Lei Shi
and Lead Counsel for the Class*


4850-8336-2860, v. 1