<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF ST. CROIX

|  |  |
|---|---|
| ERIC MARTIN,<br>                    Plaintiff,<br><br>        v.<br><br>ALTISOURCE RESIDENTIAL<br>CORPORATION, WILLIAM C. ERBEY,<br>ASHISH PANDEY, KENNETH D.<br>NAJOUR, ROBIN N. LOWE, and<br>RACHEL M. RIDLEY,<br>                    Defendants. | Civ. No. 15-0024<br><br>**OPINION** |

<u>THOMPSON, U.S.D.J.</u>[1]

This matter comes before the Court upon a motion to dismiss brought by

Defendants Altisource Residential Corporation ("RESI" or "Residential"), William C.

Erbey ("Erbey"), Ashish Pandey ("Pandey"), Kenneth D. Najour ("Najour"), Robin N.

Lowe ("Lowe"), and Rachel M. Ridley ("Ridley") (collectively, "Defendants").  (ECF

Nos. 55, 56).  Plaintiff Eric Martin ("Plaintiff") opposes.  (ECF No. 60).  The Court has

decided this matter after considering the written submissions of the parties and oral

argument on December 19, 2016.  For the reasons set forth below, the Court will deny

Defendants' motion to dismiss.

## BACKGROUND

This case consists of a securities fraud claim for violation of Section 10(b) of the

Securities Exchange Act of 1934.

---

[1] The Honorable Anne E. Thompson, United States District Judge for the District of New
Jersey, sitting by designation.

Plaintiff's allegations are as follows:

Residential owns and manages single-family rental properties through the acquisition of sub-performing and non-performing residential mortgage loans. (Am. Compl. ¶ 3). RESI was a spin off from Ocwen Corporation. Ocwen has several spin offs from 2009 to 2012, creating ASPS in 2009 (*id.* ¶ 29) and Residential and AAMC from ASPS in December 2012 (*id.* ¶¶ 46–47). The four companies have continued to cooperate for their entire existence. Residential itself had no employees. AAMC manages Residential. Residential acquires and services loans through Ocwen. (*Id.* ¶ 4). ASPS manages the day-to-day operation of the rental properties—renovations, maintenance, leasing, etc. (*Id.*). For Residential, Ocwen, Altisource Asset Management Corporation ("AAMC") and Altisource Portfolio Solutions, S.A. ("ASPS"), Erbey was either the Chairman of the Board or the Chief Executive Officer, as well as the largest individual shareholder. (*Id.* ¶ 2). The other individual Defendants were simultaneously Chief Executive Officer of both Residential and AAMC, Chief Accounting Officer of Residential and Chief Financial Officer of AAMC, and Chief Financial Officers of both Residential and AAMC. (*Id.* ¶¶ 22–25).

Plaintiff and putative class members purchased or acquired shares in RESI between December 24, 2012 and December 22, 2014. (*Id.* ¶¶ 19, 291). During that time, Defendants stated that Ocwen provided a "competitive advantage" to RESI over competitors, that Ocwen was a "leader" in the industry, and that Ocwen utilized a superior business model. (*See, e.g.*, *id.* ¶¶ 98, 100, 122). However, at the time, Ocwen was being investigated by both federal and state agencies, had been found to be violating

various regulations, and was subject to regulatory orders; individual Defendants necessarily were aware of these liabilities.  (*Id.* ¶¶ 34–44, 63–81).

Additionally, Defendants stated all related party transactions were completed in accordance with internal company policies, when they were not.  (*See, e.g.*, *id.* ¶¶ 129–130).  These representations allowed Defendants to artificially inflate Residential's stock price, obtain close to $1 billion in public equity, and improperly transfer millions of dollars between the companies for the benefit of the individual Defendants and to the detriment of stock holders.  (*Id.* ¶¶ 8–9).  Defendants' representations were made in order to draw investors and did in fact induce Plaintiff and putative class members to invest in RESI when they would not have had they known about the false statements.  Plaintiff alleges that the statements were made within the putative class period—December 24, 2012 to December 22, 2014—and the stock dropped from a high of $33.69 per share on January 13, 2014 to a low of nearly $10 per share in response to disclosures that revealed Ocwen's liabilities and the improper related-party transactions.  (*Id.* ¶ 13).

Defendants move to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (ECF Nos. 55, 56).  Defendants claim that Plaintiff has failed to plead with particularity that Defendants made any false statement or omission, or in the alternative, that Plaintiff has failed to plead with particularity facts giving rise to a strong inference of scienter, or in the alternative, that Plaintiff has failed to plead loss causation.  Defendants contend that their statements were puffery, accurate statements of historical fact, or forward-looking, and that Plaintiff's complaint is nothing more than a challenge to defendants' business decisions, which is not actionable under Section 10(b) of the Securities and Exchange Act.  This motion is presently before the Court.

