**UNITED STATES DISTRICT COURT**
**DISTRICT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| ERIC MARTIN, | |
| Plaintiff, | Civ. No. 15-24 |
| v. | **OPINION**<br>**REDACTED**[1] |
| ALTISOURCE RESIDENTIAL<br>CORPORATION, *et al.*, | |
| Defendants. | |

THOMPSON, U.S.D.J.[2]

## INTRODUCTION

This matter comes before the Court upon the Motion to Dismiss filed by Defendants

Altisource Residential Corporation ("RESI"), William C. Erbey, Ashish Pandey, Kenneth D.

Najour, Robin N. Lowe, and Rachel M. Ridley (collectively, "Defendants"). (ECF Nos. 175,

177.) Plaintiffs Lei Shi and Ashley Saunders (collectively, "Plaintiffs") oppose and, in the

alternative, seek leave to amend. (ECF No. 178.) The Court has decided the Motion upon the

written submissions of the parties and without oral argument, pursuant to Rule 78(b) of the

Federal Rules of Civil Procedure. For the reasons stated below, the Motion to Dismiss is granted

in part and denied in part, and leave to amend is denied.

---

[1] Portions of this Opinion have been redacted consistent with the Court's Confidentiality Order
(ECF No. 103) and the redactions made in the Court's Opinion deciding a prior Motion to
Dismiss (ECF No. 168).
[2] The Honorable Anne E. Thompson, United States District Judge for the District of New Jersey,
sitting by designation.

**BACKGROUND**

This is a securities fraud case brought against Defendant RESI and its officers. (3d Am. Compl. ("TAC") ¶¶ 455–68, ECF No. 169.) Defendant RESI sought to profit from buying delinquent residential mortgages, foreclosing on the mortgaged properties, and either selling the properties or converting them into rental properties. (*Id.* ¶ 4.) To perform these operations, Defendant RESI had close business relationships with several other companies (none of whom are parties to this case): Ocwen Financial Corporation ("Ocwen"); Altisource Asset Management Corporation ("AAMC"); Altisource Portfolio Solutions, S.A. ("ASPS"); and Home Loan Servicing Solutions, Ltd. ("HLSS"). (*Id.* ¶¶ 2–5.) Ocwen serviced the mortgages, AAMC provided managerial services, and ASPS renovated and operated the properties. (*Id.* ¶¶ 4–5.) At the time when all alleged misrepresentations were made, Defendant Erbey was Chairman of the Board of Defendant RESI and of the other companies. (*Id.* ¶ 26.) Defendant Najour was the Chief Accounting Officer at Defendant RESI and previously CFO of both Defendant RESI and AAMC. (*Id.* ¶ 28.) Defendants Pandey, Lowe, and Ridley were executives at both Defendant RESI and AAMC. (*Id.* ¶¶ 27, 29, 30.)

Plaintiffs, representing a putative class of investors, claim that Defendants made two categories of misrepresentations. First, Defendants allegedly touted Defendant RESI's relationship with Ocwen when, in reality, Ocwen was unable to adequately service mortgages. (*See id.* ¶ 8.) Second, Defendants allegedly stated that Defendant RESI was following certain policies when conducting related party transactions when in fact these policies were not being followed. (*See id.* ¶¶ 11–12.)

**I.      Ocwen's Ability to Service Mortgages**

Defendant RESI published several communications between December 2012 and February 2014 warning that,

Failure of Ocwen to effectively perform its servicing obligations under the Ocwen Servicing Agreement could have an adverse effect on our business and performance. . . . If for any reason Ocwen is unable to service the acquired loans at the level and/or the cost that the Company anticipates, an alternate servicer may not be readily available on acceptable terms or at all, which could adversely affect our operating results, thereby having an adverse effect on our ability to execute our business plan.

(*Id.* ¶¶ 195, 203, 222, 240, 264, 291, 314.) These communications were signed by Defendants

Erbey, Pandey, Najour, and Ridley. (*Id.* ¶¶ 193, 202, 220, 233, 262, 289, 312.)



(*See id.* ¶¶ 64, 70, 74–76, 82–88, 98–99, 109, 113–16, 122–23, 125, 136–39, 145–53, 155, 168–70.)