## LEGAL STANDARDS

### I.      Motion to Dismiss

A motion under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). The defendant bears the burden of showing that no claim has been presented. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). When considering a Rule 12(b)(6) motion, a district court should conduct a three-part analysis. *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'take note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 56 U.S. 662, 675 (2009)). Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009); *see also Connelly v. Lane Const. Corp.*, No. 14-3792, 2016 WL 106159 (3d Cir. Jan. 11, 2016). However, the court may disregard any conclusory legal allegations. *Fowler*, 578 F.3d at 203. Finally, the court must determine whether the "facts are sufficient to show that plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). If the complaint does not demonstrate more than a "mere possibility of misconduct," the complaint must be dismissed. *See Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679).

### II.     Elements of a Claim for Securities Fraud

To establish a claim for violation of Rule 10b-5, the plaintiff must allege with particularity that: (1) the defendant "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading"; (2) the

"defendant acted with scienter"; and (3) the plaintiff's reliance on defendant's misstatement or omission injured the plaintiff. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997) (citing *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1243 (3rd Cir. 1989)); *Galati v. Commerce Bancorp, Inc.*, 2005 WL 3797764, at *3 (D.N.J. Nov. 7, 2005), *aff'd*, 220 F. App'x 97 (3d Cir. 2007).

### III.    Heightened Pleading Requirement for Securities Fraud Claims

A securities fraud action "requires more than mere reference to the conventional standard applicable to motions under Rule 12(b)(6)." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002). Rather, the Private Securities Litigation Reform Act ("PSLRA"), codified at 15 U.S.C. § 78u-4 *et seq.*, and Fed. R. Civ. P. 9(b) impose heightened pleading requirements that must be satisfied for a securities fraud complaint to survive a motion to dismiss. *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 (3d Cir. 1999) (*abrogated on other grounds*); *In re Burlington Coat Factory*, 114 F.3d at 1424.

Applicable to the first element—material misrepresentation or omission—Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "This particularity requirement has been rigorously applied in securities fraud cases." *In re Burlington*, 114 F.3d at 1417 (citations omitted). Though Rule 9(b) does not require plaintiffs to plead every material detail of the fraud, it nevertheless "requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what,

when, where and how of the events at issue." *In re Rockefeller*, 311 F.3d at 217 (quotations and citations omitted).

Courts are sensitive, however, "to the fact that application of [Rule 9(b)] prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir. 1992) (quotations and citations omitted). "Accordingly, the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." *In re Burlington*, 114 F.3d at 1418.

The PSLRA also mandates more particularized pleading of the material misrepresentation or omission. It requires plaintiffs to:

> [S]pecify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1)(B). This "particularity [requirement] . . . extends that of Rule 9(b) and requires plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading." *In re Rockefeller*, 311 F.3d at 218.

Regarding the second element—scienter—the PSLRA also imposes a heightened pleading standard. Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To plead scienter in compliance with the PSLRA, plaintiffs must allege facts that either "(1) establish a motive and an opportunity to commit fraud, or (2) constitute circumstantial evidence of either reckless or conscious behavior." *In re Digital Island Sec. Litig.*, 357 F.3d 322, 328–29 (3d Cir. 2004); *see also In re Advanta*, 180 F.3d at

6

534–35.  "Either way, plaintiffs must plead facts 'with particularity,' and these facts must

give rise to a 'strong inference' of a knowing or reckless misstatement."  *In re Digital

Island*, 357 F.3d at 329; *see also id.* at 330 (noting that "the PSLRA requires a strong—as

opposed to merely reasonable—inference [of scienter] to survive a motion to dismiss").

It is not clear whether the PSLRA imposes a heightened pleading requirement for

loss causation.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005) ("we

assume, at least for argument's sake, that neither the Rules nor the securities statutes

impose any special further requirement in respect to pleading of proximate causation or

economic loss…").

## <u>ANALYSIS</u>

The Court will consider if each element of a securities fraud claim—

material misrepresentation, scienter, and loss causation—has been pleaded in

accordance with the requisite particularity requirement.  *In re Burlington*, 114

F.3d at 1417.

### I.   **Material Misrepresentation or Omission**

Defendants can be liable for both affirmative false statements and misleading

omissions.  Under the PSLRA, courts must analyze affirmative false statements at issue

to determine whether each alleged misrepresentation is pleaded with the requisite

particularity.  *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 712 (3d Cir. 1996).  Omissions

face a higher bar; omissions can give rise to liability only where the defendant had an

affirmative duty to disclose the information in question, such as "when there is insider

trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior

disclosure."  *Oran v. Stafford*, 226 F.3d 275, 285–86 (3d Cir. 2000); *see also In re Aetna*

*Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 948 (E.D. Pa. 1999) ("There is a duty to disclose information when disclosure is necessary to make defendants' other statements, whether mandatory or volunteered, not misleading.").