(*See id.* ¶¶ 152, 375–76, 404–12, 414.)

(*Id.* ¶ 413.)

## II.     Procedures Surrounding Related Party Transactions

Defendant RESI, in documents signed by Defendants Erbey, Pandey, Najour, and Ridley,

disclosed that potential conflicts of interest could arise "as a result of [Defendant RESI's]

ongoing agreements [with related companies] and the nature of [their] respective businesses,"

and as a result of the fact that Defendant Erby and others owned stock in Ocwen, AAMC, ASPS,

and HLSS. (*Id.* ¶¶ 193, 196, 202, 204, 220, 229, 262, 274, 289, 302, 312, 322.) In the 2013

Annual Report—signed by Defendants Erbey, Pandey, and Najour—Defendant RESI stated:

Other than as approved by a majority of the independent directors of our Board of Directors, we will not purchase portfolio assets from, or sell them to, our directors or officers or AAMC, [ASPS] or Ocwen or any of our or their affiliates, or engage in any transaction in which they have a direct or indirect pecuniary interest (other than [certain services agreements]).

. . .

We follow policies, procedures and practices to avoid potential conflicts with

respect to our dealings with AAMC, [ASPS] and Ocwen, including [Defendant Erbey] recusing himself from negotiations regarding, and approvals of, transactions with these entities (or where necessary, certain of our officers recusing themselves from discussions on, and approvals of transactions with AAMC). We also manage potential conflicts of interest through oversight by independent members of our Board of Directors (independent directors constitute a majority of our Board of Directors), and we will seek to manage these potential conflicts of interest through dispute resolution and other provisions of our agreements with AAMC, [ASPS] and Ocwen.

(*Id.* ¶¶ 46, 322 (emphasis removed) (ellipses in original).) According to the ABA Corporate Laws Committee's Corporate Director's Guidebook—Fifth Edition, Defendant RESI's recusal policy required Defendant Erbey to leave the meeting during deliberations. (*Id.* ¶ 47.) Defendant RESI—in documents signed by Defendants Erbey, Pandey, and Najour—also published a "Related Party Transaction Policy" that stated,

Any situation that potentially qualifies as a conflict of interest is to be immediately disclosed to the General Counsel to assess the nature and extent of any concern as well as the appropriate next steps. The General Counsel will notify the Chairman of the Board of Directors if any such situation requires approval of the Board of Directors. Related persons are required to obtain the prior written approval of the Audit Committee of the Board of Directors before participating in any transaction or situation that may pose a conflict of interest. In considering a transaction, the Audit Committee will consider all relevant factors including (i) whether the transaction is in the best interests of [Defendant RESI]; (ii) alternatives to the related person transaction; (iii) whether the transaction is on terms comparable to those available to third parties; (iv) the potential for the transaction to lead to an actual or apparent conflict of interest and any safeguards imposed to prevent such actual or apparent conflicts; and (v) the overall fairness of the transaction to [Defendant RESI].

(*Id.* ¶¶ 51, 214, 215, 220, 228, 262, 273, 289, 301 (brackets in original).) Defendants Pandey, Najour, Lowe, and Ridley repeatedly told investors that the CEO and CFO had "concluded that the disclosure controls and procedures were effective" (*id.* ¶¶ 244, 259, 284, 349, 393, 430) and issued certifications purporting to disclose any deficiencies or weaknesses in internal controls and any fraud related to internal controls over financial reporting (*id.* ¶¶ 212, 245, 260, 285, 327, 350, 364, 394).



(*Id.* ¶¶ 54–56.)

(*Id.* ¶¶ 55–56.)

(*Id.* ¶ 56.)

(*Id.* ¶ 57.)

(*Id.* ¶ 425.)

(*Id.* ¶ 57.)

(*Id.* ¶ 90.)

(*Id.*)

(*Id.* ¶ 427.) The

(*Id.* ¶ 90.)

(*Id.* ¶¶ 60–61.)

(*Id.*)

(*Id.* ¶ 63.)



(*Id.* ¶ 117.)

(*Id.*)

[3] (*Id.* ¶ 128.)

(*Id.*) (*Id.* ¶ 134.)