Additionally, Rule 10b-5 "explicitly require[s] a well-pleaded allegation that the purported misrepresentations or omissions at issue were material." *In re Rockefeller*, 311 F.3d at 211. A fact is material only if "there [is] a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the investing public. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). There must be a "substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)); *see also Basic, Inc. v. Levinson,* 485 U.S. 224, 232 (1988) (relating this standard specifically to Rule 10b-5).

Plaintiff alleges two subjects on which Defendant made specific, material false or misleading statements or omissions: 1) that the partnership with Ocwen was a material benefit to RESI, when Defendants knew Ocwen was a liability, and 2) that Defendant Erbey had a limited role and influence in RESI's related-party transactions, when in fact he was completely involved. The Court will address each in turn.

**A.  Ocwen Was a Material Benefit to RESI**

Plaintiff alleges that Defendants made the false representation that Ocwen was a material benefit to RESI, when Defendant knew that Ocwen was in fact a liability. Defendants argue that any statements are protected by the safe harbor provision of the PLSRA, or as forward-looking statements, puffery, or historical fact.

8

Plaintiff alleges that "Defendants routinely touted that Ocwen gave Residential 'a competitive advantage over other companies.'"  (Opp'n at 12, ECF No. 60, citing Am. Compl. ¶¶ 6, 105, 122, 16, 180, 212, 224, 233, 239, 272).  Defendants argue that Defendants' statements "predict[ed] that RESI's relationship with Ocwen would give it a "competitive advantage over other companies with a similar focus" and predictions are protected statements under the Safe Harbor Provision.  (Defs.' Br. at 11, ECF No. 56)

The PSLRA imposes additional pleading burdens on statements that are "predictions."  *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009).  The Safe Harbor provision, 15 U.S.C. § 78u-5(c), immunizes from liability a forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood.  *Id.* at 254 (citing 15 U.S.C. § 78u-5(c)(1)).

The term "forward-looking statement" is broadly defined in the statute to include statements such as "a projection of revenues, income (including income loss), earnings (including earnings loss) per share…"; statements of "the plans and objectives of management for future operations"; or statements of "future economic performance."  15 U.S.C. § 78u–5(i)(1)(A)–(C).  Further, forward-looking statements include "any statement of the assumptions underlying or relating to any statement described" in the definition.  *Id.* § 78u–5(i)(1)(D).

Forward-looking statements are protected under § 78u–5(c) if they are identified as forward-looking and are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from

9

those in the forward-looking statement." *Institutional Investors Group*, 564 F.3d at 256

(citing 15 U.S.C. § 78u–5(c)(1)(A)(i)).  "[A] vague or blanket (boilerplate) disclaimer

which merely warns the reader that the investment has risks will ordinarily be inadequate

to prevent misinformation.  To suffice, the cautionary statements must be substantive and

tailored to the specific future projections, estimates or opinions in the prospectus which

the plaintiffs challenge." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3

(3d Cir. 2004) (quoting *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000)).

On December 5, 2012, Defendant Erbey signed the Registration Statement on

Form 10-12B on behalf of RESI.  (Am. Compl. ¶ 97, ECF No. 48).  Defendants correctly

point out that that was before the class period.  However, Plaintiff alleges that this

Registration Statement was not effective and available to the public until December 24,

2012, the first day of the class period.  (*Id.*)  Thus, it is a relevant public statement.

In the Registration Statement, Defendants included a disclosure regarding Ocwen

and the potential risk Ocwen presented:

> *Failure of Ocwen to effectively perform its servicing obligations under the
> Ocwen Servicing Agreement could have an adverse effect on our business
> and performance.*
>
> We will be contractually obligated to service the residential mortgage
> loans that we ultimately acquire. We will not have any employees,
> servicing platform, licenses or technical resources necessary to service our
> acquired loans. Consequently, we will engage Ocwen to service the loans
> we acquire. We believe that this relationship will provide us with
> significant competitive advantages. If for any reason Ocwen is unable to
> service the acquired loans at the level and/or the cost that the Company
> anticipates, an alternate servicer may not be readily available on
> acceptable terms or at all, which could adversely affect our operating
> results, thereby having an adverse effect on our ability to execute our
> business plan.
>
> In addition, under the Ocwen Servicing Agreement, we will be required to
> pay Ocwen fees for servicing our acquired mortgage loans. If we fail to

> pay Ocwen or otherwise default under the Ocwen Servicing Agreement, Ocwen may cease to act as the servicer under the Ocwen Servicing Agreement which would adversely affect our operating results and our ability to execute our business plan.
>
> Any diminishment in Ocwen's performance under, or termination of, the Ocwen Servicing Agreement would negatively impact, or potentially eliminate, the competitive advantage provided by such agreement.