(*Id.*)

## III. Defendants' Financial Benefit

Over the course of three public offerings (in April 2013, September 2013, and January 2014), Defendant RESI raised more than $1 billion. (*Id.* ¶ 418.) The proceeds were then diverted into Defendant RESI's related companies. (*Id.* ¶ 419.) Defendant Erbey made approximately $19 million by exercising stock options in Defendant RESI and other companies. (*Id.* ¶ 421.) Defendants Pandey, Najour, Lowe, and Ridley each made at least $195,979. (*Id.* ¶ 422.)

## IV. Procedural History

Plaintiffs allege that all Defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (Count One) (*id.* ¶¶ 455–65); and that Defendants Erbey, Pandey, Najour, Lowe, and Ridley (collectively, "Individual

---

[3] Force-placed insurance is insurance acquired by the mortgage servicer when the homeowner fails to obtain insurance or allows her insurance to lapse. (TAC ¶ 127); *see also Forced Place Insurance*, Investopedia (Aug. 14, 2018), https://www.investopedia.com/terms/f/forced-place-insurance.asp.

Defendants") violated Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a) (Count

Two) (*id.* ¶¶ 466–68). This case was filed on March 27, 2015. (Compl., ECF No. 1.) On January

23, 2016, the First Amended Complaint was filed. (ECF No. 48.) On November 14, 2016, the

case was reassigned to the Honorable Anne E. Thompson. (ECF No. 68.) The Court denied a

Motion to Dismiss the First Amended Complaint on March 16, 2017. (ECF Nos. 72–73; *see also*

Op. & Order Denying Reconsideration, ECF Nos. 88–89.) Plaintiffs subsequently filed a Second

Amended Complaint on October 10, 2018. (ECF No. 127.) The Court, largely in light of the

Third Circuit decision in *City of Cambridge Retirement System v. Altisource Asset Management*

*Corp*, 908 F.3d 872 (3d Cir. 2018), dismissed the Second Amended Complaint on February 21,

2019. (ECF Nos. 164–165, 168.) Plaintiffs then filed the Third Amended Complaint on March

12, 2019. (ECF No. 169.) Following a stipulated briefing schedule (*see* Order at 2, ECF No.

171), Defendants filed the present Motion to Dismiss on April 12, 2019 (ECF No. 175),

Plaintiffs opposed on May 13, 2019 (ECF No. 178), and Defendants replied on May 31, 2019

(ECF No. 179). The Motion is presently before the Court.

## LEGAL STANDARD

A motion to dismiss under Rule12(b)(6) of the Federal Rules of Civil Procedure tests the

sufficiency of a complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). The defendant

bears the burden of showing that no claim has been presented. *Hedges v. United States*, 404 F.3d

744, 750 (3d Cir. 2005). When considering a Rule 12(b)(6) motion, a district court should

conduct a three-part analysis. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the

court must 'take note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must "review[] the complaint to

strike conclusory allegations." *Id.*; *see also Iqbal*, 556 U.S. at 679. Finally, the court must

7

assume the veracity of all well-pleaded factual allegations and "determine whether the facts are sufficient to show that plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (quoting *Iqbal*, 556 U.S. at 679); *see also Malleus*, 641 F.3d at 563. If the complaint does not demonstrate more than a "mere possibility of misconduct," it must be dismissed. *See Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679).

Additionally, in a securities case, the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, imposes a more demanding pleading standard. To allege a false or misleading statement or omission, the complaint must, "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." § 78u-4(b)(1). This pleading standard is effectively the same pleading standard as provided by Rule 9(b) of the Federal Rules of Civil Procedure, which requires that the complaint "state with particularity the circumstances constituting fraud." *Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).

## DISCUSSION

Section 10(b) and Rule 10b-5 prohibit "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). A plaintiff must demonstrate "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (citing *Stoneridge*

*Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)); *accord City of*

*Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). In this case, Defendants

argue that the Third Amended Complaint fails to plead a material misrepresentation or omission,

scienter, or loss causation. (Mot. at 9–25.) They also argue that the statute of repose bars some of

Plaintiff Saunders's claims and that Plaintiffs lack standing for some of their claims. (*Id.* at 25–

30; *see also* App'x A & B to Mot.)