(Am. Compl. ¶ 100, citing Registration Statement, Dec. 5, 2012). Defendants argue that this statement pertains to future projections, any alleged misleading statement imbedded here is surrounded by cautionary language, and, therefore, this is a forward-looking statement protected by the PSLRA Safe Harbor Provision.

However, Plaintiff alleged that "Ocwen was *already* failing to effectively perform its servicing obligations" and therefore this statement as a whole was a material misrepresentation. (Am. Compl. ¶ 101).[2] "[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("Tellabs II"); *accord In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir.

---

[2] Plaintiff alleges that the Federal Trade Commission, a coalition of state Attorneys General, the New York State Department of Financial Services ("NY DFS"), and the Consumer Financial Protection Bureau began investigating Ocwen and Erbey in 2010 and 2011. (Am. Compl. ¶¶ 34–38, ECF No. 48). Beginning in September 2011, Ocwen was subject to regulation and increasing investigation for violations, culminating in a Consent Order with NY DFS in which Ocwen was required to implement certain reforms and submit to an on-site monitor. (*Id.* ¶¶ 39–44). On December 19, 2013, the Consumer Financial Protection Bureau, forty-nine states and the District of Columbia filed a complaint against Ocwen for bad loan servicing and foreclosures in violation of state and federal law. (*Id.* ¶¶ 64–65). NY DFS continued to monitor Ocwen and limit its ability to enter deals, culminating in a new NY DFS Consent Order on December 22, 2014 requiring a civil monetary penalty, internal reforms, especially on related-party transactions, and Erbey's resignation from each of the related companies. (*Id.* ¶¶ 66–79). These allegations are sufficiently specific to infer for purposes of this motion to dismiss that Defendants knew that Ocwen was a liability.

2005) ("The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement.").  In *Tellabs II*, defendants' statement that sales of their product were "still going strong" was protected as to the forward-looking, future sales prediction, but the implication that current sales were strong was not protected insofar as it was false.  *Tellabs II*, 513 F.3d at 706.

Therefore, Defendants' statement, "We believe that this relationship will provide us with significant competitive advantages" and only "[i]f for any reason Ocwen is unable to service the acquired loans… [could the partnership] adversely affect our operating results" is clearly misleading in that it fails to acknowledge existing liabilities. This statement is not entitled to safe harbor with respect to the portion that refers to Ocwen's then-existing problemsi.

Defendants argue in the alternative that this statement was nonmaterial puffery. Puffery is defined as "vague and general statements of optimism… [that] are understood by reasonable investors as such."  *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) (abrogated on other grounds).  Puffery is not actionable under Rule 10b–5. *Stichting Pensioenfonds ABP v. Merck & Co.*, 2012 WL 3235783, at *5 (D.N.J. Aug. 1, 2012).  "The context in which optimistic statements are made is critical to the distinction between misrepresentation and puffery…  In general, the more the statement diverges from known facts about the entity or the more precise and concrete the statement, the less likely courts have been to dismiss the statement as inactionable puffery."  *Id.*

The Registration Statement does not present general statements of optimism. Defendants convey significant detail about the role that Ocwen would play and why it would be a benefit. Thus, Defendants' puffery argument fails.

The Court then turns to whether Defendants' representation that Ocwen provided a competitive advantage is material. Residential's business model was to acquire and service loans through Ocwen on single-family rental properties with sub-performing and non-performing residential mortgage loans. (Am. Compl. ¶¶ 4, 48). Residential made money off of the properties either by having Ocwen modify the loans into performing loans, which generated regular payments, or by having Ocwen foreclose the properties and then selling or renting them through ASPS. (*Id.* ¶ 48). Thus, Residential was hugely dependent on Ocwen to create profits. (*Id.*).

Therefore, a reasonable shareholder would be substantially likely to find Defendants' false or misleading statements or omissions representing that Ocwen, Residential's loan servicer, provided a "competitive advantage" or overall benefit to the company important in deciding how to act. Plaintiff has sufficiently pleaded that this statement, and any other false or misleading statements or omissions representing that Ocwen was a benefit to Residential rather than a liability, were material.

In its annual reports and prospectuses, Defendants stated,

> To effectively compete, we will rely upon AAMC's management team and their substantial industry expertise which we believe provides us with a competitive advantage and helps us assess the investment risks and determine appropriate pricing. We expect our integrated approach of acquiring sub-performing and non-performing loans and converting them to REO will enable us to compete more effectively for attractive investment opportunities. **Furthermore, we believe that our access to Ocwen's servicing expertise helps us to maximize the value of our loan portfolios and provides us with a competitive advantage over other companies with a similar focus**. We also believe that our relationship

13

> with Altisource and access to its nationwide vendor network will enable us to competitively bid on large sub-performing or non-performing mortgage portfolios with assets dispersed throughout the United States. **However, we cannot assure you that we will be able to achieve our business goals or expectations** due to the competitive, pricing and other risks that we face. Our competitors may have higher risk tolerances, may be able to pay higher prices for non-performing loans than we can or may be willing to accept lower returns on investment. As the inventory of available non-performing and sub-performing loans and REO will fluctuate, the competition for assets and financing may increase.