## I.      Plaintiffs Adequately Plead Material Misrepresentations or Omissions

On several occasions, Defendant RESI published communications—signed by

Defendants Erbey, Pandey, Najour, and Ridley—stating:

> Failure of Ocwen to effectively perform its servicing obligations under the Ocwen
> Servicing Agreement could have an adverse effect on our business and
> performance. . . . If for any reason Ocwen is unable to service the acquired loans
> at the level and/or the cost that the Company anticipates, an alternate servicer may
> not be readily available on acceptable terms or at all, which could adversely affect
> our operating results, thereby having an adverse effect on our ability to execute
> our business plan.

(TAC ¶¶ 193, 195, 202–03, 220, 222, 233, 240, 262, 264, 289, 291, 312, 314.) The above

statement is phrased conditionally: *If* Ocwen were unable to service loans adequately, *then*

Defendant RESI would be negatively affected. This statement was misleading because, at the

time these statements were made, ████████████████████████████████████[4] (*Id.* ¶¶

64, 70, 74–76, 82–88, 98–99, 109, 113–16, 122–23, 125, 136–39, 145–53, 155, 168–70); *see*

*Williams v. Globus Med., Inc.*, 869 F.3d 235, 242 (3d Cir. 2017) ("[A] company may be liable

under Section 10b for misleading investors when it describes as hypothetical a risk that has

already come to fruition.").

---

[4] Defendants argue that Ocwen was not to blame for its failure to meet expectations. (Mot. at 13–
15.) This is irrelevant. Defendants suggested that Ocwen could effectively service mortgages
even though Ocwen was unable to do so; whether Ocwen is to blame for this failure is neither
here nor there.

Additionally, Defendant RESI—in documents signed by Defendants Erbey, Pandey, Najour, and Lowe—stated that Defendant Erbey would recuse himself from transactions with Ocwen and that the Board's Audit Committee would consider five factors in approving a related party transaction. (*Id.* ¶¶ 46, 51, 214, 215, 220, 228, 262, 273, 289, 301, 322.) As to Defendant Erbey's recusal, "recusal" meant that Defendant Erbey would leave meetings where related party transactions were discussed. (*Id.* ¶ 47.)[5] Defendants Pandey, Najour, Lowe, and Ridley confirmed that these procedures were "effective." (*Id.* ¶¶ 244, 259, 284, 349, 393, 430.)



(*Id.* ¶ 57.)

(*Id.* ¶ 90.)[6]

(*Id.* ¶¶ 57, 90.)

These same misrepresentations and facts were presented in the Second Amended Complaint. (2d Mot. to Dismiss Op. at 2–3, 5, ECF Nos. 165 (sealed version), 168 (redacted version).) The Court dismissed the Second Amended Complaint because Plaintiff failed to show specifically how the statements made were misleading. (*See id.* at 9–10 ("[T]here was no reason to believe that Ocwen would not be able to service loans in the future."), 10 ("Plaintiff's general

---

[5] In deciding a motion to dismiss, the Court must accept Plaintiff's factual contentions. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (quoting *Iqbal*, 556 U.S. at 679). Where the operative complaint explains a term's industry-specific meaning, the Court must assume for purposes of the motion to dismiss that the term has that meaning. *See Kelley v. Aerie Pharm., Inc.*, 2016 WL 3437603, at *2, 3 (D.N.J. June 20, 2016) (accepting the pleaded industry-specific definition of the term "blockbuster drug").

[6] ██████████████████████████████████████ (Mot. at 18 n.6.) On the face of the operant Complaint, the Court cannot conclude at this time that investors would not have cared about the misrepresentation.

allegations . . . are insufficient to establish falsity."), at 11 ("[F]alsity cannot be established by pointing to situations that might suggest impropriety but that do not specify any particular transactions that were conducted in contravention of Defendant [RESI]'s policies.").) By contrast, the Third Amended Complaint provides specific instances ████████████████ ██████████ and of Defendant RESI acting directly in contrast to its stated policies. *See City of Cambridge*, 908 F.3d at 881–82 ("[S]uppose [Defendant] knew at the time of this report that Ocwen would soon be unable to take on any additional mortgage servicing rights obligations. In that case, [Defendant]'s statement would be misleading because what it identified as a possible risk, was, in truth, known to be imminent.").