(Am. Compl. ¶ 105, citing Annual Report, Feb. 7, 2013; *see also* Am. Compl. ¶ 122, citing Prospectus, Apr. 25, 2013; *id.* ¶ 160, citing Prospectus, Sept. 25, 2013; *id.* ¶ 180, citing Prospectus, Jan. 15, 2014).  As above, Plaintiff has plausibly and with particularity alleged that this statement is a misrepresentation because Defendants knew that Ocwen had then-existing liabilities that would risk rather than benefit RESI's bottom-line.  The cautionary statement is insufficient to save this statement, because Plaintiff has sufficiently pleaded that it was not a forward-looking projection, but rather a mixed present and future statement that Defendants knew was false as to the present facts. Thus, these are actionable, material misrepresentations.

Defendants also stated that "Ocwen was a leader in developing and implementing 'best practices' to reduce consumer losses."  (*See, e.g.*, Am. Compl. ¶ 98, citing Registration Statement, Dec. 5, 2012).  Similarly, in the April 25, 2013, September 25, 2013, and January 16, 2014 prospectuses, Defendants referred to Ocwen as "superior relative to other servicers" and "a leader in its ability to convert loans that are 90 days or more past due to current status."  (Am. Compl. ¶¶ 122, 160, 180).  In its April 29, 2014, July 22, 2014, and November 5, 2014 quarterly reports, Defendants referred to Ocwen as "a leading residential mortgage loan servicer.**"**  (Am. Compl. ¶¶ 212, 224, 239).  During his opening remarks to the July 22, 2014 investor conference call, Defendant Erbey

14

stated, "Ocwen has been ranked **best in class** in modifying loans by many third party servicing performance reports… Ocwen is recognized as an **industry leader** in managing foreclosure timelines. In summary on pools that meet our investment criteria, these factors provide us with a **significant advantage** over other market players. (Am. Compl. ¶ 233, ECF No. 48) (*emphasis added*). Given the alleged legal problems with Ocwen's practices, these statements are extremely misleading and potentially outright false. Thus, Plaintiff has specifically laid out statements that are misleading, why they are misleading, and the specific facts that support a strong inference that Defendants knew they were false or misleading when made.

In its prospectuses, Defendants also stated, "We **intend** to capitalize on the servicing capabilities of Ocwen, which **we view as** superior relative to other servicers in terms of cost, management experience, technology infrastructure and platform scalability…" (Am. Compl. ¶ 122, 160, 180) (*emphasis added*). These statements do not make affirmative promises about Ocwen, but rather state a view, an opinion, and an intention. Thus, these are not false or misleading statements.

However, accepting Plaintiff's allegations as true, these statements form a misleading picture that Ocwen was an asset when it has been plausibly alleged to be a liability. Therefore, Defendants had an affirmative duty to disclose their actual knowledge of Ocwen's benefits and liabilities in order to make this statement not misleading. *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000); *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 948 (E.D. Pa. 1999) ("There is a duty to disclose information when disclosure is necessary to make defendants' other statements, whether mandatory or

volunteered, not misleading.").  Defendant did not clarify that Ocwen had existing

liabilities that undermined its servicing capabilities.  Thus, this is an actionable omission.

In the April 25, 2013, September 25, 2013, and January 15, 2014 prospectuses,

Defendants claimed,

> Ocwen's servicing approach is focused on the psychological principles of
> influencing borrower behavior and uses non-linear optimization models
> for deciding the best resolution for a loan. Ocwen's use of artificial
> intelligence and scripting engines seeks to remove variability and human
> error from the process and provides scalability.

(Am. Compl. ¶ 122, 160, 180; *see also* Am. Compl. ¶ 190, citing Annual Report, Feb. 7,

2014).  Similarly, the April 29, 2014, July 22, 2014, and November 5, 2014 quarterly

reports stated,

> [w]e entered into long-term service agreements with Ocwen Financial
> Corporation ("Ocwen"), a leading residential mortgage loan servicer... We
> believe that our access to Ocwen's servicing expertise and multifaceted
> resolution methodologies helps us maximize the value of our loan
> portfolios and provides us with a competitive advantage over other
> companies with a similar focus.

(Am. Compl. ¶¶ 212, 224, 239).  Plaintiffs argue that these statements are actionable

misrepresentations, while Defendants argue they are non-actionable puffery.