To support its allegations, the Third Amended Complaint cites to a host of documents, and Defendants argue that several of these documents are mischaracterized. (*See* Mot. at 11–15.) However, Defendants do not identify any instance where the operant Complaint misquotes or inaccurately paraphrases the documents; rather, they claim that it fails to include other information that Defendants find important. (*Id.*) At the motion to dismiss stage, the Court must interpret the pleaded facts in the light most favorable to Plaintiffs. *See Fowler*, 578 F.3d at 210–11. The Court's role at this stage is not to weigh the material presented and determine which side has the more compelling evidence. As long as the Third Amended Complaint accurately quotes and paraphrases the documents (which it does here), the Court cannot wade into a dispute about which party has most fulsomely characterized the documents at issue. Plaintiffs adequately plead that all Defendants made material misrepresentations or omissions.

## II.    Plaintiffs Adequately Plead Scienter

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Matrixx*, 563 U.S. at 48 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). A complaint must establish an inference of scienter that is "at least as compelling as any opposing

inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

In denying the Motion to Dismiss the First Amended Complaint, the Court found that Plaintiffs adequately pleaded scienter. (1st Mot. to Dismiss Op. at 21–23, ECF No. 72.) *City of Cambridge*, published afterwards, did not address scienter and does not upset the Court's previous decision. 908 F.3d at 883. Additionally, the Court notes here that (1) Defendant Erbey would have known whether he recused himself from transactions; (2) ███████████████ ██████████████████████████████ (TAC ¶¶ 152, 375–76, 404–12, 414); and (3) ████████████ (*id.* ¶¶ 56, 90, 427) ████████████████████ (*id.* ¶ 413) ████████████████ Plaintiffs sufficiently plead scienter.

## III.    Plaintiffs Adequately Plead Loss Causation

Just as with scienter, the Court previously found that Plaintiffs adequately pleaded loss causation. (1st Mot. to Dismiss Op. at 23–25.) As the same allegations are contained in the operant Complaint, the Court incorporates its prior ruling here.

## IV.    The Statute of Repose Does Not Curtail Plaintiffs' Claims

According to Defendants, some of Plaintiff Saunders' claims are barred because Plaintiffs did not enter the case until more than five years after some of the alleged violations. (Mot. at 26–28.) The Court disagrees.

> [A] private right of action [under 15 U.S.C. § 78j(b)] may be brought not later than the earlier of—
>
> > (1) 2 years after the discovery of the facts constituting the violation; or
> >
> > (2) 5 years after such violation.

28 U.S.C. § 1658(b); *see also In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 198 (3d Cir. 2007) (applying the statute to claims brought under 15 U.S.C. § 78j(b)). Section 1658(b) is a statute of repose and thus "bars 'any suit that is brought after a specified time since the defendant

acted [] *even if this period ends before the plaintiff has suffered a resulting injury.*'" *Id.* at 199

(emphasis in original) (quoting *Statute of Repose*, Black's Law Dictionary (8th ed. 2004)). The

statute bars all suits brought more than five years after the alleged misrepresentation, *id.* at 200,

and does not allow for equitable tolling, *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*

(*CALPERS*), 137 S. Ct. 2042, 2055 (2017).

The Supreme Court in *CALPERS* analyzed a different statute of repose in the context of

securities class actions, finding that a party who opts out of a class action cannot file a new suit

after the five-year period of repose, even though the new suit contains the same allegations as the

original class action. *Id.* at 2054. As the Supreme Court explained:

> This argument [that an opting-out party can timely file a new suit as long as the
> original class action was timely brought] rests on the premise that an "action" is
> "brought" when substantive claims are presented to any court, rather than when a
> particular complaint is filed in a particular court. The term "action," however,
> refers to a judicial "proceeding," or perhaps to a "suit"—not to the general content
> of claims. See Black's Law Dictionary 41 (3d ed. 1933) (defining "action" as,
> *inter alia*, "an ordinary proceeding in a court of justice"); see also *id.*, at 43 ("The
> terms 'action' and 'suit' are . . . nearly, if not entirely, synonymous"). Whether or
> not petitioner's individual complaint alleged the same securities law violations as
> the class-action complaint, it defies ordinary understanding to suggest that its
> filing—in a separate forum, on a separate date, by a separate named party—was
> the same "action," "proceeding," or "suit."