"[S]tatements of subjective analysis or extrapolations, such as opinions, motives

and intentions, or general statements of optimism [about a company's business model]…

are not material" and are non-actionable puffery.  *Galati v. Commerce Bancorp, Inc.*,

2005 WL 3797764, at *4 (D.N.J. Nov. 7, 2005), *aff'd*, 220 F. App'x 97 (3d Cir. 2007).

However, statements that company's business model provided it with "material

competitive advantage" over industry peers not puffery, because it was stated to be

"material" to success.  *Beaver Co. Emps. Ret. Fund v. Tile Shop Holdings*, 94 F. Supp. 3d

1035, 1048 (D. Minn. 2015).

In this case, Defendants claimed Residential's methodology provided scalability, maximized value, and provided a competitive advantage. This is more similar to a statement of advantage than a general statement of optimism or extrapolation. Plaintiff has plausibly alleged that such statements were false when made. Thus, Defendants' puffery argument fails and these statements are actionable.

Defendants also touted Ocwen's industry accolades from Moody's in January 2013, Morningstar Credit Ratings in September 2012, Freddie Mac in August 2009, and Bank of American in July 2009. (Am. Compl. ¶¶ 122, 160, 180). Defendants claim that these statements do not expose them to liability because they are accurate statements of historical fact.

"[D]efendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy." *Advanta*, 180 F.3d at 538 (abrogated on other grounds, quoting *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir. 1994)); *see also In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997) ("[A] violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data."). However, as with other statements or omissions, an accurate statement of historical fact could include an actionable omission if it were clearly misleading or false. *See Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 533 (D.N.J. 2010).

These statements, especially those referencing 2012 and 2013 during the invesigations and litigation against Ocwen, form a misleading picture that Ocwen was an asset when it has been plausibly alleged to be a known liability. Plaintiff has presented sufficient specific facts that this is an actionable omission to survive a motion to dismiss.

Lastly, in the May 11, 2013 and July 22, 2014 investor conference calls, Defendants Erbey, Pandey, and Najour stated,

> Ocwen is one of the few players to have a successful track record in NPL acquisition and management. Throughout the 1990s Ocwen was one of the largest acquirers of non-performing loans. Today, Ocwen is the fifth largest servicer in the United States, servicing loans of $470 billion of Unpaid Principal Balance or UPV at March 31, 2013. With a focus on non-performing and difficult to service loans, Ocwen has been very effective in creating value by resolving approximately 70% of non-performing loans it services without foreclosing. This servicing effectiveness is attested by many organizations as depicted on Slide 5.
>
> Ocwen's operating cost of approximately 60% lower than average industry costs for servicing NPLs.

(Am. Compl. ¶¶ 144, 233).  The Complaint plausibly pleads that this is a false and misleading statement given the investigations and litigation about Ocwen's "track record [of]… acquisition and management."

Plaintiff has presented facts sufficient to show that he has a plausible claim for relief based on Defendants' false or misleading statements or omissions regarding the material fact that Ocwen was a liability not an asset.

## B.  Defendant Erbey Had a Limited Role and Influence in the Related-Party Transactions

Plaintiff claims that Defendants falsely represented to investors that the related-party transactions with AAMC, Ocwen, and Altisource were properly vetted and approved in accordance with the Company's internal controls.  In the Registration Statement, Defendants represented,

> *We could have conflicts with Altisource, Ocwen, Home Loan Servicing Solutions, Ltd. ("HLSS") and AAMC, and the Chairman and other members of our Board of Directors could have conflicts of interest due to his or their relationship with Altisource, Ocwen, HLSS and AAMC, which may be resolved in a manner adverse to us.*

18

Conflicts may arise between Altisource and us as a result of our ongoing agreements and the nature of our respective businesses. Altisource will provide us with residential property management, leasing and construction management services for our acquired REO Properties. In addition, we will become a party to a variety of agreements with Altisource in connection with the Separation, and we may enter into further agreements with Altisource after the Separation. Certain of our directors may be subject to conflicts of interest with respect to such agreements and other matters due to their relationships with Altisource.

Conflicts may arise between Ocwen and us as a result of our ongoing agreements and the nature of our respective businesses. Ocwen will perform substantially all of the mortgage loan servicing functions relating to our acquisition and ownership of mortgage loans. Certain of our directors may be subject to conflicts of interest with respect to such agreements and other matters due to their concurrent roles as directors of Ocwen.

The Chairman of our Board of Directors is the Chairman of the Board of Directors of Altisource, Ocwen, HLSS and AAMC. **As a result, he has obligations to us as well as to Altisource, Ocwen, HLSS and AAMC and may have conflicts of interest with respect to matters potentially or actually involving or affecting us and Altisource, Ocwen, HLSS or AAMC, as the case may be**.

David Reiner is a member of our Board of Directors and a member of the Board of Directors for HLSS. As a result, he has obligations to us as well as to HLSS and may potentially have conflicts of interest with respect to matters potentially or actually involving or affecting us and HLSS.