*Id.*

In this case, the original Plaintiff, Eric Martin, filed suit on March 27, 2015, well within

the five-year statute of repose for all alleged misrepresentations. (*See* Compl. ¶ 5.) Plaintiff

Ashley Saunders was added to this case by the Second Amended Complaint filed on October 10,

2018. (*See* 2d Am. Compl. ¶ 20.) However, the statute of repose does not prohibit Plaintiff

Saunders from alleging misstatements that occurred before October 10, 2013.[7] The language of the statute, reemphasized in *CALPERS*, requires a "right of action" to be "brought" within five years. 28 U.S.C. § 1658(b); *CALPERS*, 137 S. Ct. at 2054 ("The term 'action['] refers to a judicial 'proceeding,' or perhaps to a 'suit' . . . ."). By any reasonable understanding, we are in the same action (or suit, or proceeding) that was brought in 2015, even though the Plaintiffs have changed.

Moreover, following Defendants' interpretation—which would disallow amendments to the complaint that add new plaintiffs after the period of repose has concluded—would add conceptual difficulties: Could a plaintiff amend the complaint at all, even if no new parties are added? If so, what distinguishes that question from the present one? What if a plaintiff sought to amend the complaint to expand the class definition? That would add newly-eligible class members after the period of repose had closed. Would that be acceptable? If not, would a court then need to evaluate whether each amended complaint constitutes an expansion or contraction of the class?

In short, Defendants' reasoning would add needless complexity to an already complex body of law. A simpler and more satisfactory rule was suggested by the Supreme Court in *CALPERS*: that the statute of repose bars "suits," "actions," or "proceedings" brought after the given time period. Because the Third Amended Complaint was filed in *this* suit (or action, or proceeding) that began in 2015, no allegations therein are barred by the statute of repose, even though new Plaintiffs have since been added.

## V.    Plaintiffs Lack Standing for Some Allegations

---

[7] A case in the District of New Jersey recently examined the same question and reached the opposite conclusion. *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *21–25 (Dec. 31, 2018).

To bring suit under Rule 10b-5, a plaintiff must buy or sell securities (and not merely hold them) after the defendant's misrepresentations occur. *Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007).[8] Thus, the Complaint is dismissed as to misrepresentations that occurred after each Plaintiff's final purchase of securities.

Defendants argue that Plaintiffs also lack standing for any instance where Plaintiffs purchased securities after a corrective disclosure and before any subsequent misrepresentation. (Mot. at 29–30.) This argument assumes that any corrective disclosure totally eliminated the effect of preceding misrepresentations, but neither case law nor the facts alleged in the Third Amended Complaint support that assumption. In fact, the Court previously wrote, albeit in the context of loss causation, "While the stated declines [following corrective disclosures] were non-linear over the year and some appear minor at first blush, given the unsettled nature of the law on this topic, the sufficiency of the decline appears to be a proper question for the trier of fact." (1st Mot. to Dismiss Op. at 25.) For similar reasons, the Court will not dismiss claims simply because a purchase of securities followed a corrective disclosure.

## VI. Leave to Amend is Denied

The Court would typically grant leave to amend as a matter of course. Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."); *accord Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000). However, if amendment would be futile, denying leave to amend is proper. *Alvin*, 227 F.3d at 121 (citing *Smith v. NCAA*, 139 F.3d 180, 190 (3d Cir. 1998)). In this case, the only defect in the present Complaint is that Plaintiffs lack standing to pursue several of their claims. Amendment to add more factual details would not

---

[8] This requirement is often described in terms of standing, *Winer*, 503 F.3d at 325, but it can also be viewed in terms of reliance: A plaintiff cannot rely only on a misrepresentation unless it occurs before he buys or sells securities.

remedy the problem of standing and would therefore be futile. For this reason, leave to amend is denied.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Motion to Dismiss is granted in part and denied in part. An appropriate Order will follow.

Date:   6/12/19                          */s/ Anne E. Thompson*
                                          ANNE E. THOMPSON, U.S.D.J.