Our Chairman currently owns a substantial amount of Altisource, Ocwen and HLSS common stock and Altisource and Ocwen stock options, and, subsequent to the Separation, will own a substantial amount of our common stock and AAMC's common stock. In addition, certain of our directors also may own Altisource and/or Ocwen common stock and stock options due to similar current relationships with Altisource and Ocwen. **Such ownership could create or appear to create potential conflicts of interest when the Chairman of our Board of Directors and our directors are faced with decisions that involve us, Altisource, Ocwen, HLSS, AAMC or any of their respective subsidiaries**.

Altisource, Ocwen, and HLSS are not limited in their ability to compete with us. **We will seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with them and through oversight by independent members of our Board of Directors. However, there can be no assurance that such measures**

19

**will be effective, that we will be able to resolve all conflicts with Altisource, Ocwen, and HLSS or that the resolution of any such conflicts will be no less favorable to us than if we were dealing with third parties**.

(Am. Compl. ¶¶ 102–03, Registration Statement, Dec. 5, 2012) (*emphasis in Compl.*). (This or similar language also used in Annual Report, Feb. 7, 2013, cited in Am. Compl. ¶ 109; Proxy Statement, Apr. 19, 2013, Am. Compl. ¶¶ 129–30; Quarterly Report, May 9, 2013, Am. Compl. ¶ 138; Quarterly Report, Jul. 22, 2013, Am. Compl. ¶ 151; Prospectus, Sept. 25, 2013, Am. Compl. ¶ 167; Annual Report, Feb. 20, 2014, Am. Compl. ¶ 197; Quarterly Report, Apr. 29, 2014, Am. Compl. ¶ 220; Quarterly Report, Jul. 22, 2014, Am. Compl. ¶ 232; Quarterly Report, Nov. 5, 2014, Am. Compl. ¶ 247; Am. Compl. ¶ 281, ECF No. 48).

Plaintiff argues that, contrary to Defendants' representations, Defendants ignored the Company's internal controls and Related Party Transaction Policy; specifically, Erbey failed to recuse himself from the related party negotiations and transactions, or to obtain proper approval in accordance with the Policy.  (Opp'n at 18–19, ECF No. 60). The "generic" disclosures regarding the related-party transactions and associated risks were insufficient because Defendants did not actually follow the internal procedures. (Opp'n at 19).

Plaintiff does not present specific facts that Defendants were not abiding by Residential's internal Related-Party Transactions Policy procedures.  Rather, Plaintiff infers that Erbey did not follow the procedures because that is how he behaved with his other companies.  (Am. Compl. ¶ 74; Opp'n at 18).  "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).

Plaintiff notes that the court in *In re Altisource Portfolio Solutions, S.A. Sec. Lit.* found that Erbey's failure to recuse himself from related-party transactions within Ocwen was sufficient to infer that he was behaving similarly within Altisource Portfolio.  2015 WL 11988900, at *4 (S.D. Fla. 2015).  Furthermore, this is information wholly within Defendants' possession and therefore the Court takes a more lenient view towards Plaintiff's pleading requirement.  *In re Burlington*, 114 F.3d at 1418 ("the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control").  Therefore, Plaintiff has sufficiently pleaded the facts on which this belief is formed in order to overcome the motion to dismiss.

A reasonable shareholder likely would consider it important to know if Residential was not conducting its related-party transactions at arms-length.  It is substantially likely that investors would think these statements alter the total mix of information available and important to them.  Thus, Plaintiff has alleged sufficiently for the purposes of this motion that Defendants made material misrepresentations or omissions regarding their related-party transactions.

## II.    Scienter

"[T]o state a violation under Rule 10b-5, plaintiffs must allege that defendants acted with the requisite state of mind."  *In re Rockefeller*, 311 F.3d at 211.  To be actionable, a material misstatement "must be made with conscious or reckless disregard of its falsity."  *In re ATI Techs., Inc., Sec. Litig.*, 216 F. Supp. 2d 418, 428 (E.D. Pa. 2002).  As noted *supra*, to establish this state of mind plaintiffs must plead facts that

either (1) constitute circumstantial evidence of either reckless or conscious behavior or (2) establish a "motive and opportunity" to commit fraud.

Conscious misbehavior is alleged by "stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior." *In re Advanta*, 180 F.3d at 535. "A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading . . . that is either known to defendant or is so obvious that the actor must have been aware of it." *In re Digital Island*, 357 F.3d at 332 (quotations and citations omitted).

Regarding the misrepresentations about the benefit of Ocwen, Ocwen was a related company to Residential and all of the individual Defendants were also officers or directors of companies related to Ocwen. (Am. Compl. ¶¶ 22–25). Erbey in particular served as either the Chairman of the Board or the Chief Executive Officer, as well as the largest individual shareholder, of both Residential and Ocwen. (Am. Compl. ¶¶ 2). Thus, Defendants, especially Erbey, knew or should have known of the existing liabilities that Ocwen presented. Plaintiff has pleaded sufficient facts to support a strong inference of conscious misrepresentation or omission, or certainly of reckless disregard for the danger of misleading investors, with regard to the statements about Ocwen.

Motive and opportunity are properly stated when a plaintiff alleges facts showing that defendants "had the motive to commit fraud and a clear opportunity to do so." *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 633 (D.N.J. 2002) (quotations and citations omitted); *Burlington Coat,* 114 F.3d at 1418. The Third Circuit has stated that "[m]otives that are generally possessed by most corporate directors and officers do not suffice;

22

instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from [the] fraud." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).  "[C]atch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme" are not sufficient.  *Advanta,* 180 F.3d at 535.

Regarding the statements that related-party transactions were properly conducted, Plaintiff alleged facts that Erbey made $26.1 million in individual profits from Residential's related-party transactions.  (Am. Compl. ¶¶ 9–10).  Furthermore, Defendants were able to raise $1 billion in private equity for RESI, which they moved to the other corporations by the tens of millions, to the detriment of RESI's stockholders. (*Id.* ¶ 9).  Thus, Plaintiff has sufficiently alleged that Defendants had motive to commit fraud in order to move assets between the related companies, and opportunity to do so. Plaintiff has satisfied the scienter requirement with regard to the statements about proper vetting and approval of the related party transactions.

### III.    Loss Causation

"To state a claim for securities fraud under Section 10(b) and Rule 10b-5 thereunder, a complaint must show that plaintiffs reasonably relied on defendants' allegedly fraudulent misrepresentations, omissions, or conduct" and that reliance caused the plaintiffs' damages.  *Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 632 (D.N.J. 2003); *see Semerenko v. Cendant Corp.*, 223 F.3d 165, 174 (3d Cir. 2000).  Where liability is based on omissions—as opposed to affirmative misrepresentations—reliance and causation will be presumed from the materiality of the information not disclosed. *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 202 (3d Cir. 1990) (citing

*Basic, Inc. v. Levinson*, 485 U.S. 224, 241–249 (1988); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54 (1972)).  The Third Circuit has expanded that presumption to include both omissions and misrepresentations "according to a context-specific determination of where that burden more appropriately lies."  *Id.* (citing *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 188 (3d Cir. 1981)).

A plaintiff may show loss causation by pointing to corrective disclosures—public releases of information revealing the fraud, not just announcements of bad news in the market—followed by drops in a company's stock price.  *In re Merck & Co.*, 2011 WL 3444199, at *30 (D.N.J. 2011); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 561–62 (D.N.J. 2010).

In this case, Plaintiff pleads that the stock price fell from $33.69 to nearly $10 per share and each material decline was in response to a corrective disclosure that came about as a result of a consent judgment, cease-and-desist order, regulatory letter, or similar measure.  (Am. Compl. ¶ 289).  In paragraphs 249 to 262, Plaintiff presents six public disclosures between December 19, 2013 and December 22, 2014 via Consumer Finance Protection Bureau Consent Judgment and New York State Department of Financial Services Suspension, Letters, and a Consent Order.  The public disclosures cited Ocwen's violation of federal consumer financial laws, concerns about Ocwen's servicing portfolio, and improper related-party transactions involving Ocwen and Erbey.  (Am. Compl ¶¶ 249–262).  Plaintiff also includes a public announcement by ASPS that it would discontinue its force-placed insurance program due to industry-wise litigation and the regulatory environment.  (*Id.* ¶¶ 259–260).  Plaintiff has alleged how closely tied these companies' prospects are, and documents the decline in RESI's stock price that occurred

24

immediately following of each of these disclosures, from $26.49 per share at the close of December 20, 2013 to $16.84 per share at the close of December 22, 2014. (*Id.* ¶¶ 249–262). While the stated declines were non-linear over the year and some appear minor at first blush, given the unsettled nature of the law on this topic, the sufficiency of the decline appears to be a proper question for the trier of fact. *Compare No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (31% drop in stock price indicated materiality) *with Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166-167 (2d Cir. 2000) (decline in stock price constitutes evidence of materiality at perhaps the 3 to 10% level). Thus, Plaintiff has pleaded sufficiently to survive the motion to dismiss that his loss was caused by reliance on Defendants' intentional, material misrepresentations.

Additionally, Residential paid AAMC six times the amount paid by similarly situated companies for external management services. (Am. Compl. ¶ 8). Thus, Plaintiff has alleged sufficiently that RESI's shareholders suffered damages as a result of Defendants' behavior.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss will be denied. A corresponding order will follow.

**Dated:**  *3/16/17*                                   */s/ Anne E. Thompson*
                                                                    ANNE E. THOMPSON, U.S.D.J.